IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

No. 26-2679

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

STEVE SIMON,
in his official capacity as Secretary of State for the State of Minnesota;
STATE OF MINNESOTA,

Defendants-Appellees

MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATIONAL FUND; MISAEL HERNANDEZ; COMMON CAUSE; LEAGUE OF WOMEN VOTERS OF MINNESOTA; VALERIE MANGSKAU; JENNIFER COMPEAU; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CYNTHIA WILSON,

Intervenors-Defendants-Appellees

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

UNITED STATES' OPPOSED MOTION TO EXPEDITE BRIEFING
UNDER INTERNAL OPERATING PROCEDURE III(D)
AND FEDERAL RULE OF APPELLATE PROCEDURE 27
THIS MOTION REQUESTS RELIEF BY AUGUST 26, 2026

## INTRODUCTION

Pursuant to 28 U.S.C. 1657, Federal Rule of Appellate Procedure 27, and Eighth Circuit Internal Operating Procedure III(D), plaintiff-appellant United States hereby respectfully requests that this Court expedite the briefing and argument date for this appeal because it raises an issue of urgency with regard to the security of elections in the United States.

This appeal is about the United States' ability under the Civil Rights Act of 1960 (CRA) to investigate Minnesota's compliance with federal law regarding voter registration under the Help America Vote Act of 2002 (HAVA). HAVA requires States to implement a single centralized computerized statewide voter registration list (SVRL) and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). The district court's Order prohibits the United States from carrying out its investigation.

Minnesota's next federal election is rapidly approaching, with the general election to take place on November 3, 2026. Weeks before November 3, election officials will be mailing absentee ballots to

hundreds of thousands of Minnesota voters, with many of those ballots potentially going to ineligible voters, fraudulent registrants, or other individuals who should not have been registered. Minnesota voters need to know that their election is secure and that non-citizens, deceased individuals, former residents, non-residents, and voters with multiple records are not registered to vote in that election.

Given this timeline, there is good cause to expedite the appeal. *See* 28 U.S.C. 1657(a). This case should be expedited, with resolution as soon as practicable, as a matter of fairness to all sides. Minnesota's voters and elections officials need a quick answer. The Department of Justice regrets asking for such speedy work from this Court, but as this Motion details, this timing is not of the United States' making.

The United States respectfully requests that the Court set a briefing schedule as follows:

- The United States' opening brief would be due on Friday, August 28, 2026;
- Response briefs would be due on Friday, September 11, 2026; and
- The United States' reply brief would be due on Friday, September 18, 2026.

The United States suggests that any *amicus curiae* briefs be due on the same day as the party an *amicus* supports. The United States also is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument if the Court believes that the benefit of oral argument would outweigh the time concerns and would request that argument take place during the October 2026 sitting or at an earlier special hearing.

Defendants and intervenors-defendants oppose this Motion to Expedite Briefing and intend to file responses.

## PROCEDURAL BACKGROUND

This is an appeal from the district court's Order in *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026), denying the United States' Motion for Order to Compel Federal Election Records and granting Secretary Simon's and intervenor-defendants' motions to dismiss the United States' Complaint based on Title III of the CRA.

Congress passed the CRA to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions

against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Title III imposes criminal penalties on any person who "willfully steals, destroys, conceals, mutilates, or alters any record or paper" subject to Section 20701's preservation requirements. 52 U.S.C. 20702. And in the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection,

> reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703. Under 52 U.S.C. 20705, "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."

HAVA contains provisions designed to help the federal government ensure that States are overseeing federal elections in a fair and honest manner. In HAVA, Congress explicitly established standards for States' voting systems and SVRLs. 52 U.S.C. 21081, 21083. Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL, and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "ineligible voters." 52 U.S.C. 21083(a)(2)(A)(iii). And HAVA requires "State election system[s]" to "include provisions to ensure that voter registration records in the

State are accurate and are updated regularly." 52 U.S.C. 21083(a)(4). The Attorney General may bring a civil action against a State to enforce HAVA's requirements. 52 U.S.C. 21111.

