No. 26-2679

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

STEVE SIMON,
in his official capacity as Secretary of State for the State of Minnesota;
MINNESOTA, STATE OF,

Defendants-Appellees

MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATION FUND; MISAEL HERNANDEZ; COMMON CAUSE; LEAGUE OF WOMEN VOTERS OF MINNESOTA; VALERIE MANGSKAU; JENNIFER COMPEAU; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CYNTHIA WILSON,

Intervenors Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

ADDENDUM

*(see inside cover for continuation of Counsel)*

*(continuation of Counsel)*


HARMEET K. DHILLON
Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

# TABLE OF CONTENTS

**PAGE**

Order, filed August 17, 2026 (R.Doc. 210) ................................................ 1

Judgment, filed August 18, 2026 (R.Doc. 211) ....................................... 28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVE SIMON, *in his official capacity as Secretary of State for the State of Minnesota*; and STATE OF MINNESOTA;<br><br>Defendants. | No. 25-cv-3761 (KMM/EMB)<br><br>**ORDER** |

---

The United States of America ("Plaintiff" or "the government") filed this action to compel the State of Minnesota and Steve Simon, Minnesota's Secretary of State (collectively "State Defendants"), to produce Minnesota's statewide voter registration list. The government claims that it is entitled to receive a full, unredacted copy of Minnesota's voter registration list, including each registered voter's full name, date of birth, residential address, the last four digits of the registrant's Social Security number, and each registrant's full state driver's license number. According to the government, the U.S. Attorney General is authorized to demand such information from Minnesota under Title III of the Civil Rights Act of 1960 and the Help America Vote Act of 2002.

This is not the only lawsuit of its kind. Including Minnesota, the government has sued more than two dozen states to obtain unredacted copies of their complete voter registration lists. Some states have agreed to provide the requested information to the government but others, including Minnesota, have not. While several federal courts have

entered consent judgments in cases where states have agreed to provide the requested information to Plaintiff, federal courts in Michigan, Oregon, California, Maryland, Colorado, Wisconsin, Maine, Arizona, Rhode Island, Massachusetts, New Mexico, Illinois, New Jersey, Kentucky, Virginia, New York, New Hampshire, Connecticut, Pennsylvania, West Virginia, the District of Columbia, and Nevada have dismissed Plaintiff's claims demanding production of unredacted statewide voter registration lists. *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) ("*Benson I*"), *aff'd* 179 F.4th 470 (6th Cir. 2026) ("*Benson II*"); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. DeMarinis*, No. SAG-25-2934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Griswold*, No. 25-cv-03967-PAB-TPO, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036-jdp, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 1:25-cv-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, No. CV-26-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, No. 25-cv-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, Civil No. 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Oliver*, No. 1:25-cv-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-2025 (ZNQ) (JTQ), 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 2:26-cv-00019-CHB-EBA, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Koski*, No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Bd. of*

*Elections of N.Y.*, No. 1:25-CV-1338 (MAD/PJE), 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Thomas*, No. 3:26-cv-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. Warner*, No. 2:25-cv-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Evans*, Civil No. 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Aguilar*, No. 3:25-cv-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026)..

There are several motions currently pending before the Court in this case. The State Defendants and Intervenors[1] ask the Court to dismiss the complaint for failure to state a claim. (Dkts. 63, 78, 83.) The government asks the Court to compel the State Defendants to produce the voter registration list. (Dkt. 70.) The Court held a hearing on these motions on March 3, 2026, and the parties filed post-hearing briefing as requested by the Court.[2] Having carefully considered the parties' arguments as well as the relevant statutes and

[1] On September 30, 2025, the Minnesota Alliance for Retired Americans Educational Fund and Misael Hernandez filed a motion to intervene in this case under Federal Rule of Civil Procedure 24. (Dkt. 5.) On October 14, 2025, Common Cause, the League of Women Voters of Minnesota, Jennifer Compeau, and Valerie Mangskau also filed a motion to intervene under Rule 24. (Dkt. 29.) On January 6, 2026, United States Magistrate Judge Elsa M. Bullard issued an Order granting both motions to intervene. (Dkt. 90.)

[2] After the briefing on the motions in this case was originally completed, the United States District Court for the Western District of Michigan decided *Benson I*. The *Benson I* court's interpretation of Title III of the Civil Rights Act focused on language other courts had not, 819 F. Supp. 3d at 768–70, and the parties did not have a chance to address it in detail. Accordingly, the Court instructed the parties to file supplemental briefs to address the *Benson I* court's interpretation of the CRA. (Dkt. 157.)

caselaw, the Court denies the government's motion to compel production of Minnesota's voter registration list, grants the motions to dismiss, and dismisses this action.

## BACKGROUND

### I. Relevant Statutory Provisions

The government claims entitlement to Minnesota's statewide voter registration list ("SVRL") and related information under Title III of the Civil Rights Act of 1960 and the Help America Vote Act of 2002. The Court begins by summarizing the relevant provisions of these statutes, as well as the state laws through which Minnesota administers federal elections.

