No. 26-2679

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

STEVE SIMON,
in his official capacity as Secretary of State for the State of Minnesota;
MINNESOTA, STATE OF,

Defendants-Appellees

MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATION FUND; MISAEL HERNANDEZ; COMMON CAUSE; LEAGUE OF WOMEN VOTERS OF MINNESOTA; VALERIE MANGSKAU; JENNIFER COMPEAU; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CYNTHIA WILSON,

Intervenor Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

# BRIEF FOR THE UNITED STATES AS APPELLANT

*(See inside cover for continuation of Counsel)*

*(continuation of Counsel)*

HARMEET K. DHILLON
Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

## SUMMARY OF THE CASE

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General sweeping authority to inspect election records. 52 U.S.C. 20703. The United States seeks to exercise this authority to inspect Minnesota's statewide voter registration list (SVRL)—not to change or maintain the SVRL for itself, but rather to fulfill its clear statutory duty to enforce the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq*.

In dismissing the United States' Complaint and denying its Motion to Compel Production of the SVRL, the district court failed to give effect to this statutory mandate. The court's holding thwarts Congress's clear direction that election officers must retain, preserve, and produce election records. And consequently, the court's holding prevents the Attorney General from fully enforcing federal laws designed to ensure fair and secure elections. This Court should reverse.

Despite the importance of these issues, the United States is willing to waive oral argument to allow faster resolution of this case but will participate in oral argument if the Court believes that the benefit of argument outweighs the time concerns. Given the number of issues, the United States would request 20 minutes to present oral argument.

TABLE OF CONTENTS

PAGE

SUMMARY OF THE CASE

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE ........................................................ 3

SUMMARY OF THE ARGUMENT ........................................................ 8

STANDARD OF REVIEW ........................................................ 10

ARGUMENT

I. The DOJ's demand for an electronic, unredacted copy of Minnesota's SVRL satisfied Title III's requirements. ........................................................ 10

A. Minnesota's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand ........................................................ 12

1. The SVRL is a record that came into Secretary Simon's possession. ...................... 14

2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws. .................................. 23

B. Courts play a limited role in assessing the Attorney General's demand under Title III. ............... 27

**TABLE OF CONTENTS (continued):** **PAGE**


1. The Attorney General is entitled to Minnesota's SVRL without meeting the requirements for an administrative subpoena....29

2. Even under this Court's administrative-subpoena precedents, the United States is entitled to Minnesota' SVRL....36

C. The DOJ's demand stated an adequate basis. ....38

D. The DOJ's stated purpose of ascertaining Minnesota's compliance with HAVA was sufficient. ....43

1. Title III places no limits on the purpose of the Attorney General's demand....43

2. The Attorney General's demand was for the purpose of protecting voting rights. ....45

E. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303. ....49

F. Minnesota must produce an electronic, unredacted copy of the SVRL....51

II. The DOJ's demand for an electronic, unredacted copy of Minnesota's SVRL does not implicate nor violate federal or state privacy laws....53

A. Federal law preempts any contrary Minnesota privacy law....54

B. The DOJ is complying with the Privacy Act. ....57

**TABLE OF CONTENTS (continued):** **PAGE**

C. The E-Government Act does not prevent the DOJ from obtaining Minnesota's SVRL. ...................... 60

D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Minnesota's SVRL. ...................... 63

CONCLUSION ...................... 64

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**


*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961) .......... 27

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .......... 59

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .......... 54

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 46, 60

*Cook v. George's Inc.*, 952 F.3d 938 (8th Cir. 2020) .......... 10, 49

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (per curiam) .......... 40, 44-45

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .......... 55

*Dean v. United States*, 556 U.S. 568 (2009) .......... 44

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) .......... 49

*Doe v. Chao*, 540 U.S. 614 (2004) .......... 57

*Donaldson v. United States*, 400 U.S. 517 (1971),
*superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat.1520 .......... 35

*Donovan v. Shaw*, 668 F.2d 985 (8th Cir. 1982) .......... 34, 37, 39

*DuMond v. Centex Corp.*, 172 F.3d 618 (8th Cir. 1999) .......... 42

**CASES (continued):** **PAGE**


*EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035 (8th Cir. 2006) .......... 31

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*,
356 F. Supp. 3d 85 (D.D.C.),
*vacated and remanded on other grounds*,
928 F.3d 95 (D.C. Cir. 2019) .......... 62

*Endicott Johnson Corp. v. Perkins*,
317 U.S. 501 (1943) .......... 34-35, 37

*Ex Parte Siebold*, 100 U.S. 371 (1879) .......... 55

*Fischer v. United States*, 603 U.S. 480 (2024) .......... 24

*Fjellestad v. Pizza Hut of Am., Inc*,
188 F.3d 944 (8th Cir. 1999) .......... 40

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .......... 14

*Foster v. Love*, 522 U.S. 67 (1997) .......... 54-55

*Fresenius Med. Care v. United States*,
526 F.3d 372 (8th Cir. 2008) .......... 30, 36, 38

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) .......... 15

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771 (2023) .......... 57

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .......... 12, 43

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) .......... 40

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......... 39

**CASES (continued):** **PAGE**


*In re Tax Liabilities. of: John Does, All Unknown Emps. of Boundary Waters Rest. v. United States.*, 866 F.2d 1015 (8th Cir. 1989) ........ 49

*Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279 (2d Cir. 2000) ........ 42

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ........ 27, 41-42

*Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963) (per curiam) ........ 19

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ........ *passim*

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) (per curiam) ........ 18

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ........ 13

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ........ 12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) ........ 12, 43

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946) ........ 30

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601 (2019) ........ 47

*Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ........ 52

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ........ 46-47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ........ 25

**CASES (continued):** **PAGE**


*Reno v. Condon*, 528 U.S. 141 (2000) .......... 64

*Reynolds v. Sims*, 377 U.S. 533 (1964) .......... 47

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .......... 4

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) .......... 62

*United States v. Alabama*,
No. 2:08-cv-920 (M.D. Ala. Mar. 27, 2009) .......... 50

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) .......... 6, 13, 46

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... *passim*

*United States v. Benson*, 179 F.4th 470,
*reh'g en banc denied,* No. 26-1225, 2026 WL 2364306
(6th Cir. Aug. 14, 2026) .......... *passim*

*United States v. Carter*, 988 F.2d 68 (8th Cir. 1993) (per curiam) .......... 31

*United States v. Clement*, 668 F.2d 101 (8th Cir. 1962) .......... 31

*United States v. Jerde*, 841 F.2d 818 (8th Cir. 1988) .......... 25

*United States v. Georgia*, No. 1:06-cv-2442
(N.D. Ga. Oct. 12, 2006) .......... 48

*United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983) .......... 50

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) .......... 28, 39

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) .......... 52

**CASES (continued):** **PAGE**


*United States v. McDonnell Douglas Corp.*,
751 F.2d 220 (8th Cir. 1984) ........................................ 31

*United States v. Mississippi*, 380 U.S. 128 (1965) ........................ 12

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .................. 42

*United States v. Powell*, 379 U.S. 48 (1964) ......................... 2, 29-30, 33

*United States v. Whispering Oaks Residential*
*Care Facility, LLC*, 673 F.3d 813
(8th Cir. 2012)(per curiam) ........................................ 30, 38, 50

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ........................................ 1, 17

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ........................................ 23-24

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................ 39

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................ 55


**CONSTITUTION:**


U.S. Const. Art. I, § 4, Cl. 1 ........................................ 2, 54

U.S. Const. Art. VI, Cl. 2 ........................................ 2, 54, 57


**STATUTES:**


Civil Rights Cold Case Records Collection Act of 2018
44 U.S.C. 2107 note ........................................ 16
Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) .................. 16

**STATUTES (continued):** **PAGE**

Civil Rights Act of 1960
52 U.S.C. 10101 .......... 44
52 U.S.C. 20701 .......... *passim*
52 U.S.C. 20701-20706 .......... 44
52 U.S.C. 20702 .......... 3, 60
52 U.S.C. 20703 .......... *passim*
52 U.S.C. 20704 .......... 3-4, 52, 56
52 U.S.C. 20705 .......... *passim*
Pub. L. No. 86-449, § 601, 74 Stat. 90 .......... 44

Driver's Privacy Protection Act
18 U.S.C. 2721 *et seq.* .......... 2, 63
18 U.S.C. 2721(a) .......... 64
18 U.S.C. 2721(b)(1) .......... 64
18 U.S.C. 2721(c) .......... 64
18 U.S.C. 2725(1) .......... 64
18 U.S.C. 2725(3)-(4) .......... 64

E-Government Act of 2002
Pub. L. No. 107-347, 116 Stat. 2899 .......... 2, 60
44 U.S.C. 3501 note .......... 60
44 U.S.C. 3502 .......... 61
44 U.S.C. 3502(3)(A)(i) .......... 61, 63
44 U.S.C. 3502(3)(B) .......... 61
44 U.S.C. 3502(10) .......... 61
§ 201 .......... 61
§ 208(b)(1)(A)(ii) .......... 60, 62-63
§ 208(b)(1)(B)(i) .......... 60-61

Help America Vote Act of 2002
52 U.S.C. 20901 *et seq.* .......... 1, 4
52 U.S.C. 21083 .......... 6
52 U.S.C. 21083(a) .......... 63
52 U.S.C. 21083(a)(1)(A) .......... 4, 52, 63
52 U.S.C. 21083(a)(1)(A)(viii) .......... 26
52 U.S.C. 21083(a)(2)(A) .......... 4, 37

52 U.S.C. 21083(a)(2)(A)(iii) .......... 4
52 U.S.C. 21083(a)(4) .......... 4, 56
52 U.S.C. 21083(a)(4)(A) .......... 37
52 U.S.C. 21083(a)(5)(A)(i) .......... 37-38
52 U.S.C. 21083(a)(5)(A)(i)-(ii) .......... 5, 52
52 U.S.C. 21111 .......... *passim*
Pub. L. No. 107-252, 116 Stat. 1666 .......... 46

President John F. Kennedy Assassination Records Collection
Act of 1992
44 U.S.C. 2107 note .......... 16
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 .......... 16

Privacy Act of 1974
5 U.S.C. 552a(e)(4) .......... 57
5 U.S.C. 552a(e)(4)(b) .......... 58
5 U.S.C. 552a(e)(7) .......... 59
Pub. L. No. 93-579, 88 Stat. 1896 .......... 2
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 .......... 57

10 U.S.C. 130c(d)(2)(C) .......... 18

13 U.S.C. 214 .......... 18

18 U.S.C. 3486 .......... 30

18 U.S.C. 3486(a)(1)(B)(i) (2012 ed.) .......... 31

26 U.S.C. 7602 .......... 31

26 U.S.C. 7602 (1954 ed.) .......... 29

26 U.S.C. 7605(b) (1954 ed.) .......... 33

28 U.S.C. 1291 .......... 1

**STATUTES (continued):** **PAGE**

28 U.S.C. 1331 .......... 1

28 U.S.C. 1345 .......... 1

30 U.S.C. 1732(b) .......... 18

31 U.S.C. 5314(a) .......... 61

42 U.S.C. 2000e-8(a) .......... 31

44 U.S.C. 3502 .......... 61-62

44 U.S.C. 3518(c)(1)(B) .......... 61-62

44 U.S.C. 3572(f) .......... 17-18

44 U.S.C. 3601 .......... 61-62

**REGULATIONS:**

28 C.F.R. 0.50(a) .......... 58

68 Fed. Reg. 47,610 (Aug. 11, 2003) .......... 57-58

70 Fed. Reg. 43,904 (July 29, 2005) .......... 58

82 Fed. Reg. 24,147 (May 25, 2017) .......... 58

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 6392 (1960) .......... 45

106 Cong. Rec. 7767 (1960) .......... 44

H.R. Rep. No. 956, 86th Cong., 1st Sess. (1959) .......... 18

**RULES:** **PAGE**

Fed. R. App. P. 2 .......... 65-66

Fed. R. App. P. 40(d)(1) .......... 66

Fed. R. App. P. 41(b) .......... 65

Fed. R. Civ. P. 12(b)(6) .......... 10

**MISCELLANEOUS:**

1 *New Shorter Oxford English Dictionary* (4th ed. 1993) .......... 15

Authority to Obtain and Share Statewide Voter Roll Data,
50 Op. O.L.C. (May 12, 2026),
https://www.justice.gov/olc/media/1440346/dl .......... 15-16, 62

Report of the United States Commission on Civil
Rights (1959),
https://www.usccr.gov/files/historical/1959/
59-001-U.pdf .......... 19-20

*The American College Dictionary* (1959) .......... 15, 24

*The American Heritage College Dictionary* (4th ed. 2002) .......... 63

U.S. Dep't of Just., Civil Rights Division, Voting Section,
https://www.justice.gov/crt/voting-section
(last visited August 28, 2026) .......... 58

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020),
https://www.justice.gov/jm/jm-9-11000-grand-jury# .......... 59

U.S. Dep't of Just., Mem. of Understanding
between the United States and Texas (May 13, 2008) .......... 48

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1345. That court entered an Order granting defendants' and intervenor-defendants' Motions to Dismiss, denying the United States' Motion for Order to Compel Federal Election Records, and directing entry of Judgment on August 17, 2026. Add.26; App.145; R.Doc.210, at 26.[1] The United States filed a timely Notice of Appeal on August 18, 2026. R.Doc.212. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether Minnesota's SVRL is a record that Title III of the CRA requires the State to retain and preserve and to produce upon the Attorney General's written demand.

- 52 U.S.C. 20701 and 20703
- *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989)
- *United States v. Benson*, 179 F.4th 470, *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026)

---

[1] "Add.__" refers to the page numbers of the Addendum filed with this Brief. "App.__" refers to the page numbers of the Appendix filed with this Brief. "R.Doc.__, at__" refers to the docket number and internal page numbers on the district court docket sheet, No. 0:25-cv-3761 (D. Minn.).

2. Whether summary procedures should apply to the Attorney General's demand for records under Title III of the CRA.

- 52 U.S.C. 20701, 20703, and 20705
- *United States v. Powell*, 379 U.S. 48 (1964)
- *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)

3. Whether the Department of Justice (DOJ) adequately stated the basis and purpose of its demand for an electronic, unredacted copy of Minnesota's SVRL under Title III of the CRA.

- 52 U.S.C. 20703
- *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)

4. Whether federal or state privacy laws permit Minnesota to refuse the DOJ's demand for an electronic, unredacted copy of Minnesota's SVRL.

- U.S. Const. Art. I, § 4, Cl. 1
- U.S. Const. Art. VI, Cl. 2
- Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896
- E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899
- Driver's Privacy Protection Act of 1994, 18 U.S.C. 2721 *et seq.*

## STATEMENT OF THE CASE

1.a. Under Title III of the CRA, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Title III imposes criminal penalties on any person who "willfully steals, destroys, conceals, mutilates, or alters any record or paper" subject to Section 20701's preservation requirements. 52 U.S.C. 20702. And in the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records except to Congress and its committees, to governmental agencies, and in the presentation of a court proceeding. 52

U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court, which "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA to "tr[y] to cope with the problem" of racial discrimination in voting, *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966), Congress has since enacted additional laws that affect the "records and papers which come into [election officers'] possession," 52 U.S.C. 20701. In particular, HAVA helps the federal government to ensure that States are overseeing federal elections in a fair and honest manner. *See* 52 U.S.C. 20901 *et seq*.

HAVA requires States to implement a single centralized computerized SVRL, 52 U.S.C. 21083(a)(1)(A), and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis," 52 U.S.C. 21083(a)(2)(A). This process includes removing "ineligible voters." 52 U.S.C. 21083(a)(2)(A)(iii). And HAVA requires "State election system[s]" to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. 21083(a)(4).

HAVA also mandates that States may not “accept[] or process[]” an application for voter registration “unless the application includes” particular identifiers—namely, an “applicant’s driver’s license number” if he or she has one; “the last 4 digits of the applicant’s social security number”; or, if the applicant has neither a driver’s license nor a social security number, a state-assigned “unique identifying number.” 52 U.S.C. 21083(a)(5)(A)(i)-(ii).

2. In June 2025, the DOJ sent a letter to Secretary of State Simon seeking “information regarding the State’s HAVA compliance” and asking for a description of various State election processes, such as “the process by which Minnesota assigns a unique identifier to each legally registered voter in Minnesota” and the processes by which various categories of registrants are removed from the SVRL. App.50-51; R.Doc.66-1, at 1-2. The DOJ also requested Minnesota’s current SVRL, including “both active and inactive voters.” App.51; R.Doc.66-1, at 2. The Secretary’s office refused to provide the SVRL. App.53-60; R.Doc.66-1, at 4-11. The DOJ then sent a second letter requesting Minnesota’s SVRL for the purpose of “ascertain[ing] Minnesota’s compliance with the list maintenance requirements of HAVA.” App.87-88; R.Doc.66-2, at 1-2. The

letter invoked the DOJ's authority to enforce HAVA and to demand records under Title III of the CRA.

Because Secretary Simon refused to provide Minnesota's SVRL (*see* App.89-94; R.Doc.66-2, at 3-8), the United States brought suit, alleging the refusal violated Title III of the CRA, 52 U.S.C. 20703, and HAVA, 52 U.S.C. 21083 (App.33-49; R.Doc.1).[2] Multiple individuals and organizations intervened as defendants (*see* R.Docs.90, 183), and all defendants moved to dismiss (R.Docs.63, 78, 83, 186). The United States moved for an order to compel the production of the SVRL. App.95-100; R.Doc.70. On April 17, 2026, the DOJ sent Secretary Simon a follow-up letter providing as additional basis for its demand information from a news article discussing that a non-citizen "ha[d] been criminally charged for voting" in Minnesota's 2024 general election. App.118; R.Doc.180-1, at 1.

After a hearing on the Motions to Dismiss, the district court ordered supplemental briefing regarding the district court's holding in *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*), *aff'd*,

[2] The United States does not appeal the dismissal of its separate HAVA claim.

179 F.4th 470 (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*), that an SVRL is not a record within the scope of 52 U.S.C. 20701. R.Doc.157. The district court then denied the Motion for Order to Compel and dismissed the United States' Complaint. Add.26; App.145; R.Doc.210, at 26. The court first rejected the Fifth Circuit's holding that "Title III establishes 'a special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure'" and that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's statement of the basis and the purpose [of a records request]." Add.14-15; App.133-134; R.Doc.210, at 14-15 (alterations in original) (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225-226 (5th Cir. 1962)). Instead, the district court concluded that the Rules of Civil Procedure govern a Title III proceeding and that "the Court's role . . . is not as limited as Plaintiff suggests." Add.14-16; App.133-135; R.Doc.210, at 14-16.

The district court then held that the United States could not compel production of Minnesota's SVRL under Title III because "Secretary

Simon 'did not acquire, obtain, or receive the [SVRL] from a third party'"; rather, "[Minnesota] officials created it themselves." Add.20-21; App.139-140; R.Doc.210, at 20-21 (alterations in original) (quoting *Benson II*, 179 F.4th at 478-479). Further, the court determined that because the SVRL must be "continuously updated" in accordance with HAVA, it cannot be subject to Title III's preservation requirements. *Ibid.* Consequently, in the court's view, the SVRL "is not a record or paper that comes into Minnesota election officials' possession" within the meaning of Section 20701. Add.20; App.139; R.Doc.210, at 20.

The United States appeals. R.Doc.212.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing the DOJ's Title III claim on the ground that the SVRL is not a record subject to Title III's preservation and demand requirements. The CRA's text does not exclude self-generated documents. At most, the distinction between records *coming* into one's possession and *being* in one's possession is a temporal one—not a distinction between obtaining records from an outside source and through self-generation. And the CRA's preservation requirements do not conflict with the National Voter Registration Act (NVRA) and

HAVA's list maintenance requirements. Thus, the Attorney General is entitled to reproduction and copying of Minnesota's SVRL.

The district court did not reach defendants' other arguments in favor of dismissal, but they do not provide any basis to affirm. The DOJ's invocation of the CRA and assertion that it was seeking to ascertain Minnesota's compliance with HAVA's list maintenance requirements sufficiently stated both the basis of and a proper purpose for its demand.

This Court should likewise reject defendants' various privacy-related arguments. First, the CRA preempts any contrary Minnesota privacy law. Second, the demand did not violate the Privacy Act because the DOJ has an applicable System of Records Notice, and because maintaining voter registration records (including records describing First Amendment exercise) is within the scope of an authorized law enforcement activity. Third, the E-Government Act does not require a privacy impact assessment in these circumstances. Finally, the Driver's Privacy Protection Act permits disclosure of information for official government functions.

## STANDARD OF REVIEW

For all the issues addressed in this appeal, this Court "review[s] de novo a district court's disposition of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020). This Court "construe[s] the complaint liberally," "accept[ing] the factual allegations in the complaint as true and draw[ing] all reasonable inferences in the nonmovant's favor." *Ibid.* (citation and internal quotation marks omitted).

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of Minnesota's SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having

custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. If necessary, the Attorney General may seek an order from a federal court "by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the ground that Minnesota's SVRL is not a record or paper subject to the retention and preservation requirements of Section 301 because it did not "come[] into [the Secretary's] possession" and thus was not subject to the Attorney General's demand under Section 303. Add.20; App.139; R.Doc.210, at 20. And the court subjected the Attorney General's demand to the ordinary pleading standards of the Federal Rules of Civil Procedure rather than Title III's summary procedures. Add.16; App.135; R.Doc.210, at 16. Both decisions were in error.

### A. Minnesota's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Section 301 of the CRA requires an election official to "retain and preserve . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701.

This "sweeping" retention provision applies to Minnesota's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-176 (2009) (citation omitted). Title III's text supports a far broader investigative power than what the district court's reading allows.

The term "relating to" should be defined "expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018). In Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. 52 U.S.C. 20701. The district court stated that "[e]ach of these terms refers to something that the voter submits or does as part of the registration process." Add.20; App.139; R.Doc.210, at 20 (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 768-769 (W.D. Mich. 2026) (*Benson I*)), *aff'd*, 179 F.4th 470 (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*). Even if that is true, Section 301 covers any record or paper *relating to* those listed in the statute—or even relating to the catchall "other act requisite to voting." 52 U.S.C. 20701. The SVRL is a record relating to voter registration.

The district court erred in holding that Title III excludes self-generated records based on its reading of the phrase "come into his possession." Add.20-21; App.139-140; R.Doc.210, at 20-21. The phrase "come into his possession" broadly covers records created by States and local governments and records obtained from outside sources. And nothing in the NVRA or HAVA alters that natural reading.

### 1. The SVRL is a record that came into Secretary Simon's possession.

Any officer in possession of an SVRL came into possession of the SVRL at a distinct point in time. The district court erred in holding that Secretary Simon did not come into possession of the SVRL because "[Minnesota] officials created [the SVRL] themselves." Add.20-21; App.139-140; R.Doc.210, at 20-21 (first alteration in original) (quoting *Benson II*, 179 F.4th at 478-479).[3] The phrase "come into his possession" refers to how and when possession began, 52 U.S.C. 20701; it does not exclude self-generated records.

a. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer

[3] Although the Sixth Circuit denied rehearing en banc in *Benson*, five judges agreed with Judge Nalbandian's dissent, including regarding the phrase "come into his possession," *Benson III*, 2026 WL 2364306, at *13 (Thapar, J., dissenting), and four more judges joined a concurrence which indicated they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and concluded there was "room for doubt over the panel opinion's interpretation of" that phrase, *id.* at *1-2 (Murphy, J., concurring).

comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (alteration in original; emphasis added) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The American College Dictionary* 11 (1959) (defining "acquire" similarly). The term "come into his possession" is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 9), https://www.justice.gov/olc/media/1440346/dl ("[I]t is not unusual

to say that one comes into possession of a thing that one created oneself.”).

Thus, contrary to the district court’s conclusion, the word “come” cannot create a carve-out for self-generated documents. *See* Add.17-23; App.136-142; R.Doc.210, at 17-23. If anything, Congress used the phrase “*come* into his possession” rather than “*are* in his possession,” not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance.[4] 52 U.S.C. 20701; *see Webster’s Third New International Dictionary* 453 (1966 ed. unabridg.) (defining “come into” as “to enter upon or into possession of: acquire esp. as an inheritance”); *Benson III*, 2026 WL 2364306, at *7 (Griffin, J., dissenting) (“By 1960, ‘come into’ possession or custody was a familiar

---

[4] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) (referring to a record that “was created or made available for use by, obtained by, or otherwise came into the possession of” an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

legal expression. . . . [I]t did not distinguish property according to its source.”).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: “First, an agency must either *create or obtain* the requested materials,” and second, “the materials [must] have *come into the agency’s possession* in the legitimate conduct of its official duties” and remain in the agency’s possession at the time of a records request. *United States Dep’t of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (emphasis added; citation and internal quotation marks omitted). Thus, the Supreme Court has made clear that a record created by the agency can be said to have “come into the agency’s possession”—coming into possession of material refers to when and how the possession began. *See id.* at 145-146.

Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. 3572(f) (“comes into possession of such information by

reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

Moreover, the legislative history reflects that the phrase "records and papers which come into his possession" simply means "records and papers in his possession," and not some subset of the materials in his possession. *See* H.R. Rep. No. 956, 86th Cong., 1st Sess., at 6, 37, 39 (1959) (emphasis added) (explaining that Section 301 "would include *all records and papers* in the possession of election officers"). Contemporaneous decisions confirm the point. *See Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (per curiam) (requiring the district court "to order each appellee to make available . . . all records and papers in the possession, custody or control of said appellee relating to any application, registration, payment of poll tax or other act requisite to voting");

*Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (per curiam) (requiring the district court to grant the same inspection rights).

Election officers in Minnesota acquired records and information from individual voters. When those individual records were aggregated into one new, single record—the SVRL—the officers acquired that new record and retained it within their control, thus coming into possession of the SVRL.

b. Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at 475, 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices" tracking vouchers. *Id.* at 486 (Nalbandian, J., dissenting). These indices

would be government-created records, but once an index was passed "up the ladder," the receiving "state official came into possession of the index." *Ibid.* These indices were among the records that the Commission recommended that Congress make available for federal inspection. 1959 CCR Report at 137-138.

Furthermore, the Commission itself gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications, 1959 CCR Report at 87-88, 93, and reviewed self-generated records, including overall voter registration lists for specific counties showing severe disparities in the registration rates of black and white citizens. *Id.* at 75, 82, 89. These county voter registration lists have now been replaced by the self-generated electronic SVRL.

In short, documents created by state agencies historically were some of the very types of records that the United States sought to inspect to weed out discrimination. The district court's reading would exclude from the reach of Sections 301 and 303 all the most blatant evidence of discrimination—such as internal memoranda and documents showing

whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

c. Even assuming that the phrase “come into his possession” could be read to exclude self-generated records, the SVRL still came into Secretary Simon’s possession. Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into the officer’s possession. *See* 52 U.S.C. 20701; *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring), *9 (Griffin, J., dissenting), *14 (Thapar, J., dissenting). Section 301 “imposes a specific duty on an individual (each officer of election), not a general duty on the entire State.” *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring). The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701. So even assuming that every single election officer collectively generated the SVRL at one time after HAVA’s passage (which the district court never found), every new election officer who has since gained control over the SVRL has come into possession thereof at a later time. *See Benson II*, 179 F.4th at 486-487 & n.8 (Nalbandian, J., dissenting).

Secretary Simon came into possession of the SVRL when he received it from someone else in his office, or when he assumed office. *See Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting); *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring), *9 (Griffin, J., dissenting), *14 (Thapar, J., dissenting). "As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (alterations in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if *some* state officials created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—Secretary Simon "nonetheless 'c[a]me into . . . possession' of the [SVRL]" when he received it from other election officers. *Ibid.* (alterations in original) (quoting 52 U.S.C. 20701).

d. To the extent that the district court suggested that a record or paper must come, not just from an external source, but from a *prospective voter* (Add.19; App.138; R.Doc.210, at 19), that suggestion has no basis in the text. Even if the example documents listed in Section 301 are all submitted by voters, the text is explicitly not limited to those example documents, but extends to documents "relating to" that list. 52 U.S.C.

20701. And even assuming that "come into his possession" should be read to exclude self-generated documents, nothing in that phrase, or in Section 301 generally, mandates that the records come from voters, as opposed to other third parties—including other election officials.

### 2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws.

According to the district court, reading Title III to include the SVRL would put Title III's prohibition on altering records and the NVRA and HAVA's updating-and-modification requirements at odds with each other. Add.20; App.139; R.Doc.210, at 20. That is incorrect. A majority of judges on the Sixth Circuit have determined that Title III of the CRA can be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See, e.g.*, *Benson III*, 2026 WL 2364306, at *4-5 (Murphy, J., concurring), *9 (Griffin, J., dissenting), *14 n.7 (Thapar, J., dissenting). Reading Title III harmoniously with the NVRA and HAVA—which require continuous updates to the SVRL—yields the conclusion that an election officer properly "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by updating it accurately as required by those statutes, *see Voter Reference*

*Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing").[5] There is no obligation to create a new, static version of the database with every single edit.[6]

The district court concluded that statutorily required SVRL maintenance would amount to "alteration" under Section 302. Add.20; App.139; R.Doc.210, at 20 (citation omitted). But three considerations show that this worry is unfounded. First, the surrounding verbs elucidate the meaning of "alter" in this provision. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary

---

[5] *See The American College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

[6] The CRA does, however, require election officials to preserve the official voter registration list used for a specific federal election. *See Benson III*, 2026 WL 2364306, at *14 n.7 (Thapar, J., dissenting).

purposes. *See id.* at 489-490 (describing a similar list of verbs). The SVRL is, as required by HAVA, an inherently evolving and changing record. List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 302. *See Benson III*, 2026 WL 2364306, at *9 (Griffin, J., dissenting) ("'[A]lters' likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list.").[7]

Second, Section 302's prohibition on altering "record[s] or paper[s]" is accompanied by a mens rea requirement of *willfulness*, which shows beyond all doubt that list maintenance under HAVA could never run afoul of Section 302's ban on altering records. *See United States v. Jerde*, 841 F.2d 818, 821 (8th Cir. 1988) (citation omitted) (discussing that, in the context of a prosecution for failure to file tax returns, willfulness "means a voluntary, intentional violation of a known legal duty").

And third, construing Title III to exclude the SVRL would paralyze the United States' ability to enforce various federal voting laws. The

---

[7] Even if the statutes were truly inconsistent, the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Section 302. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

SVRL is not just *any* record "requisite to voting." 52 U.S.C. 20701. It "serve[s] as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii).

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, the Uniformed and Overseas Citizens Absentee Voting Act, the NVRA, HAVA, or the Voting Rights Act of 1965, for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Benson III*, 2026 WL 2364306, at *15-16 (Thapar, J., dissenting); *Lynd II*, 306 F.2d at 228.

The district court's perceived conflict between Section 302 and required list maintenance is therefore not only illusory, but also harmful. It would effectively carve out vast numbers of federal election records, including SVRLs, from the United States' inspection authority under Title III, which was plainly not Congress's intent in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

### B. Courts play a limited role in assessing the Attorney General's demand under Title III.

Courts undertake a limited role in evaluating the sufficiency of a demand under Section 303. The Attorney General's authority under Title III is "purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and that "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking, through judicial process, records required to be maintained under Section 301, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a . . . written demand for inspection of records and papers covered in [Section ], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers

‘available for inspection, reproduction, and copying.’” *Id.* at 225-226 (internal quotation marks omitted) (quoting 52 U.S.C. 20703).

Title III’s special statutory proceeding limits how the Attorney General’s demand for federal election records may be challenged and reviewed. Under that statute, “[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General’s ‘statement of the basis and the purpose therefor’ as set forth in the written demand.” *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Nor is “the factual foundation for, or the sufficiency of,” this statement “open to judicial review or ascertainment.” *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*). Accordingly, a state official responding to the Attorney General’s demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge “the reasons why the Attorney General considers the records essential.” *Lynd II*, 306 F.2d at 226.

### 1. The Attorney General is entitled to Minnesota's SVRL without meeting the requirements for an administrative subpoena.

The Attorney General's demand for election records under Section 303 must "contain a statement of the basis and the purpose therefor." 52 U.S.C. 20703. But Title III contains no requirement that the Attorney General prove the relevance of the records to a particular investigation or purpose because the Title III demand power extends only to a specific, though broad, set of documents: those "relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. 20701. The authorization for administrative subpoenas is quite the opposite: the government can demand a wide variety of records and testimony from any person but, because there is no other limit on the person affected or the type of information, the information must be relevant or material to one of the agency's authorized purposes. *See United States v. Powell*, 379 U.S. 48, 49, 53 n.12 (1964) (noting that information can be obtained if it "may be relevant or material" (quoting 26 U.S.C. 7602 (1954 ed.))).

The district court held that a Title III demand is "a species of administrative subpoena" (Add.15; App.134; R.Doc.210, at 15 (citation

omitted)), and intervenors similarly argued that the court should scrutinize the Attorney General's demand under that framework (*see* R.Doc.86, at 15; R.Doc.105, at 10, 14). Both positions are wrong. The requirements for obtaining an administrative subpoena—that the subpoena is "(1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) the information sought is not unreasonable"—have roots in the Fourth Amendment. *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012) (per curiam) (quoting *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008)); *see Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-209 (1946) (discussing how the requirements of relevance, a congressionally-authorized purpose within Congress's power, and adequate specification of the documents satisfy the Fourth Amendment). And the relevance requirement, in particular, is also tethered to the *statutory* requirements for administrative subpoenas. *See Powell*, 379 U.S. at 53 n.12; *Whispering Oaks*, 673 F.3d at 817-818 (applying the relevance requirement to a subpoena issued pursuant to 18 U.S.C. 3486 as part of an investigation into a health care offense);

18 U.S.C. 3486(a)(1)(B)(i) (2012 ed.) (emphasis added) (authorizing a subpoena for "records or other things *relevant to the investigation*"). Many of this Court's administrative-subpoena precedents have arisen from proceedings under 26 U.S.C. 7602, which authorizes the Internal Revenue Service (IRS) to obtain documents and testimony "relevant or material" to an inquiry under an enumerated purpose. *See, e.g.*, *United States v. Carter*, 988 F.2d 68, 69 (8th Cir. 1993) (per curiam); *United States v. Clement*, 668 F.2d 1010, 1012 & n.1 (8th Cir. 1982).

And when this Court has enforced administrative subpoenas under other statutes, there has still been a statutory textual hook lending itself to a relevance inquiry. *See EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035 (8th Cir. 2006) ("The EEOC is entitled to 'any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by [Title VII] and is *relevant* to the charge under investigation.'" (quoting 42 U.S.C. 2000e-8(a))); *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 227 (8th Cir. 1984) (tying the relevance inquiry to contract provisions because the governing statute authorized subpoenas for documents to which the government official had access by agreement). This

limitation makes sense for administrative subpoenas, which are used to compel individuals and corporations to produce what could otherwise be an unlimited scope of documents.

Not so here. First, the DOJ has requested state records from a state official—not an individual's private papers. For this reason, Fourth Amendment concerns, which underpin the administrative-subpoena requirements, are not implicated. And second, Section 303 itself limits any request to a specific set of documents. Thus, there is no need, and no statutory authorization, for a relevance inquiry. Finally, unlike other subpoena statutes, Section 303 does not limit the purpose of any demand; a statement of purpose must simply be provided in the demand. As evidenced by a straightforward reading of the CRA, there is consequently no statutorily prescribed set of purposes to which courts could demand relevance. As a result, the full-scale administrative-subpoena requirements do not apply to a Title III action. Instead, "Title III narrowly circumscribes the issues upon which the Court is to act" and thus requires "a special statutory proceeding." *Lynd II*, 306 F.2d at 225.

In holding otherwise, the district court relied on *Powell*, 379 U.S. 48. *See* Add.15-16; App.134-135; R.Doc.210, at 15-16. The Supreme Court explained in *Powell* that "a court may not permit its process to be abused" and that judicial inquiry into the IRS's demand for records was appropriate to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. That inquiry was authorized by Section 7605(b) of the Internal Revenue Code (IRC), which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. 7605(b) (1954 ed.)). The CRA contains no similar statutory prohibition limiting the authority of the Attorney General to demand election records. And even if it did, *Powell*'s examples of "improper purpose[s]" are harassment, pressuring a taxpayer "to settle a collateral dispute," and "other purpose[s] reflecting on the good faith of the particular investigation." *Id.* at 58. In other words, *Powell* justified judicial inquiry into the IRS's demand where the IRS may have targeted the taxpayer for nefarious reasons having no bearing on

law enforcement at all, not where it may have overreached in its understanding of its legitimate law enforcement powers. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (holding that a district court had a "duty . . . to order . . . production" where "[t]he evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose"); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[I]n a subpoena enforcement action, the agency cannot be required to demonstrate that the very matter or entity it seeks to investigate under its statutory investigatory powers is covered by the enabling statute.").

Here, defendants argued that the Attorney General lacked the authority under the CRA to compel Secretary Simon to produce Minnesota's unredacted SVRL to determine the State's compliance with HAVA. R.Doc.65, at 20-21; R.Doc. 80, at 13; R.Doc.114, at 8-10; *see* R.Doc.86, at 17-18; R.Doc.103, at 19-21; R.Doc.105, at 19-20; R.Doc.112, at 13. Even if the Attorney General's demand *were* treated as an administrative subpoena, the inquiry defendants have requested would be improper. Because this challenge is to the scope of the Attorney General's authority to enforce HAVA, *see* 52 U.S.C. 21111, it

is not a proper subject for review. *See Endicott Johnson*, 317 U.S. at 509. To be sure, the CRA provides that the Attorney General may seek an order from a federal court "by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705. Appropriate process merely requires, however, that the state election official be "given reasonable notice of the pendency of the proceeding" and the opportunity to challenge "whether or not any specified particular paper or record comes within [Title III's] broad statutory classification." *Lynd II*, 306 F.2d at 226. Consistent with this understanding, the Supreme Court later clarified that *Powell* "was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. There is no dispute that Secretary Simon received the DOJ's written demand for Minnesota's SVRL, and that he also has received access to the court to resolve disputes as to Title III's coverage or to seek a protective order. That was all the process to which he was entitled.

### 2. Even under this Court's administrative-subpoena precedents, the United States is entitled to Minnesota' SVRL.

Even if Title III did not require "a special statutory proceeding," *Lynd II*, 306 F.2d at 225, at most it would mandate the standard applicable to other agencies' document demands, under which courts consider whether the subpoena is "(1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) the information sought is not unreasonable." *Fresenius*, 526 F.3d at 375.

The DOJ has more than met these requirements. The district court considered the DOJ's demand a type of administrative subpoena but failed to recognize the DOJ's compliance with administrative-subpoena precedents. *See* Add.15; App.134; R.Doc.210, at 15.

First, Title III specifically authorizes the DOJ to demand records covered by its provisions, 52 U.S.C. 20703, and Minnesota's SVRL is a covered record. *See* Argument I.A, *supra*.

Second, the DOJ sought Minnesota's SVRL to enforce HAVA, which is a congressionally authorized and proper purpose. *See* 52 U.S.C. 21111; Argument I.D, *infra*. Minnesota expressed concern that

the DOJ would usurp Minnesota's list maintenance process. R.Doc.103, at 21. But an inquiry into the scope of what the DOJ has authority to do after receiving the SVRL goes far beyond what a court may determine in assessing an investigative demand. *See Endicott Johnson*, 317 U.S. at 509; *Donovan*, 668 F.2d at 989.

Third, the SVRL is relevant to the authorized purpose of HAVA enforcement. HAVA requires Minnesota to perform list maintenance and put in place "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. 21083(a)(2)(A) and (4)(A). The SVRL is perhaps the most relevant evidence of whether Minnesota's list maintenance program is reasonable—a low rate of ineligible voters, for example, may suggest a program is more likely to be reasonable; a high rate, by contrast, suggests a program is more likely to be unreasonable. *See Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting) (discussing that, without the SVRL, the Attorney General cannot determine whether ineligible individuals are on the voter rolls). Further, HAVA prohibits a State from accepting or processing a voter registration application that lacks identifying numbers, *see* 52

U.S.C. 21083(a)(5)(A)(i), so the SVRL showing whether Minnesota has collected or assigned those numbers is relevant to an inquiry into HAVA compliance. And in any case, the relevancy requirement "is not particularly burdensome"; the question is whether the information sought is "plainly incompetent or irrelevant to any lawful purpose of the agency." *Whispering Oaks*, 673 F.3d at 818 (citation omitted).

Fourth, the DOJ's demand was reasonable. To be reasonable, a demand must not be unduly burdensome, *see Whispering Oaks*, 673 F.3d at 819, and generally should not seek records already in the government's possession, *Fresenius*, 526 F.3d at 376. There is no dispute that the DOJ does not already possess the SVRL, and electronic production of the SVRL would not unduly burden Minnesota.

### C. The DOJ's demand stated an adequate basis.

The district court granted defendants' Motions to Dismiss the United States' Title III claim based solely on the conclusion that the SVRL is not a record within the scope of Title III. Add.21; App.140; R.Doc.210, at 21. Defendants and intervenors raised numerous other arguments that the court did not reach, including an argument that the United States' statement of basis and purpose was inadequate, *see*

R.Doc.65, at 21-28; R.Doc.80, at 12-14; R.Doc.86, at 11-18. These arguments are incorrect.

Nothing in Title III purports to authorize courts to second-guess or probe the sufficiency or sincerity of the Attorney General's statement of basis and purpose. Indeed, the statute provides no meaningful standards that would permit such judicial review. *Benson III*, 2026 WL 2364306, at *15 (Thapar, J., dissenting); *cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that the Attorney General may demand, 52 U.S.C. 20701, and a requirement that he communicate "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

Thus, there is "no justification" for requiring the United States to "allege specific details" underlying its demand. *Lynd I*, 301 F.2d at 822. Indeed, even in the administrative-subpoena context—a higher standard for the government than Title III contemplates—"a regulatory agency need not advance facts in support of its application for enforcement of a subpoena." *Donovan*, 668 F.2d at 991.

Title III does not specify that "the basis" must be a factual one, as opposed to a legal one. *See* 52 U.S.C. 20703; *contra* R.Doc.114, at 6. Instead, the Attorney General need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added; citation omitted). "No showing even of a prima facie case of a violation of Federal law need be made." *Ibid.* (citation omitted).

Furthermore, nothing in Title III requires the United States to ritualistically use the word 'basis,' 'based upon,' or any other magic words when communicating its demand to a State. *Cf. Hannah P. v. Coats*, 916 F.3d 327, 345 (4th Cir. 2019) (citation and internal quotation marks omitted) ("Proper notice does not require any magic words."); *see also Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 n.5 (8th Cir. 1999) (similar).

The DOJ's demand for an unredacted copy of Minnesota's SVRL easily satisfied the notice requirement imposed by the basis-and-purpose language. The August 13 letter itself invoked the CRA, requested the SVRL, and stated that the DOJ's purpose was to "to ascertain

Minnesota's compliance with the list maintenance requirements of HAVA." App.88; R.Doc.66-2, at 2. This letter thus informed Secretary Simon of why the demand was being made and provided him with the statutory basis for the demand. This was all the notice to which he was entitled.

Even assuming that the DOJ was required to state a factual basis, it did so. In its June 25 letter, the DOJ requested Minnesota's SVRL and posed numerous questions to Secretary Simon about Minnesota's list maintenance under HAVA, referring to that statute throughout. App.50-51; R.Doc.66-1, at 1-2. In its follow-up letter, the DOJ again pointed to HAVA as the reason for its demand. App.88; R.Doc. 66-2, at 2. Under any reasonable interpretation of this statement, the basis for the DOJ's written demand is clear—that Minnesota's list maintenance program may violate HAVA—and thus the demand put Secretary Simon on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226; *see Bruce*, 298 F.2d at 861 (citation omitted) (stating that basing a demand upon "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting" "compli[ed] with the

requirements of [Title III]”). And even if this demand were still lacking, the DOJ cured any deficiency by submitting yet another follow-up letter during the pendency of this proceeding pointing to a report that a non-citizen “ha[d] been criminally charged for voting” in Minnesota. App.118; R.Doc.180-1, at 1.

The purpose of a notice requirement is to empower the receivers of the notice to comply with their responsibilities—or appropriately challenge their obligations. *Cf. Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000); *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999). The Attorney General’s demand gave Secretary Simon both notice of his obligation and—as evidenced by his follow-up letter and this litigation—the ability to challenge it.

Nothing in Title III requires the DOJ to spell out in detail its concerns and how the requested records will alleviate them. “Questions of relevancy or good cause . . . are completely foreign to the summary proceeding under [Title III].” *Lynd II*, 306 F.2d at 228. And in all events, federal agencies may “investigate merely on suspicion that the law is being violated, or even just because [they] want[] assurance that it is not.” *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

### D. The DOJ's stated purpose of ascertaining Minnesota's compliance with HAVA was sufficient.

The district court did not reach the sufficiency of the DOJ's stated purpose for its demand. Defendants and intervenors argued below that the DOJ's stated purpose was insufficient because (1) Title III may only be used to remedy civil rights violations or, more narrowly, racial discrimination (R.Doc.65, at 22-23; R.Doc.80, at 13; R.Doc.114, at 9) and (2) the DOJ's stated purpose was pretextual (R.Doc.115, at 10-14). They are wrong on both counts.

#### 1. Title III places no limits on the purpose of the Attorney General's demand.

Title III does not limit the proper purposes for which records may be demanded. Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness*, 572 U.S. at 553, with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross*, 557 U.S. at 175-176 (citation omitted). And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted).

Here, no language limiting Title III to violations of individuals' voting rights appears anywhere in the statutory text. *See* 52 U.S.C. 20701-20706. By contrast, Congress made clear elsewhere in the CRA when it intended a remedy to be limited to particular harms—namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. *Benson III*, 2026 WL 2364306, at *4 (Murphy, J., concurring) ("I see nothing in the statute's text that limits the purposes for which the DOJ may request the records."). It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

Section 303 does not contain a list of acceptable purposes. 52 U.S.C. 20703. This is a procedural limitation, not a substantive one. Section 303's "basis and purpose" requirement ensures reasonable notice to officers of election. *See Lynd II*, 306 F.2d at 226; *Coleman*, 313 F.2d at

868; *see also* 106 Cong. Rec. 6392 (1960) (explaining that the "basis and purpose" requirement was designed to ensure election officials had "notice as to why such an inspection was being made and as to what law or what constitutional provision, right, or immunity might be involved"). And stating the demand's purpose would be a useless exercise if only one permissible purpose existed.

Nevertheless, there are limitations on the United States' authority. Section 301's 22-month retention provision limits the temporal scope of the Attorney General's reach, and only records and papers "relating to" certain voting-related acts are subject to inspection. 52 U.S.C. 20701. In short, the Attorney General only has the inspection authority that Congress has granted him. But where Congress has provided him with "sweeping" authority, *Lynd II*, 306 F.2d at 226, that authority is not subject to judicial veto.

**2. The Attorney General's demand was for the purpose of protecting voting rights.**

Even if, as intervenors argued, Title III required a civil-rights related purpose (R.Doc.114, at 9), that requirement has been met here. Ensuring Minnesota's compliance with HAVA relates to individual voting rights. By broadly authorizing the Attorney General to demand

election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *Benson I*, 819 F. Supp. 3d at 767.

HAVA is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to improve "voting systems and voter access." U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last accessed Aug. 27, 2026).

Moreover, the Supreme Court has recognized that fraudulent votes—which can be minimized through HAVA's procedures—can "dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)

(per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). Because HAVA protects voting rights, "the DOJ may use the CRA to investigate possible violations of" that statute. *Benson I*, 819 F. Supp. 3d at 767.

HAVA itself contains no inspection provision. It is implausible that Congress intended for the Attorney General to lack the ability to inspect records so pertinent to his enforcement authority under HAVA. Given that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), a better inference is that Congress saw no need to provide an inspection provision for the Attorney General in HAVA because the CRA provided a pre-existing investigative tool.

Defendants and intervenors pointed out that HAVA makes States primarily responsible for list maintenance. *See* R.Doc.65, at 13-14; R.Doc.80, at 3-4. But Congress gave the Attorney General the authority to enforce HAVA, 52 U.S.C. 21111, thereby anticipating that the Attorney General might sometimes need to review a State's compliance. The Attorney General is not supplanting Minnesota's responsibilities—

the Attorney General has separate authority to *inspect* Minnesota's SVRL, not to *remove* anyone from the SVRL.

Furthermore, contrary to intervenors' suggestion (R.Doc.80, at 13), the United States previously has pursued successful matters, including in litigation, to obtain SVRLs under Title III of the CRA to investigate issues of list maintenance.[8] For example, in matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of social security numbers, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[9]

The Attorney General's enforcement authority under HAVA does not operate in a vacuum. Title III gives the Attorney General

---

[8] The DOJ has long utilized the CRA to investigate possible violations of federal election laws other than laws addressing voting related racial discrimination, such as the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301-20311. *See* Order, at 2, *United States v. Alabama*, No. 2:08-cv-920 (M.D. Ala. Mar. 27, 2009).

[9] *See* App.102-106; R.Doc.102-1 (Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006)). The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See* App.108-114; R.Doc.102-2 (Consent Decree, *Georgia*, *supra* (Oct. 27, 2006)). The Texas matter was resolved by a Memorandum of Understanding. *See* App.115-117; R.Doc.102-3 (U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008)).

investigative powers; HAVA gives him enforcement powers. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (citation omitted) (discussing the "strong presumption" that "federal statutes touching on the same topic" "can coexist harmoniously" and a court's duty to "giv[e] effect to both"). Title III and HAVA work together to secure fair elections. This Court can and should give full effect to both.

### E. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303.

Even if the United States' SVRL demand were judicially reviewable and not subject to a special summary proceeding (*see* Add.14-16; App.133-135; R.Doc.210, at 14-16), the district court was required to take the well-pleaded facts as true and draw all reasonable inferences in favor of the United States. *See Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020). And the existence of multiple purposes does not defeat a demand for records. *See In re Tax Liabilities. of: John Does, All Unknown Emps. of Boundary Waters Rest. v. United States*, 866 F.2d 1015, 1018 (8th Cir. 1989). Further, even under the administrative-subpoena standard, a party resisting a subpoena based on claims of an improper purpose must

support its assertions with evidence—"a heavy burden." *Whispering Oaks*, 673 F.3d at 817.

Defendants have not met this burden. Their reliance on out-of-court statements (*see* R.Doc.103, at 20), a memorandum of understanding *proposed to other* States (R.Doc.86, at 17), and news articles not properly subject to judicial notice (R.Doc.86, at 5-6) falls well short of the required showing.[10] Nor are defendants entitled to discovery on this point; their allegations do not amount to "a substantial preliminary showing." *United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983). And in any case, much of what defendants rely on suggests nothing more than that the DOJ is taking seriously its congressionally authorized responsibility to enforce federal election laws.

[10] Intervenors and defendants have also relied on mischaracterizations of a letter from then–Attorney General Bondi to the Governor of Minnesota. *See* R.Doc.115, at 12-13; *see also* R.Doc.112, at 2-3. Nowhere in that letter did the Attorney General "leverage[]" its SVRL request "for non-HAVA purposes" (R.Doc.115, at 12-13); rather, the letter tied the SVRL request to concerns about possible election law violations (*see* R.Doc.113-1, at 1-3).

### F. Minnesota must produce an electronic, unredacted copy of the SVRL.

Minnesota argued below that Title III permits redactions and "does not mandate electronic data." R.Doc.103, at 13-16; *see* R.Doc.80, at 14-15; R.Doc.86, at 18-23. Minnesota is incorrect.

First, a dispute as to *how* the United States may copy the SVRL has no bearing on *whether* the United States is entitled to a copy of the SVRL. Title III requires States to make records "available" to the Attorney General "for inspection, reproduction, and copying." 52 U.S.C. 20703. Because the SVRL exists in electronic form, *see* 52 U.S.C. 21083(a)(1)(A), the most natural way to reproduce or copy a computerized list is to make an electronic copy.

Second, Title III does not permit Minnesota to redact records. Analogizing the CRA to the NVRA, defendants and intervenors have argued that nothing in the CRA prohibits Minnesota from redacting sensitive information in the SVRL prior to producing it for inspection. *See* R.Doc.86, at 21; R.Doc.103, at 14. But there is a glaring distinction between inspection under the NVRA and inspection under the CRA; the NVRA contains a *public* inspection provision. Courts have interpreted the NVRA to not require releasing voters' unredacted personal

information to the public at large. *See Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). But under the CRA, only the Attorney General and his representatives may inspect covered records—and subject to strict disclosure limits. *See* 52 U.S.C. 20703, 20704. As for intervenors' concern about the burden such disclosure would place on the right to vote (*see* R.Doc.86, at 20-21; R.Doc.105, at 18-19), Congress, in enacting HAVA, has already weighed any competing interests and determined that fair, secure elections are sufficiently important to warrant requiring would-be registrants to provide States with their identifying information (including their federal Social Security Number), *see* 52 U.S.C. 21083(a)(5)(A)(i)-(ii). Having that same identifying information shared with the United States is no greater a burden.

And Congress anticipated that covered records would contain sensitive information when it prohibited the "disclos[ure of] any record or paper produced pursuant to [Title III]." 52 U.S.C. 20704. The purpose of the CRA—to allow the Attorney General access to the information necessary to determine whether there is a violation of federal law—would be entirely thwarted by allowing States to redact identifying information

from voting records. *See generally Benson III*, 2026 WL 2364306, at *14, *16 (Thapar, J., dissenting).

## II. The DOJ's demand for an electronic, unredacted copy of Minnesota's SVRL does not implicate nor violate federal or state privacy laws.

Because the district court held that the DOJ's demand was beyond the scope of Title III, it did not reach defendants' privacy-related arguments. Add.24; App.143; R.Doc.210, at 24. Defendants argued below that the demand violated three federal privacy laws—the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act—and Minnesota privacy laws. *See, e.g.*, R.Doc.106, at 4-5; R.Doc.112, at 14. Those arguments are meritless, and do not provide alternative grounds to affirm the erroneous district court decision. Moreover, state privacy or anti-disclosure laws do not permit Minnesota to defy Title III, and Minnesota's duty to comply with Title III is independent of any duty the United States has to comply with federal privacy laws. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS summons").

### A. Federal law preempts any contrary Minnesota privacy law.

Intervenors below argued that "Minnesota's privacy laws protect the sensitive information DOJ seeks from disclosure." R.Doc.106, at 2; *see also* R.Doc.112, at 15. Put simply, state law does not allow Minnesota to defy federal law. To the extent that state law purports to prohibit Minnesota from complying with the United States' demands, state law must yield. *See* U.S. Const. Art. VI, Cl. 2; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) (citation omitted) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'").

Notwithstanding a State's broad constitutional authority over the conduct of federal elections, including voters' privacy rights, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted). Congress's regulations "are paramount to those made by the State legislature; and if they

conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ibid.* (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)).

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law" and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; citation omitted). A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Crosby*, 530 U.S. at 373; *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation and internal quotation marks omitted) ("In every preemption case, the purpose of Congress is the ultimate touchstone.").

Congress has enacted numerous laws governing the conduct of federal elections. One such law, Title III of the CRA, authorizes the Attorney General to compel production of federal election records upon written demand. *See* 52 U.S.C. 20703. That authority is not conditioned

on compliance with state laws, nor is it limited to public records.[11] What is more, Title III specifically accounts for privacy concerns by imposing limitations on the DOJ's ability to disclose those records. *See* 52 U.S.C. 20704.

Another law, HAVA, requires states to implement a computerized SVRL and establishes "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. 21083(a)(4). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. See 52 U.S.C. 20703, 20705 (CRA); 52 U.S.C. 21111 (HAVA).

The United States is entitled under federal law to compel and inspect Minnesota's unredacted SVRL. To the extent state laws purport to prevent Minnesota from complying with this federal law—as

[11] Intervenors s' claim that "Title III is intended to reach *only* 'public records which ought ordinarily to be open to legitimate reasonable inspection,' *not* 'confidential, private papers and effects'" is an incorrect characterization of *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) (*Lynd II*). R.Doc.106, at 6-7; *see also* R.Doc.103, at 14. The *Lynd II* court was discussing why the district court's delay of inspection and copying was erroneous. 306 F.3d at 231. Because the demand was for "public records," the court could not see "any real convincing reason why this much delay [in compliance] is required." *Ibid*. *Lynd II* does not, as Defendants suggest, hold that Title III can only reach public records.

defendants have argued—state law must yield. *See, e.g.*, *Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023); U.S. Const. Art. VI, Cl. 2.

**B. The DOJ is complying with the Privacy Act.**

Intervenors argued below that the DOJ "failed to comply with its obligations under the federal Privacy Act" (R.Doc.106, at 10), including by failing to identify a System of Records Notice (SORN) that covers an unredacted SVRL, *id.* at 11 (citing 5 U.S.C. 552a(e)(4)); *see also* R.Doc.103, at 24; R.Doc.115, at 18. That is incorrect.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). It requires federal agencies to "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4).

The DOJ did so here. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT - 001, "Central Civil Rights Division Index File and

Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for enforcing "all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[12]

No more persuasive is the argument that this SORN's identification of "the categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), cannot be read to include all registered voters in Minnesota and other States. *See* R.Doc.106, at 12. The SORN covers a variety of people, including "[s]ubjects of investigations, [and]

[12] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Aug. 28, 2026).

victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. Moreover, because votes cast by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611.

Minnesota relied below on a provision of the Privacy Act that prohibits federal agencies from "maintain[ing] [any] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7); *see* R.Doc.103, at 25. Enforcing the CRA and HAVA is such

law enforcement activity, *see* 52 U.S.C. 20702, 21111. The United States nonetheless agrees not to object to redaction of information—like party affiliation and how an individual has voted—that both describes First Amendment activity and is not pertinent to the DOJ's investigation. The Privacy Act therefore provides no alternative basis to affirm the district court.

### C. The E-Government Act does not prevent the DOJ from obtaining Minnesota' SVRL.

In the district court, Minnesota argued that because the United States did not allege that it conducted a privacy impact assessment (PIA), the United States had not complied with the E-Government Act. R.Doc.103, at 26-27. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat. 2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the

disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of, nor imposed any reporting requirements on, any persons in connection with the DOJ's demand for Minnesota's (or any State's) SVRL. E-Government Act § 208(b)(1)(B)(i); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals to keep records or file reports regarding certain financial relationships or transactions with foreign agencies).

Second, a "collection of information" does not include information collected during this type of investigation. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of

information as part of an "investigation involving an agency against specific individuals or entities." The DOJ's investigation into Minnesota's compliance with HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 33), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr. (EPIC) v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being

only a short time ago; recent" or "[n]ever used . . . before now." The American Heritage College Dictionary 936 (4th ed. 2002).

The demand in this case did not begin any new collection of information. The Attorney General demanded that Secretary Simon provide Minnesota's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to pre-existing "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "initiat[ion of] a new collection of information," E-Government Act § 208(b)(1)(A)(ii).

### D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Minnesota's SVRL.

Minnesota also argued that the United States' demand violated the Driver's Privacy Protection Act (DPPA), 18 U.S.C. 2721 *et seq.*, which precludes the disclosure of personal information obtained in connection with a motor vehicle record. R.Doc.103, at 27. Although the DPPA

generally prohibits the disclosure of "personal information" obtained by a state department of motor vehicles in connection with a motor-vehicle record, *see* 18 U.S.C. 2721(a) and (c), 2725(1) and (3)-(4), disclosure is allowed "[f]or use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. 2721(b)(1); *see Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000).

The United States' demand for an electronic, unredacted copy of Minnesota's SVRL falls squarely within this exception. The DOJ is a "government agency . . . carrying out [one of] its functions," 18 U.S.C. 2721(b)(1), namely assessing and ensuring compliance with HAVA. *See* 52 U.S.C. 21111. Thus, the United States' use of and access to the SVRL is authorized even if some of the information within the SVRL originates from motor-vehicle records.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment dismissing the DOJ's Title III claim and denying the Motion for Order to Compel Federal Election Records, and remand with

instructions to order Secretary Simon to immediately produce the requested unredacted SVRL.

Further, because the DOJ is entitled to "prompt and expeditious inspection" of voting records under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). A decision in the coming weeks would still allow the United States to assist Minnesota in taking real steps to clean up its SVRL, if necessary, prior to the upcoming November 3, 2026, general election.

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

s/ Andrew G. Braniff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

Date: August 28, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,998 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365. This brief complies with Eighth Circuit Rule 28A(h)(2) because the ECF submission has been scanned for viruses with the most recent version of Crowdstrike (Version 7.39.21108.0.0) and is virus-free according to that program.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney

Date: August 28, 2026

## CERTIFICATE OF SERVICE

I certify that on August 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney