No. 26-2679

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

United States of America,

Plaintiff-Appellant,

vs.

Steve Simon, in his official capacity as Secretary of State
for the State of Minnesota; Minnesota, State of,

Defendants-Appellees,

Minnesota Alliance for Retired Americans Education Fund; Misael Hernandez;
Common Cause; League of Women Voters of Minnesota; Valerie Mangskau;
Jennifer Compeau; National Association for the Advancement of Colored People;
Cynthia Wilson,

Intervenor Defendants-Appellees.

**ON APPEAL FROM U.S. DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**
**25-CV-3761-KMM-EMB**

# BRIEF OF APPELLEES STEVE SIMON AND STATE OF MINNESOTA

*(See inside cover for continuation of counsel)*

KEITH ELLISON
Attorney General
State of Minnesota

ANGELA BEHRENS, No. 351076
ALLEN COOK BARR, No. 399094
Assistant Attorneys General
LINDSEY E. MIDDLECAMP, No. 392589
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125
(651) 757-1204 (Voice)

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

This case involves the federal government's nationwide and unprecedented demand for sensitive private data—including social security numbers, driver's licenses, and birth dates—on millions of registered voters. The government ostensibly seeks the data to assess compliance with the Help America Vote Act (HAVA). HAVA requires states to make reasonable efforts to maintain accurate voter-registration lists. 52 U.S.C. § 21083(a). HAVA gives the U.S. Attorney General enforcement authority, but not investigative authority. *Id.* § 21111. The United States invoked Title III of the Civil Rights Act of 1960, *id.* § 20703, to seek the data but did not allege it was investigating any civil-rights violations.

Minnesota's Secretary of State provided detailed information about the state's list-maintenance processes, and the United States has never identified any concerns about those processes. Because the Secretary had no legal basis to share sensitive voter data, he offered the public information list, which still includes significant amounts of voter data but excludes sensitive identifiers. The United States sued, alleging violations of Title III. The district court dismissed the complaint, concluding that the state's voter-registration list is not a record subject to a Title III demand. The court did not reach the appellees' alternative grounds for dismissal.

The state appellees believe that oral argument would benefit the Court, and agree with the United States that 20 minutes per side would be appropriate.

## TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT .................... i

TABLE OF AUTHORITIES .................... iv

STATEMENT OF ISSUES .................... 1

STATEMENT OF THE CASE .................... 2

SUMMARY OF ARGUMENT .................... 11

ARGUMENT .................... 12

I. THE FEDERAL RULES OF CIVIL PROCEDURE APPLY BECAUSE THE CRA DOES NOT PROVIDE AN ALTERNATIVE JUDICIAL PROCESS. .................... 13

II. THE SVRL IS NOT SUBJECT TO TITLE III BECAUSE IT IS NOT A RECORD OR PAPER THAT COMES INTO ELECTION OFFICIALS' POSSESSION. .................... 16

A. States Have Primary Authority Over Election Administration and Voter Data. .................... 17

B. HAVA Retains States' Primary Authority Over Election Administration and Limits the Federal Government's Authority. .................... 18

1. HAVA requires only reasonable efforts to maintain SVRLS. .................... 19

2. HAVA does not give DOJ investigative authority. .................... 21

C. SVRLs are Not Records or Papers Subject to CRA Demands. .................... 23

1. Destruction of voter-submitted records led to the CRA. .................... 23

2. The CRA's plain language limits Title III to records received from others. .................... 25

3. The CRA's legislative history confirms the law does not encompass SVRLs. .................... 32

III. EVEN IF THE CRA APPLIES TO THE SVRL, THE COURT SHOULD REMAND FOR THE DISTRICT COURT TO ADDRESS ALTERNATIVE GROUNDS FOR DISMISSAL. ....................34

A. DOJ's Demand Lacked the Required Basis and Purpose. ....................35

1. DOJ's demand lacked a basis. ....................35

2. DOJ's demand lacked a civil-rights purpose. ....................37

B. DOJ's Demand Was Not for a Legitimate Purpose, Was Not Made in Good Faith, and Was Overbroad. ....................40

1. DOJ failed to identify the actual purpose for its demand. ....................41

2. DOJ's demand was not made in good faith. ....................44

3. DOJ's demand was overbroad. ....................45

C. Federal Privacy Laws Prohibit the Demand. ....................46

1. The Privacy Act precludes DOJ's demand. ....................47

2. The E-Government Act precludes DOJ's demand. ....................50

3. The Driver's Privacy Protection Act precludes DOJ's demand. ....................50

IV. NO EXPEDITED DECISION IS NEEDED. ....................52

CONCLUSION ....................53

# TABLE OF AUTHORITIES

**Page**

**FEDERAL COURT CASES**

*Acosta v. La Piedad Corp.*,
894 F.3d 947 (8th Cir. 2018).......................................................... 37, 45

*Adams v. FTC*,
296 F.2d 861 (8th Cir. 1961).......................................................... 41, 45

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013)........................................................................ 17

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
576 U.S. 787 (2015)...................................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................... 12

*Becker v. United States*,
451 U.S. 1306 (1981)..................................................................... 13

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019)........................................................ 20

*Blue Ribbon Quality Meats, Inc. v. FTC*,
560 F.2d 874 (8th Cir. 1977).......................................................... 40

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999)...................................................................... 49

*CFPB v. Accrediting Council for Independent Colleges & Schools*,
854 F.3d 683 (D.C. Cir. 2017)......................................................... 40

*Cottier v. City of Martin*,
604 F.3d 553 (8th Cir. 2009).......................................................... 32

*Cudahy Packing Co. of Louisian. v. Holland*,
315 U.S. 357 (1942) ........ 21

*Daly v. United States*,
393 F.2d 873 (8th Cir. 1968) ........ 13, 15

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 40

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*,
9 F.4th 803 (8th Cir. 2021) ........ 25

*Donovan v. Lone Steer, Inc.*,
464 U.S. 408 (1984) ........ 40

*Duffy v. City of St. Peters, Missouri.*,
930 F.3d 973 (8th Cir. 2019) ........ 34

*EPA v. Calumet Shreveport Refining, LLC*,
145 S. Ct. 1735 (2025) ........ 27

*FTC v. American Tobacco Co.*,
264 U.S. 298 (1924) ........ 44

*General Electric Co. v. Boilermaker-Blacksmith National Pension Trust*,
176 F.4th 1059 (8th Cir. 2026) ........ 32

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009) ........ 25

*Honeycutt v. United States*,
581 U.S. 443 (2017) ........ 26

*Husted v. A. Philip Randoph Institute*,
584 U.S. 756 (2018) ........ 17

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ........ 39

*In re Gordon*,
218 F. Supp. 826 (S.D. Miss. 1963).................................................................. 45

*In re Grand Jury Subpoenas*, No. 26-mc-43,
2026 WL 1783899 (D. Minn. June 22, 2026)..................................................... 43

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)..........................................................................36-37

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)................................................................... 15, 36, 38

*Kentucky v. Graham*,
473 U.S. 159 (1985)......................................................................................... 30

*Life Investors Insurance Co. of America v. Federal City Region, Inc.*,
687 F.3d 1117 (8th Cir. 2012)........................................................................... 16

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)......................................................................................... 29

*Moore v. Kobach*,
359 F. Supp. 3d 1029 (D. Kan. 2019)................................................................ 17

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
970 F.2d 1010 (8th Cir. 2020)........................................................................ 1, 34

*New Hampshire Fire Insurance Co. v. Scanlon*,
362 U.S. 404 (1960)......................................................................................... 13

*New York Times v. Gonzalez*,
459 F.3d 160 (2d Cir. 2006).............................................................................. 14

*National Labor Relations Board v. North Bay Plumbing, Inc.*,
102 F.3d 1005 (9th Cir. 1996)........................................................................... 47

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)......................................................................................... 36

*Pennsylvania State Conference of NAACP Branches v. Secretary of Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024)........................................................................ 27

*Perry v. Precythe*,
121 F.4th 711 (8th Cir. 2024) ................................................................. 39, 48

*Peters v. United States*,
853 F.2d 692 (9th Cir. 1988)........................................................................ 22

*Pharmaceutical Research & Manufacturers of America v. Williams*,
64 F.4th 932 (8th Cir. 2023) ........................................................................ 34

*ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*,
558 F.3d 809 (8th Cir. 2009)........................................................................ 35

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................................................... 18, 46

*Public Interest Legal Foundation v. Bellows*,
92 F.4th 36 (1st Cir. 2024)...................................................................... 17, 46

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ...................................................................... 20

*Public Interest Legal Foundation v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021)................................................................... 17, 46

*Roberts v. Sea-Land Services, Inc.*,
566 U.S. 93 (2021) ................................................................................. 25, 39

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) ....................................................................................... 49

*Singleton v. Commissioner of Internal Revenue*,
439 U.S. 940 (1978) ..................................................................................... 31

*Smiley v. Holm*,
285 U.S. 355 (1932) ..................................................................................... 17

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ... 25

*Tashjian v. Republican Party of Connecticut*,
479 U.S. 208 (1986) ... 17

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2013) ... 18, 46

*Tukaye v. Troup*,
157 F.4th 958 (8th Cir. 2025) ... 12

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
599 U.S. 419 (2023) ... 1, 14

*United States v. Adams*,
No. 26-cv-19, 2026 WL 2123871 (E.D. Ky. July 23, 2026) ... 10, 31, 40

*United States v. Aguilar*,
No. 25-cv-728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026) ... 10, 14, 31, 35

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ... 11, 35, 40

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ... passim

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ... passim

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ... 10, 26, 31, 36

*United States v. Board of Elections of New York*,
No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ... 10, 31

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ... 10, 31

*United States v. Classic*,
313 U.S. 299 (1941) .......... 17

*United States v. DeMarinis*,
No. 25-3934, 2026 WL 1780586 (D. Md. June 18, 2026) .......... 10, 31

*United States v. Evans*,
No. 25-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026) .......... 9, 31, 40

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) .......... 9, 31

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .......... 10, 35

*United States v. Gradwell*,
243 U.S. 476 (1917) .......... 17

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026) .......... 9, 31

*United States v. Johnson*,
703 F. 3d 464 (8th Cir. 2013) .......... 25

*United States v. Koski*,
No. 26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026) .......... 11, 31

*United States v. Lask*,
703 F.2d 293 (8th Cir. 1983) .......... 42

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) .......... 10, 31, 35, 40

*United States v. Michigan*,
868 F. Supp. 890 (W.D. Mich. 1994) .......... 22

*United States v. Oliver*,
No. 25-cv-1193, 2026 WL 2031479 (D. N. Mex. July 14, 2026) .......... 10, 36

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ................................................ 10, 36, 40, 44

*United States v. Powell*,
379 U.S. 48 (1964) ...........................................................................Passim

*United States v. S.A.*,
129 F.3d 995 (8th Cir. 1997)............................................................ 26, 35

*United States v. Scanlan*,
No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026) ........................ passim

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026).................................................... 11, 31, 44

*United States v. Thomas*,
No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026)........................... 9, 31

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877 (S.D. W.Va. July 13, 2026)....... 11, 36, 40, 46

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ....................................................... passim

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) ....................................................... 11, 31

*United States v. Ziriax*, No. 26-cv-361
(W.D. Okal. 2026)........................................................................................... 9

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ......................................................................................... 29

*Watson v. Republican National Committee*,
146 S. Ct. 2165 (2026) ............................................................................ 15, 17

*Watt v. GMAC Mortgage Corp.*,
457 F.3d 781 (8th Cir. 2006)........................................................................... 22

**STATE COURT CASES**

*Cilek v. Office of Minnesota Secretary of State*,
927 N.W.2d 327 (Minn. Ct. App. 2019) ........ 3

*Cilek v. Office of Minnesota Secretary of State*,
941 N.W.2d 411 (Minn. 2020) ........ 18

**FEDERAL CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. art. I ........ 17

5 U.S.C. § 552 ........ 47-49

15 U.S.C. § 1312 ........ 22

18 U.S.C. § 1703 ........ 26

18 U.S.C. § 2721 ........ 50

18 U.S.C. § 2722 ........ 50

29 U.S.C. § 1134 ........ 22

31 U.S.C. § 3733 ........ 23

42 U.S.C. § 1997a ........ 22

44 U.S.C. § 3572 ........ 27

46 U.S.C. § 10705 ........ 26

50 U.S.C. § 217 ........ 26

52 U.S.C. § 10101 ........ 37-38

52 U.S.C. § 20503 ........ 23

52 U.S.C. § 20507 ........ 20, 23

52 U.S.C. § 20701 ........ passim

52 U.S.C. § 20702 ........ 28

52 U.S.C. § 20703 ........ passim

52 U.S.C. § 20705 ........ 1, 14, 41

52 U.S.C. § 21081 ........ 21

52 U.S.C. § 21082 ........ 21

52 U.S.C. § 21083 ........ passim

52 U.S.C. § 21085 ........ 21, 46

52 U.S.C. § 21111 ........ i, 5, 21

52 U.S.C. § 21112 ........ 21

52 U.S.C. § 21142 ........ 22

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (1957) ........ 23

E-Government Act of 2022, Pub. L. No. 107-347, 116 Stat. 2899 (2002) ........ 50

Help America Vote Act of 2002,
Pub. L. No. 107-252, 116 Stat. 1666 (2002) ........ 18-19

**STATE STATUTES AND RULES**

Minn. Stat. § 5B.02 ........ 18

Minn. Stat. § 5B.06 ........ 18

Minn. Stat. § 200.04 ........ 21

Minn. Stat. ch. 201 ........ 20

Minn. Stat. § 201.014 ........ 4

Minn. Stat. § 201.021 .......... 3, 30

Minn. Stat. § 201.022 .......... 3, 30

Minn. Stat. § 201.071 .......... 2, 3, 45

Minn. Stat. § 201.091 .......... 6, 18

Minn. Stat. § 201.12 .......... 3

Minn. Stat. § 201.13 .......... 3

Minn. Stat. § 201.14 .......... 3-4

Minn. Stat. § 201.121 .......... 4

Minn. Stat. § 201.145 .......... 3-4

Minn. Stat. § 201.1615 .......... 51

Minn. Stat. ch. 203B .......... 20

Minn. Stat. § 203B.03 .......... 4

Minn. Stat. § 203B.07 .......... 4

Minn. Stat. § 203B.081 .......... 52

Minn. Stat. ch. 204B. .......... 20

Minn. Stat. § 204C.10 .......... 4

Minn. Stat. § 204C.12 .......... 4

Minn. Stat. § 609.48 .......... 4

Minn. R. 8200.9315 .......... 3, 45

Minn. R. 8200.9320 .......... 51

Minn. R. 8215.0300 .......... 3, 45

Minn. R. 8290.1300 .......... 18

Minn. R. ch. 8200.......... 20

**FEDERAL ORDERS AND RULES**

Executive Order No. 14,248, 90 Fed. Reg. 14005, 14006 (Mar. 25, 2025) .......... 42

Fed. R. Civ. P. 1 .......... 1, 13

Fed. R. Civ. P. 25 .......... 30

Fed. R. Civ. P. 81 .......... 13

*Privacy Act of 1974; System of Records*,
68 Fed. Reg. 47610 (Aug 11, 2003).......... 48

*Privacy Act of 1974; System of Records*,
70 Fed. Reg. 43904 (July 29, 2005).......... 48

*Privacy Act of 1974; System of Records*,
82 Fed. Reg. 24147 (May 25, 2017) .......... 48

**LEGISLATIVE HISTORY**

106 Cong. Rec. 3683 (1960) .......... 24

Dwight D. Eisenhower, *Special Message to Congress on Civil Rights–February 5, 1959*, Pub. Papers of the Presidents (1960) ..........24

H.R. Rep. No. 956 (1959).......... 24

*Proposals to Secure, Protect, and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States; Hearings before the Subcommittee on Constitutional. Rights of the Senate. Committee of the Judiciary*, 86th Cong. (1959).......... 33

S. Rep. No. 93-1183 (1974) .......................................................................... 47

U.S. Commission on Civil Rights, *Report of the United States Commission on Civil Rights 1959* (1959)..........................................................passim

U.S. Commission on Civil Rights, *Civil Rights ’63* (1963)....................................34

U.S. Department of Justice, Office of Legal Policy, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entitles* (2002)...........................................................................................22

White House, Executive Branch Liaison Office, *The Administration and Civil Rights Legislation,* Fact Paper No. 279 (1957) ................................................24

**OTHER AUTHORITIES**

*American Heritage Dictionary of the English Language* (4th ed. 2000) ................19

*Black’s Law Dictionary* (12th ed. 2024)..................................................................19

Charles Doyle, Cong. Rsch. Serv., RL 33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* (Dec. 19, 2012)......................22

Christopher Famighetti et al., *Noncitizen Voting: The Missing Millions,* BRENNAN CENTER. FOR JUSTICE 1-2 (2017)..................................................... 43

*Eligible Voters at Risk*: *Examining Changes to USCIS’s SAVE System*, FAIR ELECTIONS CENTER (July 2025) ...................................................................... 43

*Experts Raise Alarms Over Census Bureau Report Trump is Touting on Noncitizen Voting*, NATIONAL PUBLIC RADIO (Aug. 20, 2026) .......................................... 43

Transcript of Oral Argument, *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), ECF 47 ...........................................................................................43, 45

*Webster’s Third New International Dictionary of the English Language* (1966)...........................................................26, 35, 37

## STATEMENT OF ISSUES

I. Is a complaint alleging a violation of Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20703, subject to the Federal Rules of Civil Procedure?

*The district court held that the Federal Rules of Civil Procedure applied to the United States' complaint.*

Apposite Authorities:
52 U.S.C. § 20705
Fed. R. Civ. P. 1
*United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023)
*United States v. Powell*, 379 U.S. 48 (1964)

II. Is a statewide voter-registration list subject to a demand under Title III of the Civil Rights Act of 1960?

*The district court held that, because state election officials create the list and do not receive it, it is not a record or paper that "come[s] into [their] possession" and therefore not subject to a Title III demand.*

Apposite Authorities:
52 U.S.C. § 20701
52 U.S.C. § 20703
*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026)

III. Even if the Court concludes that a statewide voter-registration list is subject to a Title III demand, should the Court remand to the district court so it may consider the appellees' alternative grounds for dismissal?

*Because the district court concluded that Title III did not apply to the voter-registration list, it did not reach the appellees' other arguments that the demand was facially deficient and not made in good faith or for a legitimate purpose.*

Apposite Authorities:
*MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.2d 1010 (8th Cir. 2020)

## STATEMENT OF THE CASE

This case arises from two rounds of correspondence between the U.S. Department of Justice (DOJ) and the Minnesota Secretary of State's office in 2025. (A.App. 40-43; R.Doc. 1, ¶¶ 28-40.[1]) Understanding the correspondence and allegations in this case requires an overview of the state's processes for collecting and maintaining voter-registration data.

***Minnesota Voter Data***

To carry out its election-administration responsibilities, and consistent with federal and state law, Minnesota collects an immense amount of data about voters and potential voters. Since 2002, the Help America Vote Act (HAVA) has required states to verify information in voter-registration applications by using either a driver's license number, the last four digits of a social security number, or—if the applicant has neither—a unique voter-identification number assigned by the state. 52 U.S.C. § 20183(a)(5). Accordingly, when registering to vote in Minnesota, applicants must provide their name, home address, date of birth, and either a state identification number (in the form of a driver's license number or other state-issued identification) or the last four digits of their social security number. Minn. Stat. § 201.071, subds. 1, 3. Applicants may optionally provide a phone number and email

[1] "A.App." refers to the appellant's appendix. "S.App." refers to the state appellees' appendix.

address. *Id.*, subd. 1. Minnesota also maintains a list of which elections people have voted in for the past six years, including voters' party affiliation if they voted in a presidential-nomination primary. Minn. R. 8200.9315(E), 8215.0300, subp. 2.

These data are put in the Statewide Voter Registration System (SVRS), a centralized database established and maintained by the Secretary and used by election officials to track voter-registration information. Minn. Stat. §§ 201.021, .022, subd. 2. The SVRS categorizes people based on their registration status. *E.g.*, *Cilek v. Off. of Minn. Sec'y of State*, 927 N.W.2d 327, 328 (Minn. Ct. App. 2019), *rev'd*, 941 N.W.2d 411 (Minn. 2020); *see also* Minn. Stat. §§ 201.12-.145 (identifying conditions under which various statuses apply). State and local election officials routinely update registration records. They receive regular reports from state and federal agencies with information affecting voter eligibility, such as who has died, moved, been incarcerated for a felony conviction, or otherwise been deemed ineligible to vote. *Id.* §§ 201.13, .14, .145; A.App. 57-59; R.Doc. 66-1 at 8-10. The State is also part of the Electronic Registration Information Center, a bipartisan consortium of states that securely share data to determine whether a voter may have moved to another state or died. (A.App. 44; R.Doc. 1 ¶¶ 41-42.)

***Minnesota's Statewide Voter Registration List***

This case involves Minnesota's statewide voter-registration list (SVRL). (A.App. 45-47; R.Doc. 1 ¶¶ 47, 53). As defined by HAVA, the SVRL includes each

registered voter's name and every field of registration information associated with that person. 52 U.S.C. § 21083(a)(1)(A)(ii). The SVRL is a subset of the SVRS and includes two categories of registrants. First, it includes people with an "active" status, meaning they are registered with no outstanding qualification issues. Second, it includes people with a "challenged" status. People may have this status for several reasons, such as failing a residency verification, being placed in a guardianship that revoked voting rights, being found incompetent to vote, or being incarcerated for a felony conviction. *E.g.*, Minn. Stat. §§ 201.121, subd. 2, .145, subds. 2-5. Challenged individuals are considered registered, but they may vote only after providing evidence establishing eligibility. *Id.* § 204C.12. The SVRL includes non-public data on millions of people such as social security numbers, driver's license numbers, and dates of birth. (A.App. 54, 59; R.Doc. 66-1 at 5, 10.)

Regardless of classification, before voting in any election, all voters must attest under penalty of perjury to their eligibility to vote. *E.g.*, *id.* §§ 204C.10, 203B.07. Voting when ineligible is a felony. *E.g.*, *id.* §§ 201.014, subd. 3, 203B.03, 609.48, subd. 1.

***DOJ Data Requests***

In the summer of 2025, DOJ asked Minnesota Secretary of State Steve Simon for information about the state's voter-registration practices and how the state maintains its SVRL. (A.App. 50-53; R.Doc. 66-1 at 1-3.) It also sought the SVRL,

including all data on "active and inactive" voters on the list. (A.App. 51; R.Doc. 66-1 at 3.) As noted above, the SVRL does not include inactive voters because they are not registered voters.[2]

DOJ identified no reason for its requests, instead generally referring to HAVA. (A.App. 50-52; R.Doc. 66-1 at 1-3.) Nor did it claim Minnesota was violating HAVA. (*Id.*) The Secretary's office provided detailed information about the state's registration and list-maintenance processes but declined to provide underlying registration data. (A.App. 53-60; R.Doc. 66-1 at 4-11.)

DOJ then sent a second letter. (A.App. 87-88; R.Doc. 66-2 at 1-2.) DOJ claimed that HAVA allowed it to demand the SVRL, but cited only HAVA's enforcement provision, 52 U.S.C. § 21111. (A.App. 87; R.Doc. 66-2 at 1.) For the first time, DOJ also cited Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. § 20703, claiming that law authorized the demand. (*Id.*) DOJ identified the sole purpose of the request as ensuring compliance with HAVA's list-maintenance requirements. (A.App. 88; R.Doc. 66-2 at 2.) It did not, however, identify any concerns with Minnesota's processes or a basis for believing that Minnesota was not HAVA-compliant. (A.App. 87-88; R.Doc. 66-2 at 1-2.)

---

[2] People with an "inactive" status typically have moved, died, or otherwise failed to vote or update their registration records for certain periods of time. Maintaining data for deceased individuals strengthens election officials' ability to detect fraud should someone try to register with a deceased person's identity.

The Secretary's office again declined the request, reminding DOJ it could instead obtain voter data from the state's public information list. (A.App. 89-94; R.Doc. 66-2 at 3-8.) The public information list includes each registered voter's name, address, birth year, and voting history (i.e., whether someone voted in a particular election). Minn. Stat. § 201.091, subd. 4(a).

***Litigation***

Rather than request the state's public data, the United States sued the Secretary and the State of Minnesota, alleging that they violated Title III of the CRA and HAVA. (A.App. 45-47; R.Doc. 1, ¶¶ 45-54.) The allegations were based solely on the refusal to produce the SVRL. (A.App. 40-43; R.Doc. 1, ¶¶ 28-44.) The United States did not allege any potential civil-rights violation as the basis for its demand. (*Id.*) Nor did it allege any underlying HAVA violation. (*Id.*) As relief, the United States asked the court to order the defendants to provide "Minnesota's current SVRL, including active and inactive voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their State driver's license number or the last four digits of their social security number." (A.App. 47-48; R.Doc. 1 at 15-16.)

Other organizations and individuals intervened as defendants. (Addendum 3 n.1; A.App. 122 n.1; R. Docs. 210 at 3 n.1.) The United States moved to extend motion deadlines, presuming that the defendants would either answer or move to

dismiss. (S.App. 1; R.Doc. 52.) All defendants moved to dismiss the complaint for failing to state a claim. (S.App. 4; R. Doc. 63.) In opposing the motions, the United States relied on only its second letter as the operative Title III demand. (S.App. 22-25; R.Doc. 102 at 9, 14, 18, 22.)

More than three months after filing the complaint, the United States moved to compel production of Minnesota's voter data. (A.App. 95; R.Doc. 70.) It asserted that the demand's sole purpose was assessing compliance with HAVA's list-maintenance requirements. (S.App. 16-17; R.Doc. 72 at 6, 14.) It did not argue it had any basis for believing Minnesota was violating HAVA or voters' civil rights. (*Id.*) But it claimed for the first time that the case was a summary proceeding not subject to the rules of civil procedure. (S.App. 18-20; R.Doc. 72 at 17-19.)

The state appellees identified numerous grounds for dismissing the complaint and denying the motion to compel, noting that they planned to assert several defenses or counterclaims if the court denied the motion to dismiss. For example, they argued that: the demand letter was facially deficient; even if facially sufficient, the federal government was not acting in good faith or for its stated purpose; and the demand and actual use violated several federal privacy laws. (*E.g.*, S.App. 6-14, 27-47, 53-60; R. Docs. 65 at 20-28, 103 at 8-28; 112 at 9-16.) To support the latter arguments, they identified the federal government's numerous statements—public and private—showing that it sought to create a national voter database and to use voter

data for other purposes like immigration enforcement. (*E.g.*, S.App. 48-51, 61-62; R.Docs. 104, 113) Paired with the United States' continued failure to identify any factual basis for believing Minnesota was not complying with HAVA, the state appellees argued that, at a minimum, they established a material fact dispute. (*E.g.*, S.App. 35-47; R.Doc. 103 at 16-28.) The United States did not file a reply brief on its motion to compel or otherwise respond to the allegations of bad faith. At the motion hearing, the United States' counsel could not commit to how it might use the data. (S.App. 75-76; R.Doc. 161 at 49-50.)

The district court granted the motions to dismiss and denied the United States' motion to compel. (Addendum 26; A.App. 145; R.Doc. 210 at 26.) The court first rejected the United States' argument that the court could not apply the rules of civil procedure or entertain motions to dismiss. (Addendum 14-16; A.App. 133-35; R.Doc. 210 at 14-16.) The court then held that the SVRL is not a record under the CRA and thus not subject to Title III record demands. (Addendum 16-23; A.App. 135-42; R.Doc. 210 at 16-23.) Because this issue was dispositive, the court did not reach the appellees' other arguments. (Addendum 23-24; A.App. 142-43; R.Doc. 210 at 23-24.)

The district court also dismissed the HAVA claim. Recognizing that the United States never alleged Minnesota was violating HAVA, the court held that HAVA does not permit the United States to undertake a fishing expedition in hopes

of finding a claim. (Addendum 25-26; A.App. 144-45; R.Doc. 210 at 25-26.) The United States does not appeal the dismissal of its HAVA claim. (Br. 6 n.2.)

***Related Litigation***

Minnesota was not the only state that refused to share voters' sensitive personal data with the federal government. DOJ made similar demands of nearly every other state. *United States v. Benson*, 179 F.4th 470, 474 (6th Cir. 2026) (*Benson II*), *rehearing denied* 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*). Like Minnesota, most declined. The United States sued thirty states and the District of Columbia. Like the Minnesota district court, every court—including one appellate court and twenty-two other district courts—has dismissed the United States' complaints.[3] *Benson II*, 179 F.4th 470; *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026), *appeal docketed*, No. 26-3609 (9th Cir. June 4, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026), *appeal docketed*, No. 26-1326 (10th Cir. Aug. 18, 2026); *United States v. Thomas*, No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July 28, 2026); *United States v. Evans*, No. 25-4403, 2026 WL 2267774 (D.D.C. Aug. 6,

[3] The United States voluntarily dismissed its lawsuit against Oklahoma. *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla. dismissed Mar. 24, 2026).

2026), *appeal docketed*, No. 26-5296 (D.C. Cir. Aug. 19, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026), *appeal docketed*, No. 26-2695 (7th Cir. Aug. 17, 2026); *United States v. Adams*, No. 26-cv-19, 2026 WL 2123871 (E.D. Ky. July 23, 2026), *appeal docketed*, No. 26-5657 (6th Cir. July 24, 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026), *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. DeMarinis*, No. 25-3934, 2026 WL 1780586 (D. Md. June 18, 2026), *appeal docketed*, No. 26-1878 (4th Cir. July 13, 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 9, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*); *United States v. Aguilar*, No. 25-cv-728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026), *appeal docketed*, No. 26-5375 (9th Cir. Aug. 20, 2026); *United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); *United States v. Oliver*, No. 25-cv-1193, 2026 WL 2031479 (D. N. Mex. July 14, 2026), *appeal docketed*, No. 26-2126 (10 Cir. July 27, 2026); *United States v Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026), *appeal docketed*, No. 26-3085 (3d Cir. Aug. 20, 2026); *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026), *appeal docketed*, No. 26-2060 (2d Cir. July 28, 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3,

2026); *United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026), *appeal docketed*, No. 26-2684 (3d Cir. July 7, 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 9, 2026); *United States v. Koski*, No. 26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026), *appeal docketed*, No. 26-2002 (4th Cir. July 29, 2026); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877 (S.D. W.Va. July 13, 2026); *United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026), *appeal docketed*, No. 26-2217 (7th Cir. June 5, 2026).

## SUMMARY OF ARGUMENT

The Court should affirm the district court. The United States argues that its Title III claim is effectively exempt from judicial review, that the CRA gives it sweeping authority to request any election-related record it wants for any reason, and that it is unconstrained by principles of good faith. As the district court and numerous other courts have concluded, these arguments are atextual. Nothing in the CRA creates a summary proceeding exempt from the Federal Rules of Civil Procedure or judicial review. And by limiting the CRA to records and papers that "come into [election officials'] possession," Congress excluded documents that election officials create, like the SVRL. The CRA also requires relevant records and papers to be preserved, and prohibits altering them. Yet other laws, like HAVA,

require election officials to update and alter the SVRL. It is not a static document that can be preserved and therefore is not subject to Title III.

If the Court disagrees and concludes that the SVRL could be subject to a Title III demand, the Court should remand for the district court to decide in the first instance the appellees' alternative grounds for dismissal. But even if the Court addresses the alternative grounds, it should still affirm. A proper Title III demand must include a factual basis and a civil-rights-related purpose. And the federal government must act in good faith and for a legitimate purpose. In arguing otherwise, the United States rests primarily on strawman arguments. The appellees have not sought to litigate the ultimate merits of any underlying investigation. Rather, their arguments are simple: to make a valid demand, the federal government must comply with its authorizing statute, and it cannot act in bad faith or use its demand authority as a smokescreen for other purposes.

## ARGUMENT

This Court reviews de novo the dismissal of a complaint for failing to state a claim. *Tukaye v. Troup*, 157 F.4th 958, 961 (8th Cir. 2025). To survive dismissal, a plaintiff must allege sufficient facts that, if true, state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a court cannot infer "more than the mere possibility of misconduct," it should dismiss. *Id.* at 679.

The Court should affirm the dismissal of the United States' complaint. The district court properly applied the rules of civil procedure to the complaint. And because Title III does not require states to provide their voter-registration lists upon demand, the United States' claim failed as a matter of law. If the Court concludes the SVRL is subject to Title III, it should remand to allow the district court to address the remaining grounds for dismissal.

## I. THE FEDERAL RULES OF CIVIL PROCEDURE APPLY BECAUSE THE CRA DOES NOT PROVIDE AN ALTERNATIVE JUDICIAL PROCESS.

The United States argues that the district court erred by allowing motions to dismiss and applying the Federal Rules of Civil Procedure to evaluate its complaint. (Br. 27-35.) The district court did not err. The rules presumptively apply, the CRA did not alter that presumption, and the United States' conduct in litigating the case reinforces that outcome.

Unless a statute or rule specifies otherwise, the Federal Rules of Civil Procedure govern "all civil actions and proceedings" in federal district courts. Fed. R. Civ. P. 1. This presumption includes cases involving the federal government's attempts to enforce document requests. *E.g.*, Fed. R. Civ. P. 81(a)(5); *Becker v. United States*, 451 U.S. 1306, 1307-08 (1981). Absent express statutory authorization, courts are "extremely reluctant" to impose processes more summary than the rules provide. *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407-08 (1960); *see also Daly v. United States*, 393 F.2d 873, 876 (8th Cir. 1968) (cautioning that,

absent express statutory language, summary processes should be used “only in narrowly defined special situations”). Courts should not “lightly infer”—particularly from silence—that Congress intended a different process. *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023); *see also N.Y. Times v. Gonzalez*, 459 F.3d 160, 166 (2d Cir. 2006) (observing that statutes creating special proceedings use specific language identifying “procedures and remedies specifically tailored to a limited subset of cases”).

Here, the CRA requires election officials to preserve certain records and allows the U.S. Attorney General to inspect them upon making a proper written demand. 52 U.S.C. §§ 20701, 20703. Federal district courts have “jurisdiction by appropriate process” to compel production of the records. 52 U.S.C. § 20705. When a statute allowing judicial enforcement merely refers to an “appropriate process” without specifying another procedure, it does not create a special statutory proceeding. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964).

Under this framework, the district court correctly applied the rules of civil procedure to the CRA. As in *Powell*, the statute authorizing enforcement uses “appropriate process” but does not specify the procedure, so the Federal Rules of Civil Procedure control. In the parallel lawsuits seeking voter data, every court to address this issue in the context of the CRA has reached the same conclusion. *See, e.g.*, *Aguilar*, 2026 WL 2364502, at *3 (collecting cases).

The United States' arguments to the contrary are unpersuasive. It primarily disputes the district court's reading of *Powell* and view that CRA demands are like administrative subpoenas. But the United States does not meaningfully grapple with the strong presumption that the rules of civil procedure apply to *all* "civil actions and proceedings," and the lack of another process identified in the CRA. Instead, it relies primarily on a Fifth Circuit case, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), to argue that Title III creates a special statutory proceeding where defendants have few, if any, rights. (Br. 32.) *Lynd* is not binding or persuasive. The case is inconsistent with the CRA's plain language, and predates *Powell*'s holding that, standing alone, a statutory reference to "appropriate process" does not create a special statutory proceeding. *See Daly*, 393 F.2d at 875-76 (applying *Powell*); *see also Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2174 (2026) (recognizing that historical practice is not dispositive when interpreting statutes).

The United States suggests that *Powell* is distinguishable because it addressed an IRS statute. (Br. 30-33.) This argument misses the point. *Powell* interpreted the statutory phrase "appropriate process" when the statute did not further specify the judicial process. The CRA uses the same language.

The United States similarly argues about the scope of what may be challenged in a CRA action. (*E.g.*, *id.*at 29-35.) As explained below, defendants can raise certain challenges. But even if some inquiries might be limited in the investigative-demand

context, those limits go to substantive *scope* of discovery or any resulting hearing, not to whether the rules apply at all. And arguments about what the court may have done if it denied the motions to dismiss are not ripe. *See, e.g.*, *Life Invs. Ins. Co. of Am. v. Fed. City Region, Inc.*, 687 F.3d 1117, 1122 (8th Cir. 2012) (holding that issue district court did not address was not ripe for appellate review).

Finally, the United States' claim of a special process how it litigated this case: it filed a standard complaint, proposed a standard briefing schedule with dispositive motions, waited nearly three months to claim that a special process exists, and never sought to expedite the case. The district court's sole action in applying the rules should be uncontroversial: it analyzed a question of law by assessing whether the United States stated a claim. The district court did not err.

## II. The SVRL Is Not Subject to Title III Because it Is not a Record or Paper that Comes into Election Officials' Possession.

The district court properly dismissed the United States' Title III claim because it has no right to the SVRL. The United States' claim implicates three intersecting areas of law: states' presumptive authority over elections, HAVA's list-maintenance requirements that preserve states' broad authority, and the CRA's separate civil-rights focus. The CRA allows the United States to obtain certain records that election officials *receive* so it can investigate potential civil-rights violations; it does not allow the United States to obtain records that election officials *create* like the SVRL. The CRA is not a mechanism for auditing HAVA compliance.

### A. States Have Primary Authority Over Election Administration and Voter Data.

States have primary authority to decide the time, place, and manner of federal elections. U.S. Const. art. I, § 4. Only Congress, through legislation, may impinge this authority. *Id.*; *Watson*, 146 S. Ct. at 2170. When it does so, it uses positive, clear language. *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

States' power to set election procedures is broad. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *United States v. Classic*, 313 U.S. 299, 311 (1941). It encompasses providing a "complete code" for elections. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). This includes establishing voter-registration procedures, maintaining voter rolls, and protecting voter data. *Husted v. A. Philip Randoph Inst.*, 584 U.S. 756, 774 (2018); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013); *Smiley*, 285 U.S. at 366; *see also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 822 (2015) (identifying other state procedures that constitute time, place, and manner regulations). As discussed above, implementing a comprehensive elections system requires collecting data about voters and potential voters. These data necessarily implicate significant privacy interests. *E.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021); *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1049-50 (D. Kan. 2019); *Project*

*Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2013).

Given the data's sensitive nature, Minnesota's legislature carefully balanced who may access voter data and for what purposes. *Cilek v. Off. of the Minn. Sec'y of State*, 941 N.W.2d 411, 417 (Minn. 2020). The state's public information list includes each registered voter's address, year of birth, and voting history. Minn. Stat. § 201.091, subds. 4-5. It excludes addresses of voters in the state's address-confidentiality program for people who have been victims (or are at risk of being victims) of domestic violence, sexual assault, harassment, or stalking. *Id.* §§ 5B.02, subd. 1(2), .06; Minn. R. 8290.1300, subp. 2a. Beyond these disclosures, Minnesota does not mandate any voter-data disclosures. *See, e.g.*, *Cilek*, 941 N.W.2d at 417 (rejecting organization's attempt to obtain all SVRS data). And the legislature expressly restricted disclosure of dates of birth, full or partial social security numbers, and various identification numbers. Minn. Stat. § 201.091, subd. 9.

### B. HAVA Retains States' Primary Authority Over Election Administration and Limits the Federal Government's Authority.

While the United States does not challenge the dismissal of its independent HAVA claim, HAVA is the foundation of its CRA claim. Congress enacted HAVA in 2002 to establish minimum election-administration standards for state and local election officials when administering federal elections. Pub. L. No. 107-252, 116

Stat. 1666 (2002). But HAVA's list-maintenance requirements do not provide the broad authority the United States claims.

### 1. HAVA requires only reasonable efforts to maintain SVRLS.

HAVA requires states to create and maintain an electronic SVRL. 52 U.S.C. § 21083(a)(1)(A). It also establishes minimum standards for maintaining the list. *Id.* § 21083(a)(4). States must have a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote" while "ensur[ing] that eligible voters are not removed in error." *Id.*

This list-maintenance requirement is central to the United States' data demand. But HAVA does not support the United States' sweeping demand. HAVA's plain language requires only a "system of file maintenance" that makes a "reasonable effort" to remove ineligible registrants while safeguarding eligible registrants. Because HAVA does not define these phrases, their ordinary meanings apply. A "system" is "[a] group of interacting, interrelated, or interdependent elements forming a complex whole." *American Heritage Dictionary of the English Language* 1757 (4th ed. 2000). "Reasonable" means "rational" or "being in accordance with reason or sound thinking." *Id.* at 1457; *see also Reasonable efforts*, *Black's Law Dictionary* (12th ed. 2024) ("One or more actions rationally calculated to achieve a usu[ally] stated objective, but not necessarily with the expectation that all

possibilities are to be exhausted.") HAVA thus requires only that the states have rational means for removing ineligible voters from SVRLs.

"Reasonable efforts" are just that: reasonable, not perfect, efforts to maintain accurate registration lists.[4] *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625, 628 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026); *Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019). HAVA's focus is systemic procedures rather than individual voter records. Courts have rejected the "spot check" method of assessing SVRLs (i.e., pointing to ineligible voters) to determine compliance with list-maintenance obligations. *See, e.g.*, *Pub. Int. Legal Found.*, 136 F.4th at 626-27; *Bellito*, 935 F.3d at 1205-07 (11th Cir. 2019); *Weber*, 2026 WL 118807, at *16. Nor would such spot checks be informative. SVRLs are dynamic, constantly changing as people move, die, or otherwise have life events affecting eligibility. (*E.g.*, A.App. 57-59; R.Doc. 66-1 at 8-10.) A static list from a single day would say little about whether a state's list-maintenance system makes reasonable efforts to update data.

Relevant to this case, the United States has never claimed that Minnesota lacks a system of list maintenance that makes reasonable efforts to remove ineligible registrants and safeguard eligible ones. Nor could it: Minnesota makes reasonable efforts to update its SVRL. *See, e.g.*, Minn. Stat. ch. 201, 203B, 204B; Minn. R.

[4] The Sixth and Eleventh Circuit were interpreting a parallel "reasonable efforts" list-maintenance provision in the National Voter Registration Act, 52 U.S.C. § 20507(a)(4)(A).

ch. 8200. When DOJ asked, the state explained these processes in detail and received no questions about them. (A.App. 54-59; R.Doc. 66-1 at 4-10.)

#### 2. HAVA does not give DOJ investigative authority.

While creating list-maintenance requirements, Congress kept states in the driver's seat of election administration. States define, maintain, and administer SVRLs; perform list maintenance; and decide whether to register particular applicants and how to remove ineligible ones. *See, e.g.*, 52 U.S.C. § 21083(a)(1)(A), (2)(A)(iii), 4(A), (5)(A)(iii) (giving states final authority to determine whether applicant provides enough information for verification purposes); *id.* § 21085 (leaving methods of HAVA compliance to states' discretion).

HAVA has two enforcement mechanisms: a civil action by the U.S. Attorney General and a state administrative-complaint procedure. *Id.* § 21111-12; *see also* Minn. Stat. § 200.04 (establishing Minnesota's administrative-complaint process). As to the U.S. Attorney General's enforcement authority, the authority is limited to bringing a civil action "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title." 52 U.S.C. § 21111.

Enforcement authority does not confer investigative authority, and Congress's decision to withhold the latter is not unusual. The executive branch's authority to require data production is statutory. *See, e.g.*, *Cudahy Packing Co. of La. v. Holland*,

315 U.S. 357, 360-67 (1942) (concluding that even statutes giving subpoena authority did not permit delegating subpoena-signing authority within agency); *see also Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) (recognizing statute must create agencies' investigative authority); *United States v. Michigan*, 868 F. Supp. 890, 893 (W.D. Mich. 1994) (rejecting argument that enforcement authority implicitly gave U.S. Attorney General investigative authority to inspect records). When construing a statute, courts assume that Congress intentionally omitted words that it did not use. *Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006).

Within HAVA, Congress gave the U.S. Attorney General authority to audit financial grants, but not voter-registration data. *Id.* § 21142(b). In addressing data-sharing, Congress authorized states only to share with other state agencies and local governments. *Id.* § 21083(a)(1)(A)(iv)-(v). In contrast, Congress expressly granted DOJ or other federal agencies broad investigative or subpoena authority in more than 300 provisions of federal law, spanning a variety of contexts. *See, e.g.*, Charles Doyle, Cong. Rsch. Serv., RL33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* 4 (Dec. 19, 2012); *see also* U.S. Dep't of Just., Off. of Legal Pol'y, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities* § I.A (2002). As just a handful of examples: the Antitrust Civil Process Act (15 U.S.C. § 1312(a)), the Civil Rights of Institutionalized Persons Act (42 U.S.C. § 1997a-1(a)), ERISA (29 U.S.C.

§ 1134(a)), and the False Claims Act (31 U.S.C. § 3733(a)) each provide express authority to investigate and inspect or collect records.

Congress excluded this authority from HAVA. The National Voter Registration Act (NVRA) reinforces that intentional choice. In contrast to HAVA, the NVRA requires subject states to make certain list-maintenance records publicly available. 52 U.S.C. § 20507(i). Collectively, these statutes show that Congress knows how to create authority to demand data. But Congress excluded this authority from HAVA. As for the NVRA, Minnesota is exempt from its requirements. *Id.* § 20503(b)(2) (exempting states with election-day registration in 1994). And, as explained below, even under the NVRA states can redact sensitive data.

### C. SVRLs are Not Records or Papers Subject to CRA Demands.

Against this backdrop is the central question before the Court: the scope of records subject to Title III of the CRA. The CRA's text and history confirm that it is not a backdoor mechanism for the federal government to audit states' voter-registration data or assess HAVA list-maintenance compliance. Rather, Congress limited it to inspecting materials election officials receive, not those they create.

#### 1. Destruction of voter-submitted records led to the CRA.

The CRA built on prior legislation that proved ineffective in combatting race discrimination in voting. In 1957, Congress created the bipartisan Commission on Civil Rights. *See* Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (1957);

*see also* White House, Exec. Branch Liaison Off., *The Administration and Civil Rights Legislation*, Fact Paper No. 279 (1957), https://perma.cc/WF7Q-8XDX. In its first report, the Commission emphasized racial discrimination that resulted in denials of the right to vote. U.S. Comm'n on Civil Rights, *Report of the United States Commission on Civil Rights 1959*, at 40 (1959) [hereinafter *1959 CCR Report*], https://perma.cc/J55Z-VVP8. The Commission also reported that states had thwarted the Commission's core purposes by failing to retain or produce rejected voting applications and other registration documents. *See, e.g.*, *id.* at 70, 93, 98, 137.

The Commission recommended requiring states to preserve and retain these documents for inspection. *Id.* at 138. President Eisenhower similarly urged Congress to strengthen the federal response to racially discriminatory voting practices. Dwight D. Eisenhower, *Special Message to Congress on Civil Rights - Feb. 5, 1959*, Pub. Papers of the Presidents 164-65 (1960). In discussing the CRA, legislators repeatedly characterized the legislation's general purpose as eradicating racial discrimination in the voting arena. *E.g.*, H.R. Rep. No. 956, at 7 (1959); 106 Cong. Rec. 3683, 3692, 5192-94, 5208-09, 5299-300, 5450 (1960) (statements of Sen. Jacob Javits, Rep. Ray Madden, Rep. William McCulloch, Rep. Seymour Halpern, and Rep. Emanuel Cellar).

It was against this backdrop that, in 1960, Congress exercised its authority under the Fourteenth and Fifteenth Amendments to enact the CRA. *South Carolina*

*v. Katzenbach,* 383 U.S. 301, 313 (1966). Its key provisions relate to record retention and inspection, providing in relevant part:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary [federal] election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .

52 U.S.C. § 20701. The U.S. Attorney General's authority to inspect records under Title III of the CRA is limited to these records. *Id.* § 20703.

Because piecemeal litigation under the CRA and its predecessor remained ineffective in combating race discrimination, Congress soon enacted the Voting Rights Act of 1965, which included "sterner and more elaborate measures." *Katzenbach*, 383 U.S. at 309, 313-14.

#### 2. The CRA's plain language limits Title III to records received from others.

In assessing the CRA's inspection authority, the starting point is the statute's language, considering contemporaneous understandings of the relevant statutory terms. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-76 (2009). Courts construe statutory text based on the context in which it appears and the broader context of the whole statute. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2021); *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021). Courts assume that each part of the text has meaning. *United States v. Johnson*, 703 F. 3d 464, 468 (8th Cir. 2013). When the plain language

contains some indicators of intent, but leaves room for ambiguity, courts give the statute a "sensible construction" that accounts for the law's purpose and subject matter, along with the circumstances preceding its enactment. *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997).

The district court correctly concluded that only records that "come into [an election official's] possession" are subject to Title III demands and the SVRL is not such a record. (Addendum 17-23; A.App. 136-42; R.Doc. 210 at 17-23.) "Come into possession" is synonymous with "obtain," "get," and "acquire." *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (citing *Random House Dictionary of the English Language* 995 (1966) and 7 *Oxford English Dictionary* 37 (1933)); *see also Webster's Third New International Dictionary of the English Language* 453 (1966) (defining "come into" as "to enter upon or into possession of").

As used in the CRA, the phrase refers to items received or acquired by election officials, not those that officials create. As other courts have observed, this mirrors other statutes in which Congress used "come into possession" to refer to items obtained from another source. *Benson I*, 819 F. Supp. at 768 (identifying multiple statutes using phrase for external sources); *see also*, *e.g.*, 18 U.S.C. § 1703(a) (prohibiting Postal Services officer or employee from destroying or opening mail that "come[s] into his possession"); 50 U.S.C. § 217 (requiring soldiers to report property that "comes into [their] possession"); 46 U.S.C. § 10705 (establishing

processes when deceased seaman's property "comes into possession of a consular officer"); 44 U.S.C. § 3572 (limiting federal employees' use of confidential information that "comes into [their] possession").

Other CRA text confirms this reading. When a catchall follows a statutory list of documents, courts construe the catchall to include items like those specifically enumerated. *EPA v. Calumet Shreveport Refining, LLC*, 145 S. Ct. 1735, 1746 (2025). The CRA identifies specific types of documents that may come into election officials' possession: applications, registrations, and poll-tax payments. 52 U.S.C. § 20701. These are all voter-submitted documents. The CRA's catchall of "other act requisite to voting" therefore also refers to the same type of documents. *See Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 132 (3d Cir. 2024) (interpreting identical language in Civil Rights Act of 1964). Similarly, Congress's use of "relating to" ties back to these documents, all limited by the phrase "comes into his possession."

The CRA's imposition of a retention period tied to a specific election also highlights Congress's intent to encompass registration-related materials received for specific elections, not routinely updated internal administrative databases. This makes sense considering the practical need the CRA was designed to meet: investigating allegations of election officials treating prospective voters' registration applications differently based on race.

In contrast to underlying records that election officials receive from voters, the SVRL does not come into election officials' possession. It is not something that election officials receive; they establish and maintain it. While individual pieces of data may be used in the SVRL, the SVRL is established and maintained solely by election officials. As the Sixth Circuit observed, this is confirmed by the natural use of the phrase "come into possession": a baker who bought ingredients and then baked a cake would not then say that she "came into possession" of a cake. *Benson II*, 179 F.4th at 479. Had Congress intended to encompass all records in election officials' possession, it would have said so.

Other federal laws confirm that the CRA's record-retention requirement does not encompass the SVRL. The CRA requires election officials to "retain and preserve" records and papers, and it expressly prohibits destroying or altering these records and papers. 52 U.S.C. §§ 20701-02. An SVRL is inherently dynamic because HAVA (and for some states, the NVRA) mandates regular updates. By its nature, an SVRL is not preservable in a static state. It cannot be that election officials must violate one law to comply with the other. And because of its constantly changing nature, any snapshot of an SVRL would be immediately out of date and of limited utility. On this point, the United States strains to harmonize the laws, suggesting "alter" does not really mean "alter" and that HAVA is an exception to

the requirement. (Br. 24-25.) This interpretation would defeat the CRA's purpose: retaining and preserving records.

The United States' other arguments are similarly unavailing. The United States dances around section 20701's limiting phrase "comes into possession" by focusing on other phrases in isolation, defining terms the statute does not use, and citing other statutes that use different phrases. What "comes into possession" may mean when surrounded by different phrases does not bear on its meaning in section 20701. *See, e.g.*, *Scanlan*, 2026 1864054, at *5 ("Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source, including in the statutes cited by the United States.") For example, the United States cites *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989). In that case, the Court interpreted "agency records" in the Freedom of Information Act. *Id.* at 143, 145. The issue was whether the agency had control of documents, not how they arrived at the agency. *Id.*

The self-serving legal opinion that DOJ issued in May 2026—the day before its Sixth Circuit oral argument—similarly carries no weight on what a law written more than 65 years earlier means. *Benson II*, 179 F.4th at 482; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (recognizing contemporaneous executive-branch interpretations may be entitled to deference).

Nor does the law support the United States' argument that the statute merely creates a "temporal distinction" to encompass all records created or obtained during the twenty-two-month retention period. (Br. 8, 45.) In short, the United States asks the Court to believe that Congress took a convoluted and counterintuitive route to broadly encompass all records and papers that *are* in an election official's possession. If Congress intended to cover present possession, regardless of circumstances, it would have written "records or papers in his possession." But it did not. As the Sixth Circuit observed, the temporal argument also falls apart by timing. *Benson II*, 179 F.4th at 481-82. The SVRS and SVRL have existed for decades, far before the relevant twenty-two-month period. *See, e.g.*, Minn. Stat. §§ 201.021-.022.

The United States next suggests that each election official still "receives" an SVRL from external sources because they personally acquire it when taking office. (Br. 21-22.) This argument overlooks the capacity in which election officials maintain SVRLs. In Minnesota, for example, the Secretary of State maintains the SVRL, no matter who the officeholder is. Minn. Stat. § 201.021. Thus, Secretary Simon's role relative to the SVRL comes in his official capacity, which for legal purposes is the state. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); Fed. R. Civ. P. 25(d) (providing automatic substitution of public officials). And the SVRL is not a discrete document or file handed off to each successor. It is generated from a continually updated database. And in any event, Secretary Simon has been the

Secretary of State since taking office in 2015—well before the relevant twenty-two-month period for the demand in this case.

Along with the district court here, every court to address the issue, including the Sixth Circuit, has concluded that an SVRL is not subject to a Title III demand. *E.g.*, *Benson II*, 179 F.4th at 478-82; *Adams*, 2026 WL 2123871, at *4-5; *Aguilar*, 2026 WL 2364502, at *4-5; *Bellows*, 834 F. Supp. 3d at 126-27; *Benson I*, 819 F. Supp. 3d at 767-69; *Bd. of Elections*, 2026 WL 1999921, at *8-11; *Caldwell*, 2026 WL 2186515, at *6-8; *DeMarinis*, 2026 WL 1780586, at *4-5; *Evans*, 2026 WL 2267774, at *5-11; *Fontes*, 832 F. Supp. 3d at 949-54; *Griswold*, 2026 WL 2235374, at *5; *Koski*, 2026 WL 2032532, at *5-6; *Matthews*, 2026 WL 2212877, at *3-4; *Scanlan*, 2026 WL 1864054, at *4-6; *Schmidt*, 835 F. Supp. 3d at 699-700; *Thomas*, 2026 WL 2070437, at *5-6; *Wis. Elections Commission*, 833 F. Supp. 3d at 953-55. This Court should similarly adopt this unanimous view.

The United States nevertheless attempts to manufacture a new Sixth Circuit opinion, cobbling together a dissent and further statements from concurrences and dissents in the court's rehearing denial. (*E.g.*, Br. 14 n.3, 16, 21-26, 37 n.6, 39, 44, 55.) That some judges on the court speculated about what they may have done does not change the outcome. *See Singleton v. Comm'r of Internal Revenue*, 439 U.S. 940, 944-45 (1978) (calling dissents from denial of discretionary review "the purest form

of dicta"); *Cottier v. City of Martin*, 604 F.3d 553, 557 (8th Cir. 2009) (recognizing that denying rehearing is not merits decision).

Finally, the United States suggests that excluding the SVRL would paralyze its attempts to investigate. This argument fails for several reasons. First, this is a policy argument for Congress, not the Court. Second, no good-faith investigation to paralyze exists, when, at most, the United States is trying to use Title III for improper purposes. Finally, the United States can use Title III to obtain documents within the law's scope, and it has enforcement authority under other federal statutes like the Voting Rights Act, HAVA, and the NVRA.

**3. The CRA's legislative history confirms the law does not encompass SVRLs.**

When a statute is ambiguous, courts may consider legislative history. *Gen. Elec. Co. v. Boilermaker-Blacksmith Nat'l Pension Trust*, 176 F.4th 1059, 1064 (8th Cir. 2026). Even if the Court concludes that section 20701 is ambiguous, legislative history confirms that it does not encompass the SVRL.

The need for the CRA arose because of ongoing racial discrimination in voting. States deployed facially neutral registration requirements in discriminatory ways, such as poll taxes, witness requirements, and ambiguous literacy and knowledge tests, among other things. *E.g.*, *1959 CCR Report* 31-33, 59-62, 65-67, 73. Election officials would subject Black applicants to different standards, rejecting their applications for discretionary reasons or minor technicalities. *E.g.*, *id.* at 62, 67,

73, 103-04. Comparing accepted and rejected applications was central to assessing discriminatory practices. *Id.* at 87-90 (highlighting disparities when able to compare applications); *Proposals to Secure, Protect, and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States: Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 86th Cong. 191-92 (1959) (statement of U.S. Attorney General William P. Rogers) [hereinafter *1959 Hearings*]. But investigating these issues proved difficult pre-CRA because states and local governments would either destroy or withhold the registration applications and similar papers. *1959 CCR Report* at 70-71, 95, 98-99, 133; *1959 Hearings*, 86 Cong. 191-92 (statement of Rogers).

Congress reflected this history and purpose in the CRA by requiring election officials to retain the voting records they received. It further tied the retention period to specific elections because the focus was on discriminatory registration practices denying individuals the right to vote in specific elections. When Congress enacted the CRA, records like the SVRL did not exist and were not contemplated to be encompassed within its scope.

After gaining the authority to inspect registration records, the federal government wielded that power precisely how Congress intended: gathering evidence to investigate complaints of racially discriminatory practices, evaluating patterns or practices of disenfranchising Black voters, and seeking legal remedies in

the federal courts. *See generally* U.S. Comm'n on Civil Rights, *Civil Rights '63* (1963), https://perma.cc/N2KP-VLKC (detailing investigations, negotiations, and lawsuits using the 1957 and 1960 Civil Rights Acts).

## III. EVEN IF THE CRA APPLIES TO THE SVRL, THE COURT SHOULD REMAND FOR THE DISTRICT COURT TO ADDRESS ALTERNATIVE GROUNDS FOR DISMISSAL.

Even if the Court concludes that the SVRL is a qualifying record under Title III, the United States is not entitled to the list. The district court did not reach the appellees' many alternative grounds for dismissal. This Court is "a court of appellate review, not of first view." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1021 (8th Cir. 2020) (internal quotation marks omitted). If a district court did not address an issue, the Court ordinarily remands so the district court can rule in the first instance. *Id.*; *see also Pharm. Research & Mfrs. of Am. v. Williams*, 64 F.4th 932, 950 n.14 (8th Cir. 2023) (remanding and declining to reach merits). Accordingly, the Court should remand for the district court to make the fact-specific determination whether DOJ's demand was otherwise legal.

If, however, the Court declines to remand, it should still affirm for multiple reasons. *Duffy v. City of St. Peters, Mo.*, 930 F.3d 973, 976 (8th Cir. 2019) (recognizing Court may affirm on any ground the record supports). DOJ's demand was facially invalid because it did not identify the statutorily required factual basis or civil-rights purpose. And even if facially valid, the demand was not made in good

faith, its claimed purpose was pretextual, and it was overbroad. Finally, at least three federal privacy laws prohibit DOJ from amassing Minnesota voter data.

### A. DOJ's Demand Lacked the Required Basis and Purpose.

To be valid, a Title III demand must state "the basis and the purpose therefor." 52 U.S.C. § 20703. Basis "and" purpose are distinct requirements. *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809, 814 (8th Cir. 2009). DOJ's demand contained no basis, and its purpose was not within the civil-rights purposes authorized by Title III.

#### 1. DOJ's demand lacked a basis.

The starting point for interpreting Title III's basis requirement is its plain language. *S.A.*, 129 F.3d at 998. A "basis" is "something that supports or sustains." *Webster's Third New International* 182. And the statute prefaces basis with the definite article "the," reflecting that DOJ must identify the factual reason for a demand. It did not do so.

DOJ never asserted *any* basis for the demand. The United States argues that the second letter satisfied the basis requirement by citing Title III. (Br. 39.) This reasoning is circular. Title III provides legal authority for demands, not their factual bases. Otherwise, DOJ could always cite Title III, making the basis requirement superfluous. *Benson II*, 179 F.4th at 483; *Aguilar*, 2026 WL 2364502, at *6; *Amore*, 831 F. Supp. 3d at 156; *Galvin*, 830 F. Supp. 3d at 130; *Matthews*, 2026 WL

2212877, at *5; *Oliver*, 2026 WL 2031479, at *10; *Oregon*, 828 F. Supp. 3d at 1104; *Scanlan*, 2026 WL 1864054, at *7; *Warner*, 2026 WL 2018877, at *4.

The United States next argues that general references to HAVA satisfied the basis requirement. (Br. 41.) The United States did not argue this below. Moreover, even if the Court reaches the argument, merely mentioning HAVA's existence does not state a factual basis to believe that the state may be violating HAVA. Indeed, in both cases the United States cites as examples of what basis is required, the demands identified facts suggesting civil-rights violations. *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (reflecting demand stated Attorney General had information "tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction"); *Lynd*, 306 F.2d at 229 n.6 (same).

Here, in contrast, DOJ did not state a factual basis for believing Minnesota was violating any law. This stands in stark contrast even with its demands to other states in the current wave of litigation, where DOJ at least attempted to claim anomalies in voter data.[5] *E.g.*, *Benson I*, 819 F. Supp. 3d at 766; *Weber*, 816 F. Supp.

---

[5] The United States claims an April 2026 news article cured any basis deficiency. (Br. 42.) But this case is solely about its August 2025 demand. Nor can it cobble together a basis by citing a post-lawsuit news article. *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (holding a notice must be a single document, "not a mishmash of pieces with some assembly required"). Title III requires a single demand: "*[t]his* demand" must "contain *a* statement of *the* basis and *the* purpose therefor." 52 U.S.C. (Footnote Continued on Next Page.)

3d at 1191. Such fishing expeditions are not allowed. *Acosta v. La Piedad Corp.*, 894 F.3d 947, 953 (8th Cir. 2018). To the extent that DOJ wants to review voter information, it can obtain Minnesota's public information list. But it has no unfettered right to sensitive data on every Minnesota registered voter.

### 2. DOJ's demand lacked a civil-rights purpose.

Title III demands must also state the "purpose therefor." 52 U.S.C. § 20703. A "purpose" is "an object to be attained." *Webster's Third New International* 1847. And "therefor" means "for that reason." *Id.* at 2372. Taken together, this language reflects Congress's intent to limit Title III demands: DOJ can use the records sought only for the stated purpose. And for multiple reasons, it also reflects Congress's intent to limit demands to civil-rights enforcement purposes. First, the provision is within the CRA, which prohibits discriminating and interfering with voting rights. *E.g.*, 52 U.S.C §§ 10101 et seq. Second, to avoid making "purpose therefor" surplusage, it must substantively limit demands.

If DOJ could request data for any reason, the purpose requirement would be meaningless. For example, if purposes were not cabined, DOJ could demand voter-registration records identifying its purpose as gathering information about the

§ 20703. And, as addressed above, a report that one person committed a crime does not bear on whether Minnesota has a list-maintenance system that makes reasonable efforts to update registrations. *See, e.g.*, *Bruce*, 298 F.2d at 863 & n.2 (observing that failing to purge voters was irrelevant to CRA inquiry).

Attorney General's favorite Minnesota-based author, or sending antagonistic mailers to voters who abstained from the 2024 election. In either instance, the state would have to hand over millions of Minnesotans' sensitive data. Settled statutory construction requires the Court to assume that Congress did not intend this absurd result. The only reasonable reading that avoids surplusage is that Congress limited the records-inspection provision to purposes related to civil-rights violations.

Legislative history confirms these limits. As described above, Title III came about through incremental civil-rights legislation. Congress tasked the Civil Rights Commission with addressing racial discrimination in voting, but states impeded its work by destroying registration records. *1959 CCR Report* 127, 129-30. Against this backdrop the Commission recommended, and Congress adopted, the requirement to preserve registration and voting records. The CRA focused on preventing interference with voting rights and assisting the federal government in deciding whether to file a lawsuit under what is now codified as 52 U.S.C. § 10101, which prohibits discriminating and interfering with voting rights. *Lynd*, 306 F.2d at 228.

After Title III's adoption, DOJ adhered to this civil-rights purpose requirement. The Fifth Circuit cases on which the United States heavily relies confirm this scope. (Br. 44.) In those cases, the purpose was not disputed because the demands explained that DOJ had information tending to show racial discrimination in voting and registration. *E.g.*, *Lynd*, 306 F.2d at 229 n.6; *In re*

*Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

DOJ did not identify a civil-rights purpose here. Instead, it cited HAVA enforcement. (A.App. 52; R.Doc. 66-2 at 2) Title III is not a backdoor mechanism for demanding records related to HAVA. *See Bellows*, 834 F. Supp. 3d at 126 (holding that construing Title III as United States argued would require turning blind eye to traditional principles of federalism in election administration). The CRA is intended to protect against discriminatory registration and voting practices.

Avoiding text and history, the United States now argues that Title III lacks any meaningful standard by which a court can assess DOJ's basis and purpose. (Br. 39, 44.) But this argument ignores that courts do not read statutes in isolation; instead, they construe statutes based on their context. *Roberts*, 566 U.S. at 93. And read as a whole, Title III sits within the CRA. Valid CRA demands must therefore be tied to civil-rights protection.

The United States also argues that HAVA "relates to individual voting rights." (Br. 45.) The United States did not make this argument below so it is forfeited. *Perry v. Precythe*, 121 F.4th 711, 716 (8th Cir. 2024). But the argument is meritless anyway. As the United States acknowledges, Congress enacted HAVA to improve voting systems and voter access. (Br. 46.) There is no reason to think that Congress would have assumed that a 1960 law intended to facilitate civil-rights investigations

could be used to indiscriminately audit all voter data maintained under HAVA. This Court should join the many other courts that have rejected HAVA enforcement as satisfying Title III's purpose requirement. *Adams*, 2026 WL 2123871, at *6; *Amore*, 831 F. Supp. 3d at 158; *Bellows*, 834 F. Supp. 3d at 126-28; *Matthews*, 2026 WL 2212877, at *6; *Oregon*, 828 F. Supp. 3d at 1105; *Warner*, 2026 WL 2018877, at *7; *Weber*, 816 F. Supp. 3d at 1183; *cf. Evans*, 2026 WL 2267774, at *8 (addressing interaction of HAVA and Title III); *see also, e.g.*, *CFPB v. Accrediting Council for Indep. Coll. & Sch.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (rejecting "perfunctory" purpose stated in civil-investigative demand).

### B. DOJ's Demand Was Not for a Legitimate Purpose, Was Not Made in Good Faith, and Was Overbroad.

Even when DOJ has authority to demand records, the demand must be for a legitimate purpose, made in good faith, and not be overbroad. Parties can challenge a demand on these grounds. *Powell*, 379 U.S. at 58; *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977). A belated invocation of a civil-rights-based election statute can be evidence of pretext. *Dep't of Commerce v. New York*, 588 U.S. 752, 781-83 (2019). Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (quotation omitted).

The United States boldly argues that these basic limits on government conduct do not apply to its Title III demands. (Br. 29-35.) But while DOJ can ask for

whatever records it wants, enforcing that demand runs through the courts, as Congress expected. 52 U.S.C. § 20705. And *Powell* makes clear that, even absent explicit statutory language, "a court may not permit its process to be abused." 379 U.S. at 58. Instead, demands are "confined to the rudimentary principles of justice." *Adams v. FTC*, 296 F.2d 861, 866 (8th Cir. 1961). Here, there is substantial reason to conclude that DOJ did not meet these requirements.

### 1. DOJ failed to identify the actual purpose for its demand.

Before a court can enforce an investigative demand, it must ensure that the demand was not made for an improper purpose. *Powell*, 379 U.S. at 58. An improper purpose may include demanding information to use in collateral matters unrelated to the enforcement authority under which the demand is made. *Id*. Here, DOJ's shifting justifications and contrary statements to other courts and in public reflect that DOJ sought voter data for improper and unlimited purposes.

DOJ identified no purpose when it first requested the data. (A.App. 50-52; R.Doc. 66-1 at 1-3.) Only in its second letter did DOJ claim it wanted to assess HAVA compliance. (A.App. 87-88; R.Doc. 66-2 at 1-2.) Despite having received detailed information about Minnesota's list-maintenance processes, DOJ never claimed that it had any reason to believe Minnesota was not complying with HAVA. It instead fixated only on gathering sweeping amounts of unredacted voter data. (A.App. 50, 88; R. Docs. 66-1 at 1, 66-2 at 2.) This fixation continued throughout

the litigation and in the public. For example, the Assistant Attorney General for Civil Rights derided needing a basis or purpose for data demands. (S.App. 38; R.Doc. 103 at 19.) She boasted, "The attorney general doesn't have to show her homework as to what she's going to do with it, and I'm her designee, so I get to ask for that information and [states] have to give it." (*Id.*)

Statements by DOJ and other federal officials before and after the demand confirm its pretextual nature.[6] In March 2025, the President ordered the Department of Homeland Security to review each state's voter registration list and list-maintenance activities alongside federal immigration databases. Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006 (Mar. 25, 2025). In its complaint, the United States confirmed that the executive order motivated the demand, not any particularized belief that Minnesota was violating the law. (A.App. 33-34; R.Doc. 1 at 1-2.) And last fall, the administration confirmed a purpose unrelated to HAVA enforcement: sharing state voter data with the Department of Homeland Security to look for noncitizens. (S.App. 48-49; R.Doc. 104 at 1-2.)

---

[6] The United States dismisses this evidence as not properly subject to judicial notice. (Br. 50.) But many of these statements come directly from the federal government, while others have been confirmed by later government statements and action. Moreover, at this stage, the state appellees need only make a "preliminary showing." *United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983). Indeed, this Court has endorsed at least permitting examination of the person who issued the demand to determine its purpose when there is reason to doubt its purpose. *E.g.*, *id.* at 300 n.6. Because of the procedural posture of this case, however, the state appellees have not even had access to that minimal procedure yet.

Since then, the United States confirmed in court its "intention . . . to run [the data] against DHS's SAVE database." Tr. of Oral Arg. at 50:22-23, *Amore*, 831 F. Supp. 3d 149, ECF 47.[7] And in January 2026, the then-U.S. Attorney General wrote to Minnesota's governor, again connecting the demand for Minnesota's voter data to immigration enforcement. (S.App. 65; R.Doc. 113-1 at 3.) She later stated that Minnesota "BETTER support President Trump." *In re Grand Jury Subpoenas*, No. 26-mc-43, 2026 WL 1783899, at *4 (D. Minn. June 22, 2026) (finding multiple subpoenas to Minnesota officials were unconstitutional because they were issued for improper purpose). DOJ's demand did not disclose these purposes, which have nothing to do with HAVA or the CRA.

The United States also divulged another undisclosed purpose to another court: creating a federal voter roll on which it would perform its own list-maintenance program. The United States wants to run the data through a "confirmation process" to identify supposedly "problematic registration[s]." Transcript of Oral Argument at 51:25-52:1, *Amore*, 831 F. Supp. 3d 149. That mirrors what the United States has argued in this Court, suggesting it needs a quick decision and access to the state's

---

[7] This is so despite noncitizen voting being rare, and the SAVE database having known reliability concerns. Christopher Famighetti et al., *Noncitizen Voting: The Missing Millions*, BRENNAN CTR. FOR JUST. 1-2 (2017), https://perma.cc/D3V9-U7FJ; *Eligible Voters at Risk: Examining Changes to USCIS's SAVE System*, FAIR ELECTIONS CTR. 4-5 (July 2025), https://perma.cc/3AUV-LB4H; *see also Experts Raise Alarms Over Census Bureau Report Trump is Touting on Noncitizen Voting*, NAT'L PUB. RADIO (Aug. 20, 2026), https://perma.cc/VL2L-V7AJ.

data to audit the state's voter data and confirm its accuracy. (Br. 65-66.) Congress did not give the federal government list-maintenance authority. And this purpose—which also usurps states' authority under the Elections Clause—was not disclosed. Other courts have rejected DOJ's proposed purposes as pretextual on this basis. *Oregon*, 828 F. Supp. 3d at 1106-07; *Schmidt*, 835 F. Supp. 3d at 699-700; *Weber*, 816 F. Supp. 3d at 1184.

The United States counters that Title III lacks any substantive limit on data use. (Br. 44-45.) This ignores Title III's requirement to provide "the purpose *therefor*." And by its own concession, DOJ must state its purpose to provide notice to state officials of why the inspection was being made. (*Id.*) Such notice would be pointless unless some reasons were proper and some improper. Title III makes clear that proper purposes must be cabined to civil rights and they must be disclosed. The purposes of DOJ's demand to the Secretary were neither.

**2. DOJ's demand was not made in good faith.**

Courts must ensure that any investigative demand they enforce is made in good faith. *Powell*, 379 U.S. at 58. Before demanding Minnesota's voter data, the United States must therefore have some good-faith basis for believing that the data will reveal some evidence of a violation. *Id.*; *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

The United States' dragnet approach reflects a lack of good faith. If DOJ were seeking data to assess HAVA compliance, one would expect it to identify *some* basis to believe that Minnesota is not complying with HAVA. But it has not done so. The public record shows that the demand is part of a larger fishing expedition. As the United States put it to another court, "every state is under suspicion of not [complying with HAVA] until [DOJ] verif[ies] that they've done it." Transcript of Oral Argument at 55:6-10, *Amore*, 831 F. Supp. 3d 149. Such wide-ranging requests—particularly when paired with the lack of any alleged HAVA violation and demands made to other states across the country—show that the United States has no good-faith basis that Minnesota is violating HAVA.

**3. DOJ's demand was overbroad.**

Courts refuse to enforce information requests that are unreasonably broad. *Acosta*, 894 F.3d at 951-53; *Adams*, 296 F.2d at 866. Title III is intended to be a limited tool, not a broad discovery mechanism. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963). Because DOJ's demand was overly broad, it is unenforceable.

As explained above, the data DOJ demanded would not enable it to assess HAVA compliance. The data DOJ seeks information includes information like which elections an individual voted in (which can include specific parties' presidential primaries), as well as sensitive identification numbers. Minn. Stat. § 201.071, subd. 1; Minn. R. 8215.0300, subp. 2, 8200.9315(E). That highly

sensitive information, however, has nothing to do with whether Minnesota has a HAVA-compliant list-maintenance system. Nor is information on inactive voters—who by definition are not on the SVRL—relevant. HAVA gives states broad discretion; it does not require any particular program. *E.g.*, 52 U.S.C. § 21085. Other courts have rightly recognized that such demands are therefore overbroad for assessing HAVA compliance. *Scanlan*, 2026 WL 1864054, at *10; *Warner*, 2026 WL 2018877, at *8; *Weber*, 816 F. Supp. 3d at 1183; *see also Bellows*, 834 F. Supp. 3d at 127 (recognizing availability of public lists).

Finally, the United States suggests that the CRA preempts any state privacy laws and prohibits redaction. (Br. 54-56.) It does not. The Supremacy Clause applies only when state and federal laws conflict. Here, no federal law conflicts with state law. HAVA contains no data-disclosure provision, and it expressly leaves compliance procedures to states' discretion. 52 U.S.C. § 21085. And even when Congress has expressly required data disclosure—such as in the NVRA—states may still redact sensitive personal data. *E.g.*, *Pub. Int. Legal Found.*, 92 F.4th at 56; *Pub. Int. Legal Found.*, 996 F.3d at 257; *Project Vote*, 208 F. Supp. 3d at 1344-45; *True the Vote*, 43 F. Supp. 3d at 693, 736-39.

### C. Federal Privacy Laws Prohibit the Demand.

Even if DOJ's demand was otherwise proper, Minnesota anticipates raising affirmative defenses or counterclaims under federal privacy laws. (S.App. 50;

R.Doc. 104 at 3.) If substantiated, those violations would make DOJ's demand unenforceable. *See, e.g.*, *Nat'l Lab. Rels. Bd. v. N. Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) (assessing whether enforcement would violate federal Privacy Act). Here, DOJ's demand violated the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. These violations also support affirmance or, at a minimum, a remand for the United States to try to establish compliance.

**1. The Privacy Act precludes DOJ's demand.**

The Privacy Act prevents "the secret gathering of information on people or the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch." S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917. The law requires the government to provide public notice of how it collects and uses data before doing so. And it generally limits collecting data relating to the exercise of First Amendment rights. DOJ's demands violate both prohibitions.

First, DOJ failed to comply with the Privacy Act's notice requirements. Before creating or modifying a "system of records," federal agencies must publish a System of Records Notice (SORN). 5 U.S.C. § 552a(e)(4). Among other things, the notice must include the categories of individuals on whom records are maintained, the categories of records maintained, each routine use of the records—including the purpose of such use—and the agency's policies on storage, retrievability, access

controls, retention, and disposal. *Id.* § 552a(e)(4)(B)-(E). No SORN covers DOJ's attempt to gather Minnesota voter data.

The United States cites three SORNs, but none covers its conduct. (Br. 57-58.) Two are irrelevant because they address sharing information after an investigation is closed and disclosures after data breaches. *Privacy Act of 1974; System of Records*, 70 Fed. Reg. 43904, 43904 (July 29, 2005); *Privacy Act of 1974; System of Records*, 82 Fed. Reg. 24147, 24147-48 (May 25, 2017). The remaining SORN fares no better. It addresses "[s]ubjects of investigations, victims, [and] potential witnesses," and the most arguably relevant use provides that data may be used to "indicate[] a violation or potential violation of law." *Privacy Act of 1974; System of Records*, 68 Fed. Reg. 47610, 47611-12 (Aug 11, 2003). But this SORN lacks notice that DOJ is maintaining a searchable database of the personal information of every registered voter in the country. *See id*. And it lacks notice that the federal government may—as it has admitted it plans to do—share personal voter information with the DHS for immigration purposes. *See id.*

The United States argues that "subjects" encompasses everyone on the SVRL because they may have committed crimes, thus making them subject to investigation and everyone else a "victim." (Br. 59.) As with many of its arguments, the United States forfeited this argument by not making it below. *Perry*, 121 F.4th at 716. This

argument is also non-responsive to DOJ using the data for activities not identified in the SORN.

The Privacy Act also prohibits federal agencies from maintaining records describing how any individual exercises rights guaranteed by the First Amendment unless (1) expressly authorized by statute, (2) expressly authorized by the individual, or (3) the record is pertinent to and within the scope of an authorized law enforcement activity. 5 U.S.C. § 552a(e)(7). Electoral activities implicate the First Amendment, but DOJ did not comply with these requirements. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69, 75-76 (1990). Although the United States claims its collection is "authorized law enforcement activity," DOJ has no role to play in auditing states' voter data. As former experienced DOJ attorneys explained in the district court, Title III is not a proper weapon to investigate perceived voter fraud. (S.App. 67-70; R.Doc. 123 at 19-22.) Rather, the proper steps would be for DOJ's civil division to review public voter data and then, if reasonable suspicion arises about a particular voter, refer the matter to the criminal division, which has authority to investigate election crimes. (*Id.*) And absent any allegation that Minnesota is violating any law, there is no "law enforcement" to occur.

### 2. The E-Government Act precludes DOJ's demand.

The E-Government Act requires federal agencies to conduct a "privacy impact assessment" before initiating a new collection of information that includes "information in an identifiable form permitting the . . . contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)-(B), 116 Stat. 2899, 2921-22 (2002). This requirement ensures that there are "sufficient protections for the privacy of personal information." *Id.* § 208(a), 116 Stat. at 2921. Minnesota's voter-registration records are the results of identical questions posed to more than ten people. Yet nothing suggests that DOJ complied with requirements to collect this data en masse. Indeed, in the district court, the United States did not respond to Minnesota's argument that the E-Government Act precluded its demand. Having failed to make that showing, DOJ cannot engage in that collection.

### 3. The Driver's Privacy Protection Act precludes DOJ's demand.

The Driver's Privacy Protection Act (DPPA) limits access to personal information received from the Minnesota Department of Public Safety in connection with a motor vehicle record. Access requires a permissible purpose, such as government agencies carrying out their functions. 18 U.S.C. §§ 2721(b), 2722(a). Minnesota's SVRL includes such information. For example, the Secretary's office

receives information if a person registers to vote while applying for a driver's license, and his office uses the agency's data to verify the accuracy of voter registrations. Minn. Stat. § 201.1615; Minn. R. 8200.9320.

In the district court, the United States again did not explain how its demand could be squared with the DPPA. But even if the Court reaches the DPPA now, the United States is wrong. Reviewing individual voter records for HAVA compliance is not a DOJ function. And, as explained above, HAVA requires only reasonable efforts to remove ineligible voters. The single snapshot of Minnesota's SVRL that DOJ demanded would not help assess compliance because it would not show whether people were removed over time. Accordingly, the driver data in question would not assist with DOJ's HAVA-compliance assessment, and the DPPA prohibits sharing that data.

* * *

The district court did not address any of these alternative grounds for dismissal. If the Court agrees with the United States' interpretation of Title III, the Court should remand to the district court for that court to engage in the factfinding needed to develop a record to address them. But if the Court chooses not to remand, these issues show that the United States has not established entitlement to Minnesota's SVRL. And based on that failure, the Court should affirm on one or more of these alternative bases.

## IV. NO EXPEDITED DECISION IS NEEDED.

This Court previously denied the United States' request for an expedited decision. Without identifying any changed circumstances, the United States renews its request and also asks the Court to shorten the time for requesting rehearing and issuing the mandate. (Br. 65-66.) As the state appellees explained in opposing the prior motion, the United States took no steps to expedite the district court proceeding and no circumstances warrant rushing now.

Voting for the November 2026 general election begins in Minnesota on September 18. Minn. Stat. § 203B.081, subd. 1. As reflected above, the state has robust list-maintenance procedures that have prepared election officials for the upcoming election. The United States' desire to urgently audit the state's data—particularly when it lacks grounds for believing Minnesota is not complying with HAVA—is unfounded. Nor is its sought course of action—in which it immediately receives and then audits data from a static version of the SVRL (which would likely have already changed)—realistic. This case is before the Court on a motion to dismiss. Even if the United States prevails, the posture would be that the Court would remand to the district court for further proceedings consistent with its decision. This Court would not have the authority to directly order production of data.

## CONCLUSION

The Court should affirm the district court. Consistent with the many persuasive decisions from across the country, the district court correctly held that the Federal Rules of Civil Procedure apply and that the United States failed to state a claim. If the Court concludes otherwise, it should remand to the district court to decide the remaining issues.

Dated: September 11, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

/s/**Angeal Behrens**

ANGELA BEHRENS, No. 351076
ALLEN COOK BARR, No. 399094
Assistant Attorneys General
LINDSEY E. MIDDLECAMP, No. 392589
Special Counsel

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125
(651) 757-1204 (Voice)
(651) 297-1235 (Fax)
angela.behrens@ag.state.mn.us

ATTORNEYS FOR APPELLEES SIMON AND STATE OF MINNESOTA

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,846 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/**Angela Behrens**
Angela Behrens
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE**
**WITH 8th Cir. R. 28A(h)(2)**

The undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus-free.

/s/**Brenda Hanson**
Brenda Hanson