On June 25, 2025, the United States Department of Justice (the DOJ) sent a letter to Secretary of the State of Minnesota Steve Simon, seeking "information regarding the State's HAVA compliance." R. Doc. 66-1, at 1. In this letter, the DOJ requested, among other things, that Secretary Simon produce the "current statewide voter registration list." R. Doc. 66-1, at 2. The Secretary's office responded to the DOJ's letter but refused to provide the SVRL. R. Doc. 66-1, at 4-11. On August 13, 2025, the DOJ sent a second letter requesting Minnesota's SVRL by August 21, 2025, for the purpose of "ascertain[ing] Minnesota's compliance with the list maintenance requirements of HAVA." R. Doc. 66-2, at 1-2. The letter invoked the DOJ's authority to enforce HAVA and to demand records under Title III of the CRA. Because Secretary Simon refused to comply with the DOJ's demand for Minnesota's SVRL (*see* R. Doc. 66-2, at 3-8), the DOJ brought suit on September 25, 2025, alleging that this refusal violated Title III of the CRA, 52 U.S.C. 20703, and HAVA, 52 U.S.C. 21083 (R. Doc. 1). The United States then moved for an order to compel

the production of the SVRL. R. Doc. 70. On April 17, 2026, the DOJ sent a follow-up letter providing as additional basis for its demand information from a news article discussing that a non-citizen "ha[d] been criminally charged for voting" in Minnesota's 2024 general election. R. Doc. 180-1, at 1.

On August 17, 2026, the district court entered an Order denying the Motion for Order to Compel and dismissing the United States' Complaint. *Simon*, 2026 WL 2389778, at *13. The court first rejected the Fifth Circuit's holding that "Title III establishes 'a special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure'" and that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's statement of the basis and the purpose [of a records request]." *Id.* at *7 (omission and alterations in original) (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225-226 (5th Cir. 1962)). Instead, the district court concluded that the Rules of Civil Procedure govern a Title III proceeding and that "the Court's role . . . is not as limited as Plaintiff suggests." *Id.* at *7-8.

The district court then held that the United States could not compel production of Minnesota's SVRL under Title III because "Secretary Simon 'did not acquire, obtain, or receive the [SVRL] from a third party'"; rather, "[Minnesota] officials created it themselves." *Simon*, 2026 WL 2389778, at *10 (alterations in original) (quoting *United States v. Benson*, 179 F.4th 470, 478-479 (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*)). Further, the court determined that because the SVRL must be "continuously updated" in accordance with HAVA, it cannot be subject to Title III's preservation requirements. *Id.* at *9-10. Consequently, in the court's view, the SVRL "is not a record or paper that comes into Minnesota election officials' possession" within the meaning of Section 20701. *Id.* at *10.

The United States appeals from the Order of dismissal. The district court's rulings are contrary to the law. An expedited appeal is necessary to secure the elections in Minnesota and permit Minnesota the time to clean its voter rolls prior to the election this fall.

## ARGUMENT

The United States recognizes that it seeks a tight window for briefing and decision but urges this Court to expedite the appeal because

time is short and Minnesota voters deserve an answer from this Court on such a major issue. In the absence of a prompt resolution of the issue this appeal presents, irreparable harm will occur to Minnesota voters and to the United States in enforcing laws designed to protect the integrity of elections. Indeed, other federal courts of appeals have expedited appeals in parallel cases brought by the United States demanding SVRLs under the CRA and raising similar issues. *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*); *United States v. Oregon*, No. 26-1231 (9th Cir. argued May 19, 2026); *United States v. Weber*, No. 26-1232 (9th Cir. argued May 19, 2026). Moreover, courts routinely expedite appeals in election cases, given their time-sensitive nature. *See, e.g.*, *Carson v. Simon*, 978 F.3d 1051, 1056-1057 (8th Cir. 2020) (expediting appeal in case seeking injunction prohibiting State from counting late-arriving absentee ballots); *Craig v. Simon*, 978 F.3d 1043, 1046, 1051 (8th Cir. 2020) (expediting appeal in case seeking to enjoin State from "refusing to give legal effect to the ballots cast" in a general election); *Uno v. City of Holyoke*, 72 F.3d 973, 978 (1st Cir. 1995) (expediting appeal in a Voting Rights Act case).

There are at least two additional reasons to expedite this appeal.

***First***, this appeal presents the important purely legal questions of how a court is to adjudicate the United States' demand for federal election records under the CRA and whether the United States may demand SVRLs under the CRA to enforce HAVA.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). It provides that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701 (formerly 42 U.S.C. 1974) (emphasis added).

Section 303 provides the Attorney General of the United States a correspondingly sweeping power to obtain Federal election records: "Any record or paper required by [52 U.S.C. 20701] to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection,

reproduction, and copying." 52 U.S.C. 20703. The written demand need only "contain a statement of the basis and the purpose therefor." *Ibid.*; *see Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute. No showing even of a prima facie case of a violation of Federal law need be made." (quoting 106 Cong. Rec. 7767 (statement of Senator Keating))).

The district court erred in declining to apply summary procedures and instead applying the Rules of Civil Procedure in full. Title III calls for "a special statutory proceeding" and "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-226. Indeed, Title III provides no "judicially manageable standards to guide [a court's] review." *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting).

The district court further erred in limiting the Attorney General's authority to demand records under Section 303. The phrase "come into his possession" does not exclude from the scope of Section 301 all government-generated records. 52 U.S.C. 20701. If it did, then the most

blatantly discriminatory internal memoranda would be beyond the Attorney General's reach and, armed with only voter registration applications, the Attorney General would have no documentary means of determining which applications had been accepted and which rejected. *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting).

And the Supreme Court has itself used the phrase "come into . . . possession" to refer to materials that an agency "*either create[d] or obtain[ed].*" *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (emphasis added) (quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980)). The phrase "come into his possession" conveys that an election official's responsibility arises at the moment he obtains possession of a covered document in his official capacity; it does not otherwise limit the array of documents covered by the language "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. 20701.

Furthermore, statutorily required SVRL maintenance does not amount to "alter[ation]" under Section 20702. 52 U.S.C. 20702. The surrounding verbs elucidate the meaning of "alter" in this provision. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all

describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *See id.* at 489-490 (describing a similar list of verbs). List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 20702. *See Benson III*, 2026 WL 2364306, at *9 (Griffin, J., dissenting). And Section 20702's prohibition on altering "record[s] or paper[s]" is accompanied by a mens rea requirement of *willfulness*, which shows beyond all doubt that list maintenance under HAVA could never run afoul of Section 20702's ban on altering records. *See United States v. Jerde*, 841 F.2d 818, 821 (8th Cir. 1988) (discussing that, in the context of a prosecution for failure to file tax returns, willfulness "means a voluntary, intentional violation of a known legal duty" (citation omitted)).

In *Benson II*, a divided panel of the Sixth Circuit held that an SVRL is not a record subject to retention and production under Title III because an SVRL is created by election officials, and therefore it does not "come into [their] possession," *Benson II*, 179 F.4th at 478-482. The majority's narrow interpretation of Title III would have excluded the voter-registration lists of the 1960s—which, like SVRLs, were created by election officials—and thus it would have allowed election officials to

avoid accountability for not registering black citizens, a result Congress could not have intended. Not surprisingly, the majority's flawed decision drew a vigorous dissent. *See Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting).

Because the majority's decision in *Benson* was so clearly wrong, the United States sought rehearing en banc, which the Sixth Circuit denied. *Benson III*, 2026 WL 2364306. But the denial is instructive because while the court denied the United States' petition for rehearing en banc, a nine-judge majority agreed with the United States on significant points.

Five judges outright agreed with Judge Nalbandian's dissent to the district court order, and four more judges indicated they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and expressed "doubt over the panel opinion's interpretation of the phrase 'come into his possession' in Title III." *Benson III*, 2026 WL 2364306, at *1-2 (Murphy, J., concurring). In particular, with regard to whether the state voter registration list is a record and whether that record comes into possession of the state election official, a majority endorsed Judge Nalbandian's conclusion that because "the language imposes a specific duty on an individual (each officer of

election), not a general duty on the entire State of Michigan[,]" "the Secretary of State 'came into possession' of the voter-registration list when she assumed office in 2019." *Id.* at *2 (Murphy, J., concurring); *see also id.* at *9 (Griffin, J., dissenting) ("[W]hen the [SVRL] comes under Benson's official custody and control through the actions of those subordinates, it comes into her possession."), *14 (Thapar, J., dissenting) (similar). Judge Murphy, and his fellow concurring judges, also acknowledged the possibility that the phrase "come into possession" had "developed a specialized legal meaning[,]" seemingly endorsing the position that "[t]he phrase marked the commencement of lawful possession and the legal duties or liabilities that followed[,] . . . [b]ut it did not distinguish property according to its source." *Id.* at *2 (Murphy, J., concurring), *7 (Griffin, J., dissenting).[1]

**Second**, an expedited appeal will allow the United States to confirm that Minnesota's voter rolls are composed solely of individuals who are eligible to vote in the 2026 federal elections.

[1] A majority of judges likewise found that Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See, e.g.*, *Benson III*, 2026 WL 2364306, at *4-5 (Murphy, J., concurring), *9-10 (Griffin, J., dissenting), *14 n.7 (Thapar, J., dissenting).

Minnesota's next federal election will be held November 3, 2026, and thus is rapidly approaching. Within hours of receiving Minnesota's SVRL, the DOJ could commence highly accurate dual-state voter list comparisons to find duplicates (comparing name, date of birth, and last four digits of social security number) between Minnesota and many of the Gulf Coast states' SVRLs.[2] The DOJ would also be able to start a multi-state analysis with voter lists from about 20 States across the country that have provided the DOJ with their full or partial SVRLs. This multi-state analysis would be more comprehensive and would take less than a week to complete. A multi-state analysis would be likely to identify additional out-of-state voters and duplicate voter registrations that Minnesota may be unable to identify because of its lack of nationwide voter list data-sharing agreements and analysis capabilities.

Furthermore, the DOJ would work with the Social Security Administration (SSA) to determine if there are fraudulent or noncitizen

---

[2] There is a strong likelihood of Gulf State matches from many Minnesota "snowbirds" who reside in Texas, Florida, or other nearby states. *See* Kelly Smith, *What's the Story Behind the Minnesota Communities in Arizona and Florida?* Star Trib. (Feb. 16, 2024), https://www.startribune.com/arizona-florida-naples-minnesota-snowbirds-retirees/600343995/.

registrations in Minnesota stemming from the misuse of social security numbers.

Although the National Voter Registration Act of 1993 limits "systematic[] remov[als]" within 90 days of "the date of a primary or general election for Federal office," 52 U.S.C. 20507(c)(2)(A), Minnesota is not subject to the NVRA and therefore need not comply with this limitation. *See* Civil Rights Division, U.S. Department of Justice, *The National Voter Registration Act Of 1993 (NVRA)*, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited Aug. 19, 2026). Indeed, the purpose of the NVRA's 90-day Quiet Period—avoiding the risk that a voter will be incorrectly removed from the rolls too close in time to an election to be able to vote, *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)—does not apply in Minnesota, where voters may register at the time of voting, whether they vote in person or absentee, R. Doc. 66-1, at 5. And even States subject to the NVRA's Quiet Period provision retain authority to engage in plenty of list-maintenance activities within 90 days of an election, including correcting registration records, removing deceased registrants, and removing ineligible individuals in a non-systematic

manner. 52 U.S.C. 20507(a)(4)(A) and (c)(2); *see Arcia*, 772 F.3d at 1344-1346, 1348 ("[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90–day window."); *Virginia Coal. for Immigrant Rts. v. Beals*, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024) (discussing that the 90-day Quiet Period applies only to systematic removals); *see generally Bell v. Marinko*, 367 F.3d 588, 591-592 (6th Cir. 2004) ("In creating a list of justifications for removal, Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place."). HAVA itself mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a *regular basis*." 52 U.S.C. 21083(a)(2)(A) (emphasis added).

Minnesota would not be prejudiced by expediting the appeal. If anything, a rapid resolution of this matter will permit Minnesota to properly conduct an election this fall without the specter of non-citizens and ineligible voters remaining on its voter rolls.

## CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to expedite this case. The United States urges the adoption of the schedule listed above, or any alternative schedule that would allow a decision in time.

Respectfully submitted,


HARMEET K. DHILLON
Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section

s/ James T. Tucker
JAMES T. TUCKER
Department of Justice
Civil Rights Division
Voting Section
4 Constitution Square
150 M Street, N.E.
Seventh Floor
Washington, D.C. 20530
(202) 307-2767
James.T.Tucker@usdoj.gov


Date: August 21, 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 3,651 words, excluding the parts exempted by Federal Rules of Appellate Procedure 27(d)(2) and 32(f). This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ James T. Tucker
JAMES T. TUCKER
Attorney

Date: August 21, 2026

## CERTIFICATE OF SERVICE

I certify that on August 21, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ James T. Tucker
JAMES T. TUCKER
Attorney

Date: August 21, 2026