#### A. The Civil Rights Act of 1960.

Start with Title III of the Civil Rights Act of 1960 ("CRA"), Pub. L. No. 86-449, 74 Stat. 86 (1960), codified at 52 U.S.C. §§ 20701–06. The government primarily relies on the CRA as the authority for its demand for Minnesota's SVRL. It argues that the CRA gives the Attorney General the power to seek the records sought in this proceeding and requires the State Defendants to provide that information in response to the Attorney General's request.

"The Civil Rights Acts of 1957 and 1960 were the first pieces of federal civil rights legislation passed since Reconstruction." William Sturkey, *The Hidden History of the Civil Rights Act of 1960*, Black Persps. (Feb. 8, 2018), https://www.aaihs.org/the-hidden-history-of-the-civil-rights-act-of-1960 [https://perma.cc/7PAA-LUPV]. In the wake of the Civil Rights Act of 1957, Pub. L. 85-315, 71 Stat. 634 (1957), "the Civil Rights Act of 1960 aimed to address rampant voter suppression and racially discriminatory restrictions on

voting." J. Michelle Childs, *Voting Rights: Mechanism for Social Change*, 76 Ala. L. Rev. 603, 609 (2025); *see also United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964) (explaining that the CRA was passed to address the "problem of assuring full rights of suffrage to all Americans"). In Title III of the CRA, Congress sought to address the problem that the U.S. Department of Justice encountered in proving racial discrimination by the states through their imposition of various voter-registration requirements. Specifically, the federal government lacked access to information about "who was been permitted to register to vote and who has not." *Oregon*, 828 F. Supp. 3d at 1097 (quoting statements in the Congressional Record).

Because state officials destroyed voter registration records of Black Americans or "refused to turn them over," Title III "requir[ed] states to retain and preserve all records pertaining to voter registration, voting applications, and payment of poll taxes." *Weber*, 816 F. Supp. 3d at 1175. This record-preservation requirement is found in Section 301 of the CRA. That provision reads as follows:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for [any federal office] are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701. The CRA imposes criminal penalties for willfully failing to preserve such records, *id.*, or for stealing, destroying, concealing, mutilating or altering them, *id.* § 20702.

Section 303 of the CRA authorizes the Attorney General to demand records. It states:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

52 U.S.C. § 20703. A demand for such documents must "contain a statement of the basis and the purpose therefor." *Id.* Except in specifically identified circumstances, the documents the Attorney General obtains based on a CRA demand must not be disclosed, *id.* § 20704, and "the United States District court for the district in which a demand is made pursuant to section 20703 . . . shall have jurisdiction by appropriate process to compel the production of such record or paper," *id.* § 20705.

**B. The Help America Vote Act of 2002**

Second, consider the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (2002), codified at 52 U.S.C. § 21083. In this proceeding, the government claims that it has made a demand, pursuant to the CRA, to obtain Minnesota's SVRL so the federal government can assess Minnesota's compliance with its obligations to maintain an SVRL under HAVA.

"Congress enacted HAVA in the wake of the 2000 presidential election." *Oregon*, 828 F. Supp. 3d at 1096 (quoting *Crowley v. Nev. ex rel. Nev. Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012)). Congress passed this statute for several reasons:

> To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Crowley*, 678 F.3d at 734; *see also Poor Bear v. County of Jackson*, No. 5:14-cv-05059-KES, 2016 WL 3435181, at *1 n.1 (D.S.D. June 17, 2016) ("The Help America Vote Act was enacted to establish minimum election administration standards and to improve accessibility and quantity of polling places."). Congress also sought to address the problem of voters arriving at their polling place on election day believing they were able to vote only to be told that they could not because "election workers cannot find their names on the list of qualified voters." *Oregon*, 828 F. Supp. 3d at 1096 (quoting *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 564, 569 (6th Cir. 2004)).

Most relevant here, in Section 303 of HAVA, Congress requires states to create and maintain electronic statewide voter registration lists as follows:

> [E]ach State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State.

52 U.S.C. § 21083(a)(1)(A). HAVA also requires state election officials to "perform list maintenance with respect to the computerized list on a regular basis," including removal of the names of ineligible voters from the list, such as convicted felons and voters who

have died. *Id.* § 21083(a)(2)(A)(ii). In maintaining the computerized list in this way, state election officials must ensure that the names of registered voters are not removed and only voters who are ineligible are removed. *Id.* § 21083(a)(2)(B). HAVA also requires each state election system to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly[.]" *Id.* § 21083(a)(4). These provisions must include "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(A)–(B).[3]

**C. Relevant Minnesota Election Laws**

Finally, we turn to the provisions of Minnesota law that govern voter registration and maintenance of the SVRL. Under Minnesota law, eligible voters are required to register in order to vote. Minn. Stat. § 201.018, subd. 2. When registering to vote, an applicant provides their name, home address, date of birth, and either a state identification number (from a Minnesota driver's license or state ID) or the last four digits of their social security number. Minn. Stat. § 201.071, subds. 1–3. The State has a "permanent system of voter

[3] Congress enacted HAVA nine years after it enacted the National Voters Registration Act of 1993 ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (1995), codified at 42 U.S.C. § 1973gg, *et seq.* The NVRA requires some states to establish procedures for voter registration in federal elections. 52 U.S.C. § 20503(a). "Minnesota is exempt from the NVRA." *Minn. Voters All. v. City of Minneapolis*, No. 20-cv-2049 (MJD/TNL), 2020 WL 6119937, at *6 (D. Minn. Oct. 16, 2020). (Dkt. 1 ¶ 25.) However, some of NVRA's list-maintenance requirements are incorporated into HAVA and apply to a state like Minnesota that is exempt from the NVRA. For example, an exempt state is required to "remove the names of ineligible voters from the computerized list [required by HAVA] in accordance with State law." 52 U.S.C. § 21083(a)(2)(A)(iii).

registration by county . . . with a single, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the state level[.]" Minn. Stat. § 201.021. The Minnesota "secretary of state is responsible for defining, maintaining, and administering the centralized system." *Id.*

The statewide voter registration system ("SVRS") is a "central database containing voter registration information from around the state." Minn. Stat. § 201.022, subd. 1. Among other things, Minnesota's SVRS must "assign a unique identifier to each legally registered voter in the state"; be able to receive driver's license and state ID numbers, as well as the "last four digits of the Social Security number for each voter record"; "coordinate with other agency databases within the state"; and allow for access and modification by various public officials. *Id.* § 201.022, subd. 1(1)–(15). State and local officials update registration records on a regular basis with information that determines eligibility for voting, including changes to voters' names or addresses, deaths of registered voters, felony convictions, findings of legal incompetence, and other factors. Minn. Stat. §§ 201.13, 201.14, 201.145.

County auditors maintain a "master list" of registered voters in each precinct, and the "information contained in the master list may only be made available to public officials for purposes related to election administration, jury selection, and in response" to specific investigative law enforcement inquiries. Minn. Stat. § 201.091, subd. 1. Each county auditor is also responsible for providing a "public information list which must contain the name, address, year of birth, and voting history of each registered voter in the county." Minn. Stat. § 201.091, subd. 4(a). "The county auditors and the secretary of state must

provide copies of the public information lists in electronic or other media to any voter registered in Minnesota" when they receive an appropriate request and payment of reproduction costs, and they must "make a copy of the list available for public inspection without cost." Minn. Stat. § 201.091, subd. 5. These publicly available lists cannot include "a voter's date of birth or any part of a voter's Social Security number, driver's license number, identification card number, military identification card number, or passport number." Minn. Stat. § 201.091, subd. 9.

## II. Factual Background

The dispute at the heart of this case began in June of 2025, when the government sent a letter to the State Defendants requesting information about Minnesota's procedures to comply with HAVA's list maintenance requirements. (Dkt. 1 ¶ 28; Dkt. 66-1 ("June 2025 DOJ Letter") at 1–3.[4]) The June 2025 DOJ Letter requested descriptions of Minnesota's processes for the following: new voter registrations; assigning unique identifiers to each legally registered voter; coordination between the statewide voter registration list and databases maintained by other agencies; identification and removal of duplicate voter registrations, voters convicted of felonies, and deceased registrants; and several other list-maintenance and verification categories. (Dkt. 1 ¶ 28; June 2025 DOJ Letter at 1–2.) In addition, the DOJ asked Secretary Simon to "send . . . Minnesota's current statewide voter

[4] The complaint refers to and quotes from the June 2025 DOJ Letter and other correspondence between the parties that occurred before this lawsuit was filed. (Dkt. 1 ¶¶ 28–40.) Plaintiff did not attach the parties' letters to the complaint, but the State Defendants provided them as exhibits to the Declaration of Justin R. Erickson. (Dkt. 66.) Because the letters are embraced by the complaint, the Court considers them for purposes of addressing the State Defendants' and Intervenors' motions to dismiss.

registration list," including "active and inactive voters." (June 2025 DOJ Letter at 2; *see* Dkt. 1 ¶ 28.)

On July 25, 2025, Justin R. Erickson, general counsel at the Office of the Secretary of State of Minnesota, responded to the June 2025 DOJ Letter on behalf of Secretary Simon. (Dkt. 1 ¶ 30; Dkt. 66-1 ("July 2025 Response Letter") at 4–37.) Minnesota's July 2025 Response Letter submitted information answering fourteen of the fifteen numbered inquiries in the June 2025 DOJ Letter. However, in response to the government's request for a copy of Minnesota's SVRL, Mr. Erickson observed that the list contains "sensitive personal identifying information on several million individuals," and asserted that the government failed to "identify any legal basis in its June 25 letter that would entitle it to Minnesota's voter registration list." (*Id.* at 7–8.[5])

The parties exchanged an additional round of correspondence prior to this suit. On August 13, 2025, the government sent Mr. Erickson a reply to the July 25 Response Letter. (Dkt. 1 ¶ 33; Dkt. 66-2 ("August 2025 DOJ Letter") at 1–2.) The government asserted that it was entitled to a copy of Minnesota's full SVRL under HAVA and Section 303 of the CRA. (August 2025 DOJ Letter at 1–2.) On August 21, 2025, Mr. Erickson again responded to the government on behalf of Secretary Simon, asserting that neither HAVA nor the CRA supported the government demand for the SVRL. (Dkt. 1 ¶¶ 39–40; Dkt. 66-2 ("August 21 Response Letter") at 3–8.)

[5] Citations to the July 2025 Response Letter use the pagination found in the upper right corner of the document.

This lawsuit followed a little over a month after the State Defendants sent the August 21 Response Letter. The government's complaint asserts two Causes of Action. First, Plaintiff claims that the CRA gives "the United States authority to obtain the records and information requested in its June 25 Letter and its August 13 Letter," and "[u]nless and until ordered to do so by this Court, [the State] Defendants' refusal to provide these records as requested constitutes a continuing violation of Federal law." (Dkt. 1 ¶¶ 47, 49.) Second, Plaintiff claims that the State Defendants "have failed to take the actions necessary for Minnesota to comply with Section 303 of HAVA." (*Id.* ¶ 51.) According to Plaintiff, without the full SVRL, the Attorney General cannot evaluate Minnesota's compliance with HAVA's list-maintenance requirements. (*Id.* ¶¶ 52–53.) The government seeks a declaration that the State Defendants' refusal to provide the full list violates Title III of the CRA and HAVA Section 303. (*Id.*, Prayer for Relief ¶¶ A–B.) Plaintiff also asks the Court to declare that any Minnesota law prohibiting Secretary Simon from providing the requested list is preempted by federal law. (*Id.*, Prayer for Relief ¶ C.) And the government seeks an order requiring the State Defendants to provide the requested information. (*Id.*, Prayer for Relief ¶ D.)

On December 23, 2025, the parties filed the motions now pending before the Court. (Dkt. 63, 70, 78, 83.) The Court held a hearing on the motions on March 3, 2026. (Dkt. 157.) Following the hearing, on April 17, 2026, the Civil Rights Division of the U.S. Department of Justice sent another letter to the State Defendants entitled "Additional Basis to Obtain Minnesota's Voter Registration List Under the Civil Rights Act of 1960." (Dkt. 178; Dkt. 180-1 ("April 2026 DOJ Letter").) This letter reasserted a demand for

production of Minnesota's SVRL, claimed that the previous letters sent to Secretary Simon provide an adequate statement of the basis and purpose for the demand, and stated that recent public reporting provides "an additional basis for the foregoing request." (April 2026 DOJ Letter at 1.) Specifically, the government referred to a report that a noncitizen was criminally charged for voting in the November 5, 2024 general election. (*Id.* (citing Kate Wermus, *Noncitizen registered to vote, cast ballot in Minnesota's 2024 election: Charges*, Fox9 KMSP (April 14, 2026, 1:58 p.m. CDT), https://www.fox9.com/news/noncitizen-registered-vote-cast-ballot-minnesotas-2024-election-charges).) According to Plaintiff, because Minnesota "failed to remove an ineligible individual . . . from Minnesota's voter rolls, the Division must verify that no such other individual is registered to vote, in violation of federal law." (*Id.* at 2 (citing 18 U.S.C. §§ 611, 1015; 52 U.S.C. § 21144(b)).)

In the motions before the Court, State Defendants and the Intervenors argue that Plaintiff has failed to state a claim under HAVA or the CRA. The government argues that its claims are supported by the statutory provisions invoked and that State Defendants should be summarily compelled to produce the requested records.

## DISCUSSION

### I. Motion to Dismiss Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## II. Analysis

### A. Applicability of Rule 12(b)(6)

The government first argues that the Court should deny Defendants' motions to dismiss and compel the State Defendants to provide Plaintiff the unredacted SVRL because the Federal Rules of Civil Procedure are inapplicable to the Attorney General's demand for records under Title III of the CRA. Relying primarily on the Fifth Circuit's decision in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), the government argues that factual allegations supporting its CRA claim are unnecessary and Rule 12(b)(6) does not apply because a Title III case like this one is a special proceeding to facilitate investigation of covered records before a lawsuit is filed. (Dkt. 102 at 6–8.) The Court disagrees.

For reasons articulated in the decisions of many other courts addressing this issue, the Court's role in this case is not as limited as Plaintiff suggests. *E.g.*, *Aguilar*, 2026 WL 2364502, at *2–3 (collecting cases). In *Lynd*, the Fifth Circuit stated that Title III establishes "a special statutory proceeding … [that] does not require pleadings which

satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225–26. The *Lynd* court also stated that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's statement of the basis and the purpose [of a records request]." *Id.* at 226. Of course, *Lynd* is not binding on this Court, and Plaintiff does not point to any binding authority applying *Lynd*. Moreover, this Court finds *Lynd*'s discussion and Plaintiff's characterization of a district court's role in a Title III proceeding unpersuasive. The Federal Rules of Civil Procedure "'are the default rules in civil litigation,' and though Congress may exempt a statutory proceeding from the Rules, courts 'may not lightly infer that Congress has done so; and silence on the subject is seldom enough.'" *Caldwell*, 2026 WL 2186515, at *6 (quoting *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023)) (cleaned up).

The CRA gives federal district courts the power "*by appropriate process* to compel the production of" records demanded under 52 U.S.C. § 20703. 52 U.S.C. § 20705 (emphasis added). "Title III does not completely displace the Federal Rules of Civil Procedure," and "Title III records requests are a species of administrative subpoena" to which the Federal Rules of Civil Procedure are applicable. *Evans*, 2026 WL 2267774, at *4 (citing Fed. R. Civ. P. 81(a)(5)). And in *United States v. Powell*, 379 U.S. 48 (1964), a case decided two years after the Fifth Circuit's ruling in *Lynd*, the Supreme Court interpreted a similar statute and held that the Federal Rules of Civil Procedure apply in cases where the government attempts to enforce an administrative subpoena. As explained in a case like this one:

> Like Title III, the statute at issue in *Powell* confers jurisdiction on district courts "by appropriate process to compel" compliance with federal document demands. *See* 26 U.S.C. § 7604(a). Interpreting that statute, the Supreme Court explained, "Because § 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination of records."

*Oregon*, 828 F. Supp. 3d at 1102 (cleaned up); *see also Weber*, 816 F. Supp. 3d at 1182 & n.15 (finding the Fed. R. Civ. P. apply in a Title III case and citing *Powell*); *Caldwell*, 2026 WL 2186515, at *6 (same).

In sum, the Court agrees with other courts that have evaluated identical arguments made by the government: "Nothing in the CRA's text exempts this case from the Federal Rules." *Caldwell*, 2026 WL 2186515, at *6; *Koski*, 2026 WL 2032532, at *2 n.2 (same) (collecting cases). Accordingly, the Court turns to the substance of Plaintiff's claims, starting with its assertion that Minnesota is required to provide the SVRL as requested by the Attorney General under Title III of the CRA.

**B. CRA Claim**

Through Title III of the CRA, Congress required state election officials to retain and preserve certain records and papers, empowered the Attorney General to demand production of those materials, and required state election officials to produce those records when the Attorney General makes that demand. "Title III requires election officers like [Secretary Simon] to 'retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . [1] all records and papers which [2] come into his possession [3] relating to [4] any application, registration, payment of poll tax, or other act requisite

to voting in such election.'" *Benson II*, 179 F.4th at 478 (quoting 52 U.S.C. § 20701). Further, Title III "requires election officers to produce any record or paper required by section 20701 upon demand in writing by the Attorney General or his representative." *Id.* at 483 (quoting 52 U.S.C. § 20703) (cleaned up). The Attorney General's demand for "shall contain a statement of the basis and purpose therefor." *Id.* (quoting 52 U.S.C. § 20703).

Defendants argue that the government here fails to state a claim under Title III of the CRA for two reasons: (1) because the demand letters sent to Secretary Simon do not "contain an adequate statement of the basis and purpose" of the demand for the SVRL (Dkt. 65 at 20–28; Dkt. 105 at 12–16); and (2) the SVRL is not a record that "come[s] into [election officials'] possession" within the meaning of the statute (Dkt. 172 at 5–7.) Because the Court agrees with the second of these arguments, and it is dispositive of Plaintiff's CRA claim, the Court starts there.

**1. "Records and Papers Which Come into [Defendants'] Possession"**

As several courts "have persuasively explained, the language, context, and purpose of Title III all confirm that Title III authorizes the Attorney General to obtain records that come into state election officials' possession, not records created by those officials." *Evans*, 2026 WL 226774, at *5 (citing the decisions of fifteen courts that have reached that conclusion). This Court reaches the same conclusion.

The issue is one of statutory interpretation, the goal of which is "to give effect to the will of Congress," *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993), and "determine the best reading of the statute," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 368, 400 (2024). A federal court's inquiry into congressional intent begins with the statute's text. *Minn.*

*Telecom Alliance v. Fed. Commc'ns Comm'n*, 175 F.4th 905, 921 (8th Cir. 2026). If the statute's language is plain and the meaning of the terms used are clear, then a court's role is simply to enforce that plain language. *United States v. Cacioppo*, 460 F.3d 1012, 1016 (8th Cir. 2006) ("Where the language is plain, we need inquire no further."). When a statute's terms are not specially defined in the law, courts give the words used their "ordinary meaning at the time Congress enacted the statute." *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021). The ordinary meaning of terms can be discerned from "simple dictionary definition[s] from the time of the statute's enactment," considered in combination with the statute's broader purpose and context. *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040–41 (8th Cir. 2020).

Applying that framework here, the question is what Congress intended when it required state election officials to retain and preserve "all records and papers which *come into their possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701 (emphasis added), and to decide whether Minnesota's SVRL is that kind of record, in which case it must be produced upon demand by the Attorney General, 52 U.S.C. § 20703. In answering these inquiries, the Court finds the Sixth Circuit's analysis in *Benson II*, 179 F.4th at 478–82, instructive and agrees with its reading of the relevant statutory text. And numerous other courts considering this issue have reached the same result. *E.g.*, *Benson I*, 819 F. Supp. 3d at 768–70; *Demarinis*, 2026 WL 1780586, at *4–5; *Bellows*, 2026 WL 1430481, at *6; *Scanlan*, 2026 WL 1864054, at *4–6; *Evans*, 2026 WL 2267774, at *5–10. The Court adopts the reasoning of these decisions as its own, and rather than repeat it in full, summarizes the

key indicators that the State Defendants have not violated Title III of the CRA by failing to produce the SVRL as requested by Plaintiff.

The analysis must begin with the ordinary meaning of the words "come into . . . possession," and "[a]round the time that Congress enacted Title III, this term meant to 'acquire,' 'obtain,' or 'receive.'" *Benson II*, 179 F.4th at 478 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) and dictionary definitions from the time of the statute's enactment); *see also Koski*, 2026 WL 2032532, at *5 (same). "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson II*, 179 F.4th at 478. Instead, the "phrase "come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Bellows*, 2026 WL 1430481, at *6 (quoting *Benson I*, 819 F. Supp. 3d at 769). "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier. . . ." *Caldwell*, 2026 WL 2186515, at *7 (quoting *Benson I*, 819 F. Supp. 3d at 768); *see also Bellows*, 2026 WL 1430481, at *6 n.10 ("Congress could have required the retention and production of all election-related records and papers 'in the possession of' the state election official but did not."). But that isn't what Congress wrote and, consequently, not what it intended. By referring to records that "come into [election officials] possession," Congress "referr[ed] to only those documents that state election officials receive from prospective voters." *Benson I*, 819 F. Supp. 3d at 768.

This understanding of the statutory text is further supported by the surrounding language and context. The records referred to in § 20701 are those "relating to any

application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. "Each of these terms refers to something that the voter submits or does as part of the registration process." *Benson I*, 819 F. Supp. 3d at 768–69. Further, as explained in *Benson II*, "Title III tells election officials to retain and preserve certain records and papers that come into their possession, and the NVRA and HAVA tell election officials to remove ineligible voters from statewide voter registration lists. We should not adopt a reading that would place election officials in violation of one federal law for trying to comply with others." 179 F.4th at 480. And other courts agree:

> [I]nterpreting § 20701 to cover an SVRL would bring it into conflict with an adjacent provision, 52 U.S.C. § 20702, which criminalizes the alteration of any record or paper covered by § 20701. An SVRL, unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered. Indeed, the NVRA and HAVA require an SVRL's constant alternation. The United States's proposed interpretation of the CRA would therefore criminalize the same conduct that the NVRA and HAVA require.

*DeMarinis*, 2026 WL 1780586, at *5; *see also Caldwell*, 2026 WL 2186515, at *8 ("The records to which the DOJ has access under Title III are necessarily those that the State may not otherwise modify, like the records of voter registration it receives. However, the VRL *must* be modified regularly as a matter of federal election law."); *Thomas*, 2026 WL 2070437, at *6 (same).

The unredacted SVRL the government demanded from the State Defendants in this case is not a record or paper that comes into Minnesota election officials' possession. Secretary Simon "did not acquire, obtain, or receive the [SVRL] from a third party. Instead,

[Minnesota] officials created it themselves." *Benson II*, 179 F.4th at 478–79. Under Minnesota law, and as required by HAVA, the SVRL is a statewide computerized list that is created and continuously updated by state officials. Minn. Stat. §§ 201.13, 201.14, 201.145. "Thus, under the plain language of Title III, the SVRL does not fall within its scope." *Thomas*, 2026 WL 2070437, at *6 (concluding the same with respect to Connecticut's statewide list and collecting cases reaching the same conclusion for other states).

As in other similar cases, "[t]he United States makes several arguments in support of its preferred interpretation," but "[n]one are persuasive." *Koski*, 2026 WL 2032532, at *5. The government argues that this Court's conclusion "rests on an unduly narrow reading of what qualifies as a covered record." (Dkt. 171 at 9.) But Plaintiff offers scant textual analysis that aligns its preferred reading with the ordinary meaning of the statutory term "come into his possession." Instead, Plaintiff's arguments to the contrary read this language out of the statute. For example, government states that "[n]othing in Section 20701 restricts 'all records and papers to only those records and papers submitted by voters[.]" (Dkt. 171 at 3.) But this assertion ignores that § 20701 applies to "all records and papers *which come into* [*election officials'*] *possession*." 52 U.S.C. § 20701 (emphasis added).

The government only addresses the language of the operative phrase by asserting that "Congress used the phrase 'come into his possession' rather than 'are in his possession,' . . . to focus on how and when the officer gains possession of the records or documents in the first instance." (Dkt. 171 at 6; *see also id.* at 6–7 (discussing the phrase "come into possession of it" in the context of 8 U.S.C. § 1454(a) and suggesting that this

demonstrates the phrase only "implies a temporal change in circumstances").) Plaintiff made this same argument in other cases, and just like other courts that have considered it, this Court rejects it. As explained by the *Evans* court:

> [T]he fact that Congress often uses "come into possession" with other words specifying when or the manner in which something is acquired tells us nothing about the ordinary meaning of "come into possession." A person can "come into possession" of a record created by a third party "through improper means" or "at a particular time" or through unspecified means at an unknown time. The time at which or the character of the source from which a record is acquired are additional pieces of information that Congress might use to trigger a particular duty or to identify an item. They do not define the phrase "come into possession."

2026 WL 2267774, at *7; *see also Benson II*, 179 F.4th at 481–82 (identifying flaws in the government's "temporal distinction" argument).

Next, the government suggests the SVRL is within the scope of Title III because of the statute's reference to records "relating to" registration applications and other documents received by election officials from voters. Dkt. 171 at 2–3 ("Minnesota's statewide voter registration list is perhaps the archetypical example of a 'record' that 'relates to' voter 'registration.'" (cleaned up)). But this argument elides the meaning of the phrase "come into [their] possession." *See Evans*, 2026 WL 2267774, at *8 ("By reading relating to in a manner that swallows and nullifies come into his possession, the [government's] interpretation ignores the plain meaning of the statute and violates the 'fundamental rule of statutory interpretation that in construing statutes, we should give effect, if possible, to every word used by Congress.") (cleaned up).

Similarly, Plaintiff posits that interpreting § 20701 to only cover records that state election officials receive, rather than including those that the officials themselves create, would "undermine the statute's purpose." (Dkt. 171 at 4.) Again, the Court disagrees. *See Benson II*, 179 F.4th at 482 ("Pure policy considerations, of course, do not constitute a proper method of statutory interpretation." (quoting *Reichert v. Kellogg, Co.*, 170 F.4th 473, 487 (6th Cir. 2026))). Indeed, as one court put it, "nothing supports the . . . supposition that Congress intended Title III to be a freewheeling source of authority for the Attorney General to investigate any violation of federal election law" *Evans*, 2026 WL 2267774, at *8–10.

None of the government's other arguments convinces the Court that the interpretation of the statutory text reflected above is incorrect or that a different result is required. Accordingly, Plaintiff's claim that the State Defendants' failure to produce the unredacted SVRL is in violation of Title III of the CRA fails as a matter of law, and that claim is dismissed.

**2. "Basis and Purpose"**

The parties dispute whether the government's letters to the State Defendants comply with the statutory requirement that the Attorney General provide a "statement of the basis and purpose" for the demand for records under the CRA. This debate centers on the statements the government made (or didn't make) about the reasons for its requests for the SVRL in the June 2025 DOJ Letter, the July 2025 DOJ Letter, the August 2025 DOJ Letter, and the April 2026 DOJ Letter. According to Defendants, the government's letters do not contain the requisite "statement of the basis and purpose" for their requests for the SVRL

because they communicate no specific factual basis for believing that a civil rights violation occurred and its stated purpose of determining Minnesota's compliance with list maintenance requirements of HAVA is insufficient. (Dkt. 65 at 21–23; Dkt. 105 at 13–14.) Defendants also argue that the April 2026 DOJ Letter constitutes an impermissible attempt to amend the complaint and fails to cure the problems with the government's underlying demand for the SVRL. (Dkt. 187.)

The government contends that the letters sent to Secretary Simon in 2025 contain an adequate statement of the basis and purpose for the request and § 20703 does not impose the burden on the Attorney General that Defendants attribute to it. (Dkt. 72 at 13–15; Dkt. 102 at 6–8, 14–16.) In addition, the government argues that even if its 2025 letters were deficient, the April 2026 DOJ Letter satisfied even the more restrictive reading of § 20703 that Defendants champion. (Dkt. 189 at 3–4.)

The Court's determination above, Discussion.II.B.1, *supra*, that the government's CRA claim fails as a matter of law because the SVRL is not a record that "come[s] into [state election officials'] possession" makes consideration of these disputes unnecessary.

**C. HAVA**

In Count II of the complaint, the government claims that Minnesota has violated HAVA by failing to provide the unredacted SVRL. In their motions to dismiss, Defendants argue that the government fails to state a claim in Count II because HAVA contains no provision requiring disclosure. The Court agrees.

The substantive provisions of HAVA require states to create and maintain statewide computerized voter registration lists. Under HAVA, Minnesota must take reasonable steps

to ensure that its computerized list is up to date by providing for removal of ineligible voters while ensuring that eligible voters remain on the list. However, HAVA does not contain any disclosure provision, and the government points to no provision of HAVA that mandates production of any records to the federal government. *Oregon*, 828 F. Supp. 3d at 1101 ("Plaintiff cites no provision of HAVA that Defendants violated by failing to produce an unredacted voter registration list, nor could it because HAVA contains no record disclosure provision."); *Weber*, 816 F. Supp. 3d at 1190 ("HAVA simply contains no such provision. This ends the inquiry."). And "HAVA grants the Attorney General the ability to bring a civil action for enforcement, not disclosure." *Oregon*, 828 F. Supp. 3d at 1101. The fact that other statutes *do* contain disclosure provisions "signals that the omission in HAVA was intentional." *Weber*, 816 F. Supp. 3d at 1190.

Despite the absence of a disclosure requirement, the government argues that it is not "without recourse to seek list maintenance records under HAVA" because "it may do so through the ordinary discovery process necessary to prosecute its Section 303 claim." (Dkt. 102 at 29.) It argues that it is entitled to obtain the records it requests because they are "necessary to establish a claim under HAVA." (*Id.*) These arguments are unpersuasive.

Even assuming the government can use ordinary discovery tools to obtain the information the government has demanded from the State Defendants, the problem is that the complaint contains no allegation that the State Defendants failed, in any way, to comply with HAVA's list-maintenance requirements. *Benson I*, 819 F. Supp. 3d at 759 ("[T]he United States does not state a HAVA claim because it does not allege any violations of HAVA's substantive provisions."). The government does not point to anything in the record

indicating that Minnesota failed to abide by its list-maintenance obligations. Instead, the government argues that it is entitled to take discovery in search of a claim. But that would mean that the Attorney General could file a case for enforcement of HAVA's substantive provisions without pleading any facts sufficient to state a claim of a HAVA violation and thereby subject a state to civil discovery. In other words, the government suggests it is permitted to use a civil action as a "fishing expedition." But an ordinary litigant isn't allowed to seek discovery first and allege a claim later, and the federal government has no special privilege to do so either. *See Weber*, 816 F. Supp. 3d at 1191 (dismissing the DOJ's HAVA claim for California's voter registration list because it "appears to be a telltale 'fishing expedition'" supported by nothing more than "gross speculation"); *Benson I*, 819 F. Supp. 3d at 759 –60 ("There is simply no basis in the Federal Rules of Civil Procedure for the United States's suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery.") (citing cases).

For these reasons, Count II of the complaint is dismissed.

## ORDER

Consistent with the discussion above, **IT IS HEREBY ORDERED THAT**:

1. The Defendants' and Intervenor Defendants' Motions to Dismiss (Dkts. 63, 78, 83) are **GRANTED**.
2. Plaintiff's Motion for Order to Compel Production of Federal Election Records Pursuant to 52 U.S.C. § 20701, *et seq.* (Dkt. 70) is **DENIED**.
3. This matter is **DISMISSED**.

**Let Judgment be entered accordingly**.

Date: August 17, 2026

*s/Katherine Menendez*
Katherine Menendez
United States District Judge

# UNITED STATES DISTRICT COURT
## District of Minnesota

United States of America

Plaintiff(s),

v.

Steve Simon, Minnesota, State of

Defendant(s),

Minnesota Alliance for Retired Americans Educational Fund, Misael Hernandez, Common Cause, League of Women Voters of Minnesota, Valerie Mangskau, Jennifer Compeau

Intervenor Defendant(s),

Bipartisan Former State Secretaries of State, Former Employees of the U.S. Department of Justice

Amicus(s).

**JUDGMENT IN A CIVIL CASE**

Case Number: 25-cv-03761-KMM-EMB

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. The Defendants' and Intervenor Defendants' Motions to Dismiss (Dkts. 63, 78, 83) are **GRANTED**.

2. Plaintiff's Motion for Order to Compel Production of Federal Election Records Pursuant to 52 U.S.C. § 20701, *et seq*. (Dkt. 70) is **DENIED**.

3. This matter is **DISMISSED**.

Date: 8/18/2026

KATE M. FOGARTY, CLERK

## CERTIFICATE OF SERVICE

I certify that on August 28, 2026, I electronically filed the foregoing ADDENDUM with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney