No. 26-2679

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STEVE SIMON, in his official capacity as Secretary of State for the State of Minnesota, and the STATE OF MINNESOTA,

*Defendants-Appellees*,

MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATIONAL FUND, MISAEL HERNANDEZ, COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF MINNESOTA, JENNIFER COMPEAU, VALERIE MANGSKAU, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, and CYNTHIA WILSON,

*Intervenor-Defendants-Appellees*.

Appeal from the United States District Court for the District of Minnesota
District Court Civil No. 25-cv-3761-KMM-EMB
District Court Judge Katherine M. Menendez

# BRIEF OF INTERVENOR-DEFENDANTS-APPELLEES MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATIONAL FUND AND MISAEL HERNANDEZ


Sybil L. Dunlop
Katherine M. Swenson
Kshithij Shrinath
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-0830

Uzoma N. Nkwonta
Robert Golan-Vilella
Julianna D. Astarita
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
Telephone: (202) 948-1135

*Attorneys for Intervenor-Defendants-Appellees Minnesota Alliance for Retired Americans Educational Fund and Misael Hernandez*

## SUMMARY OF THE CASE

Last year, the U.S. Department of Justice ("DOJ") sent letters to election officials across the nation demanding their States' full, unredacted statewide voter registration list ("SVRL"). Many officials refused, prompting DOJ to sue 30 States and the District of Columbia to obtain these lists. DOJ has lost *every single one* of these cases so far: 24 courts (including one court of appeals and the district court below) have rebuffed DOJ's demands.

Here, DOJ claims that it is entitled to inspect Minnesota's SVRL under Title III of the Civil Rights Act of 1960 ("CRA"). However, as the district court correctly held, the CRA entitles DOJ only to inspect records that "come into [the] possession" of election officials—*not* internally created records such as a State's SVRL. 52 U.S.C. § 20701. This Court should hold the same and affirm.

Numerous alternative grounds also support affirmance, including that (1) DOJ provided no factual basis for its demand, as required by the CRA, 52 U.S.C. § 20703; (2) DOJ failed to articulate a proper "purpose" under the CRA, *id.*; (3) the sensitive information DOJ seeks is protected from disclosure by Minnesota law, which Title III does not preempt; and (4) DOJ's requested relief would violate the federal Privacy Act.

Given the weighty issues implicated, this Court should hold oral argument and allow 30 minutes per side, divided among Defendants and Intervenors.



Appellate Case: 26-2679 Page: 2 Date Filed: 09/15/2026 Entry ID: 5683751

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Local Rule 26.1A, Intervenor-Defendants-Appellees submit this corporate disclosure statement:

Minnesota Alliance for Retired Americans Educational Fund hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Misael Hernandez is not a corporation and therefore has nothing to report under Fed. R. App. P. 26.1 and Eighth Circuit Local Rule 26.1A.



Appellate Case: 26-2679 Page: 3 Date Filed: 09/15/2026 Entry ID: 5683751

## TABLE OF CONTENTS

SUMMARY OF THE CASE ........ i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........ ii

TABLE OF AUTHORITIES ........ v

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

I. The Constitution and federal law assign States primary responsibility for voter registration. ........ 3

A. The Civil Rights Act of 1960 ........ 3

B. The National Voter Registration Act ........ 7

C. The Help America Vote Act ........ 7

II. DOJ embarks on a nationwide campaign to collect the private voter data of millions of Americans. ........ 9

III. DOJ sues Minnesota to compel production of its protected voter data ........ 12

IV. The district court dismisses DOJ's complaint. ........ 14

SUMMARY OF THE ARGUMENT ........ 15

STANDARD OF REVIEW ........ 17

ARGUMENT ........ 17

I. The CRA does not cover state-created, dynamic records like Minnesota's SVRL. ........ 17

A. Minnesota's SVRL was created by Minnesota election officials and did not "come into" their possession. ........ 18

B. Applying the CRA to Minnesota's SVRL would require it to be preserved without alteration, but federal law requires constant updates. ........22

C. DOJ's interpretation of the CRA should be rejected. ........23

II. The Court should also affirm because of other flaws in DOJ's claim. ........33

A. DOJ's CRA demand is subject to meaningful judicial review. ........33

B. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis........37

C. DOJ's purported desire to investigate list maintenance is not a proper purpose under the CRA........40

D. The CRA does not preempt Minnesota's voter privacy laws. ........45

E. DOJ has not complied with the Privacy Act. ........47

III. If the Court reverses, the next step would be to remand for discovery. ........50

CONCLUSION ........52



Appellate Case: 26-2679 Page: 5 Date Filed: 09/15/2026 Entry ID: 5683751

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) .....42

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .....45

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937) .....22

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .....3

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) .....29

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .....9

*Biden v. Nebraska*,
600 U.S. 447 (2023) .....42

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) .....35

*CFPB v. Source for Pub. Data, L.P.*,
903 F.3d 456 (5th Cir. 2018) .....35

*City and Cnty. of S.F. v. EPA*,
604 U.S. 334 (2025) .....31

*Donaldson v. United States*,
400 U.S. 517 (1971) .....36

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .....23

*Fischer v. United States,*
603 U.S. 480 (2024) .....31



Appellate Case: 26-2679 Page: 6 Date Filed: 09/15/2026 Entry ID: 5683751

*Foster v. Love*,
522 U.S. 67 (1997)....................................................................................3

*Honeycutt v. United States*,
581 U.S. 443 (2017)................................................................................19

*Huddleston v. United States*,
415 U.S. 814 (1974)................................................................................19

*Hulce v. Zipongo Inc.*,
132 F.4th 493 (7th Cir. 2025)..................................................................20

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962)........................................................40

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)...................................................................44

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)............................................................*passim*

*League of Women Voters v. DHS*,
No. 1:25-CV-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025).................48

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. CV 25-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026).... 12, 47

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)................................................................................42

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)....................................................................................20

*Liscomb v. Boyce*,
954 F.3d 1151 (8th Cir. 2020).................................................................18

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026)...........................................................48

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)................................................................................21



Appellate Case: 26-2679 Page: 7 Date Filed: 09/15/2026 Entry ID: 5683751

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)....................................................................39

*Patel v. Garland*,
596 U.S. 328 (2022)....................................................................32

*Phipps v. FDIC*,
417 F.3d 1006 (8th Cir. 2005) .......................................................17

*Plymouth County v. Merscorp, Inc.*,
774 F.3d 1155 (8th Cir. 2014) .......................................................17

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......................................................2, 46

*Pub. Int. Legal Found., Inc. v. Simon*,
No. 25-1703, 2026 WL 2545322 (8th Cir. Aug. 28, 2026)............................7

*R.J. Reynolds Tobacco Co. v. City of Edina*,
60 F.4th 1170 (8th Cir. 2023)........................................................46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................................................................45

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)..........................................................7

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005)..........................................48

*State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) ............................................................5

*State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*,
580 U.S. 26 (2016)......................................................................45

*Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*,
584 F.3d 340 (1st Cir. 2009)..........................................................35

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989)....................................................................25



Appellate Case: 26-2679 Page: 8 Date Filed: 09/15/2026 Entry ID: 5683751

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)....................................................................................34

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ..............................................................41

*United States v. Bd. of Elections of the State of N.Y.*,
No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ..........................................................................................................41

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026)........................................................ *passim*

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ................................................................ *passim*

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026).......................................................21

*United States v. Clarke*,
573 U.S. 248 (2014)....................................................................................51

*United States v. DeMarinis*,
No. 25-cv-3934, 2026 WL 1780586 (D. Md. June 18, 2026).......................23

*United States v. Evans*,
No. 1:25-cv-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026) ......... 17, 27-29

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026)................................................ 2, 11, 40

*United States v. Koski*,
No. 3:26-cv-42, 2026 WL 2032532 (E.D. Va. July 14, 2026)......................20

*United States v. Lamere*,
980 F.2d 506 (8th Cir. 1992) ........................................................................40

*United States v. Lask*,
703 F.2d 293 (8th Cir. 1983) ........................................................................51

*United States v. Maswai*,
419 F.3d 822 (8th Cir. 2005) ........................................................................26

*United States v. Mathews*,
761 F.3d 891 (8th Cir. 2014) ....................................................................32

*United States v. Matthews*,
No. 3:25-cv-03398-CRL-DJQ, 2026 WL 2212877 (C.D. Ill. July 31, 2026) ....................................................................41

*United States v. Oliver*,
No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026) ....................................................................38

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) .................................................... *passim*

*United States v. Powell*,
379 U.S. 48 (1964)........................................................................... 2, 16, 34

*United States v. Scanlan*,
No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026)............ 21, 22, 30

*United States v. Talley*,
16 F.3d 972 (8th Cir. 1994) ....................................................................41

*United States v. Thomas*,
No. 3:26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026) .....................22

*United States v. Warner*,
No. 2:26-cv-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026) ........................................................................... 2, 41, 42

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)............................................... *passim*

*Voter Reference Foundation, LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ....................................................... 2, 30, 46

*Watson v. Republican Nat'l Comm.*,
146 S. Ct. 2165 (2026)...........................................................................23

*Yates v. United States*,
574 U.S. 528 (2015)...........................................................................21

**STATUTES**


5 U.S.C. § 552a ........................................ 2, 48-50

6 U.S.C. § 1502 ........................................ 20

7 U.S.C. § 12 ........................................ 20

10 U.S.C. § 130c ........................................ 26

13 U.S.C. § 9 ........................................ 26

13 U.S.C. § 214 ........................................ 26

18 U.S.C. § 1512 ........................................ 31

18 U.S.C. § 3500 ........................................ 20

28 U.S.C. § 1291 ........................................ 1

28 U.S.C. § 1331 ........................................ 1

28 U.S.C. § 1345 ........................................ 1

30 U.S.C. § 1732 ........................................ 20, 26

42 U.S.C. § 1971 ........................................ 5

44 U.S.C. § 3572 ........................................ 26

49 U.S.C. § 47124a ........................................ 20

52 U.S.C. § 10101 ........................................ 5, 42

52 U.S.C. § 20701 ........................................ *passim*

52 U.S.C. § 20702 ........................................ 14, 22

52 U.S.C. § 20703 ........................................ *passim*

52 U.S.C. § 20704 ........................................ 46

52 U.S.C. § 20705 ........................................ 1, 34





Appellate Case: 26-2679 Page: 11 Date Filed: 09/15/2026 Entry ID: 5683751

52 U.S.C. § 21083 ........ *passim*

52 U.S.C. § 21085 ........ 8

52 U.S.C. § 21111 ........ 8, 44

Pub. L. No. 85-315, 71 Stat. 634 (1957) ........ 3

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976) ........ 36

Minn. Stat. § 201.091 ........ 2, 45

**FEDERAL RULES**

Fed. R. Civ. P. 1 ........ 33

Fed. R. Civ. P. 15 ........ 39

Fed. R. Civ. P. 81 ........ 33

**OTHER AUTHORITIES**

68 Fed. Reg. 47610 (Aug. 11, 2003) ........ 49, 50

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 ........ 11

*Acquire*, *Webster's Third New International Dictionary* (1961) ........ 18

*Alter*, *Webster's Third New International Dictionary* (1966) ........ 31

*An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 6 (1960) ........ 5

*Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. (May 12, 2026) ........ 11

*Basis*, *Black's Law Dictionary* (4th ed. 1968) ........ 38

*Come into*, *Webster's Third New International Dictionary* (1966) ........ 18

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) ........ 4, 5, 43

*Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. 6 (1960) ........ 27

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Aug. 24, 2026),https://perma.cc/CK5B-NKP7 ........ 10

Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/C3YJ-NV6A ........ 11

*Obtain*, 7 *Oxford English Dictionary* (1933) ........ 19

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2 ........ 11

*Receive, Black's Law Dictionary* (12th ed. 2024) ........ 19

*Receive*, *Webster's Third New International Dictionary* 1894 (1961) ........ 19

*Rep. of the U.S. Comm'n on C.R.* (1959) ........ 3

U.S. Dep't of Just., *Memorandum of Understanding Between the United States and Texas* (May 13, 2008), https://perma.cc/3ZHL-TNCG ........ 32



Appellate Case: 26-2679 Page: 13 Date Filed: 09/15/2026 Entry ID: 5683751

## JURISDICTIONAL STATEMENT

DOJ's jurisdictional statement is not complete and correct. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1345, and 52 U.S.C. § 20705, because DOJ alleges a violation of the Civil Rights Act of 1960, 52 U.S.C. § 20703. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on August 18, 2026, Add.28-29; App.147-48; R.Doc.211, based on its Order dismissing the action on August 17, 2026, Add.1-27; App.120-46; R.Doc.210.[1] DOJ filed a timely Notice of Appeal on August 18, 2026.

## STATEMENT OF ISSUES

1. Does Title III of the CRA require Defendants to provide DOJ with a complete, unredacted copy of Minnesota's SVRL, which is a state-created database that must be continually updated rather than preserved unaltered?

   *Apposite authorities:*

   52 U.S.C. §§ 20701-20703

   *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026)

   *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026)

2. Did DOJ provide a sufficient "statement of the basis and the purpose" for its CRA demand, where its pre-suit demand contained no factual basis and DOJ sought Minnesota's SVRL for an unprecedented purpose?

   *Apposite authorities:*

[1] Documents in the district court record are cited as "R.Doc.___," documents in DOJ's appendix are cited as "App.___," and documents in DOJ's addendum are cited as "Add.___."

52 U.S.C. § 20703

*United States v. Powell*, 379 U.S. 48 (1964)

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026)

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026)

*United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026)

3. Did DOJ meet its burden to demonstrate that Title III preempts Minnesota state privacy laws that, as DOJ does not contest, protect the confidential information on SVRLs that DOJ seeks?

   *Apposite authorities:*

   Minn. Stat. § 201.091, subd. 9

   *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026)

   *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025)

   *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)

4. Does DOJ's demand for Minnesota's SVRL as part of a national campaign to assemble voter lists violate the federal Privacy Act?

   *Apposite authorities:*

   5 U.S.C. § 552a

   *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026)

## STATEMENT OF THE CASE

### I. The Constitution and federal law assign States primary responsibility for voter registration.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). Although Congress may preempt state regulations of federal elections, such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case.

#### A. The Civil Rights Act of 1960

Congress enacted Title III of the Civil Rights Act of 1960 to address problems that emerged from Southern resistance to the Civil Rights Act of 1957. In particular, the U.S. Commission on Civil Rights was charged with "investigat[ing] allegations … that certain citizens of the United States [were] being deprived of their right to vote." Pub. L. No. 85-315, § 104(a)-(b), 71 Stat. 634, 635 (1957). As part of its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission determined that election officials in Southern States often imposed tests on Black applicants from which White applicants were exempt, *see Rep. of the U.S. Comm'n on C.R.* 87-88 (1959) ("*Comm'n Rep.*"), and denied registration to Black applicants "because of

inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[2] The Commission thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

Yet the Commission's investigatory work was thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, in response to the 1957 Act, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 212 (1959) ("*Hearings*") (statement of Att'y Gen. Rogers).[3] Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring that election officials retain applications to vote and allow DOJ to inspect them. *Comm'n Rep.* 137-38. In testimony before Congress, DOJ agreed that comparing the voter applications of Black and White voters was essential, explaining that, "[i]n many cases,

[2] The Commission Report is available at: https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

[3] Available at: https://perma.cc/ET26-FKD9.



Appellate Case: 26-2679 Page: 17 Date Filed: 09/15/2026 Entry ID: 5683751

discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 6 (1960) (statement of U.S. Att'y Gen. Rogers).[4] "Congress responded by passing the Civil Rights Act of 1960." *Penn. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Shwartz, J., dissenting).

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence necessary to investigate voting rights violations. As explained by a principal drafter of the CRA, "[t]he purpose of [T]itle III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *Hearings* at 700 (statement of Rep. William M. McCulloch).[5] The CRA thus "enable[s] the Attorney General to determine whether § 1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[6] To that end, the CRA contains several interlocking provisions that

---

[4] Available at: https://perma.cc/46G6-GQZB.

[5] Available at: https://perma.cc/ET26-FKD9.

[6] 42 U.S.C. § 1971, now codified at 52 U.S.C. § 10101, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." *Id.* § 10101(a)(1).

collectively permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The CRA's core provision requires officials to "retain and preserve" the records most critical to a voting rights investigation:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701. The CRA criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, threatening "imprison[ment]" for "[a]ny person … who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved," *id.* § 20702. The CRA allows DOJ to inspect covered records after it makes a compliant pre-suit demand:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.* Finally, the CRA provides that the federal district court for the district in which a CRA demand is made or in which a demanded record is located

"shall have jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

### B. The National Voter Registration Act

Three decades after the CRA's enactment, Congress passed the National Voter Registration Act ("NVRA") to "establish procedures that will increase the number of eligible citizens who register to vote" and "ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b). Among other provisions, the NVRA requires covered States to take steps to ensure their voter rolls are reasonably up to date. *See id.* § 20507(a)(4). Congress, however, provided that a "State is exempt from the NVRA if it allows election-day registration 'under law that is in effect continuously on and after August 1, 1994.'" *Pub. Int. Legal Found., Inc. v. Simon*, No. 25-1703, 2026 WL 2545322, at *1 (8th Cir. Aug. 28, 2026) (quoting 52 U.S.C. § 20503(b)(2)). "Minnesota is one of six States currently exempt from the NVRA." *Id.*

### C. The Help America Vote Act

A decade after the NVRA, and more than four decades after the CRA, Congress enacted the Help America Vote Act ("HAVA") to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA requires States to

create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A).

The list is dynamic by design. For instance, HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* § 21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information." *Id.* § 21083(a)(1)(A)(vii). Likewise, HAVA requires that the list "shall be coordinated with other agency databases within the State." *Id.* § 21083(a)(1)(A)(iv). HAVA also requires States to ensure that "voter registration records" are "accurate and are updated regularly." *Id.* § 21083(a)(4). In other words, HAVA charges States with regularly changing their single, centralized SVRLs, to continuously reflect the current snapshot of their registered voters.

HAVA gives DOJ authority to sue to address violations of the statute, *see id.* § 21111, but does not empower it to demand or inspect SVRLs or otherwise audit States' voter list-maintenance practices. To the contrary, HAVA reaffirms the preeminent role of States in managing voter lists, instructing that each State's list be "defined, maintained, and administered at the State level," *id.* § 21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] … to the discretion of the State," *id.* § 21085. The absence

of any inspection provision in HAVA reflects Congress's view that state authority over voter registration is central to preserving our democratic system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Rather, HAVA ports over the NVRA's list-maintenance requirements to the computerized SVRL, charging most States with "perform[ing] list maintenance" of their computerized voter lists "on a regular basis" consistent with the requirements of the NVRA. 52 U.S.C. § 21083(a)(2)(A).

## II. DOJ embarks on a nationwide campaign to collect the private voter data of millions of Americans.

Last year, DOJ launched an unprecedented campaign to collect States' unredacted SVRLs, which include sensitive information about each registered voter. DOJ sent demands to at least 48 States, but most refused to turn over their unredacted

lists.[7] DOJ has sued 30 States and the District of Columbia to attempt to compel disclosure.

DOJ's legal theories have shifted over the course of these lawsuits. Initially, DOJ brought claims under both the CRA and HAVA (and, where applicable, under the NVRA as well). *See* App.33-49; R.Doc.1; *see also, e.g.*, *United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 1. In its later-filed actions, DOJ abandoned its HAVA and NVRA claims and focused solely on the CRA. *See, e.g.*, *United States v. Amore*, No. 25-cv-639 (D.R.I. Dec. 2, 2025), ECF No. 1. Regardless of the vehicle, every single district court that has addressed DOJ's claims to date in these cases has dismissed them, and the Sixth Circuit affirmed the Michigan district court's decision dismissing DOJ's claims.[8]

DOJ's factual allegations have varied from State to State. In some early complaints, DOJ alleged its demands were prompted by anomalies in voter list-maintenance statistics. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 5-4. Here, however, DOJ cited no such anomalies in either its

---

[7] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Aug. 24, 2026), https://perma.cc/CK5B-NKP7.

[8] *See* Add.2-3, 26; App.121-22, 145; R.Doc.210, at 2-3, 26 (dismissing DOJ's claims and cataloguing the opinions of the 22 federal district courts that previously did the same); *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026).

pre-suit letters or its complaint. *See* App.33-49; R.Doc.1; App.50-52; R.Doc.66-1, at 1-3; App.87-88, R.Doc.66-2, at 1-2. In more recent suits, DOJ has abandoned the pretext that its demands were prompted by individualized concerns, arguing it need not provide any factual basis. *See, e.g.*, *United States v. Galvin*, 830 F. Supp. 3d 122, 130 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 9, 2026).

DOJ's actions also betray its true purpose: to empower the federal government to oversee each State's SVRL, despite no congressional authorization to do so. The head of DOJ's Civil Rights Division has confirmed that DOJ's goal is to purge "hundreds of thousands of people" from voter rolls.[9] DOJ intends to run the SVRLs it seizes from States through the Department of Homeland Security's notoriously unreliable Systematic Alien Verification for Entitlements ("SAVE") database to identify suspected noncitizens and then attempt to cajole States into removing them from voter rolls.[10] DHS Secretary Mullin has threatened election officials with withheld grants, fines, and even criminal prosecution if they do not meet the administration's voter-removal demands.[11] Those threats come even though a

---

[9] Video posted by AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795.

[10] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1, 5-7); Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/C3YJ-NV6A.

[11] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States Over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2.

federal court recently blocked the federal government's efforts to use SAVE for voter removals, finding that agencies "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and that using SAVE for voter verification would risk removing "United States citizens from voter rolls based on inaccurate information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026), *appeal docketed*, No. 26-5243 (D.C. Cir. June 29, 2026), *stay denied*, 2026 WL 2643439 (D.C. Cir. Sept. 4, 2026).

## III. DOJ sues Minnesota to compel production of its protected voter data.

On June 25, 2025, DOJ sent a letter to Secretary Simon requesting Minnesota's SVRL. App.50-51; R.Doc.66-1 at 1-2. The letter also asked numerous questions "regarding the State's HAVA compliance." App.50; R.Doc.66-1 at 1. On July 25, the Minnesota Secretary of State's Office responded with a letter answering DOJ's questions in detail. App.53-60; R.Doc.66-1. As to the SVRL, however, it noted DOJ had failed to "identify any legal basis in its June 25 letter that would entitle DOJ to" that list, and explained that Minnesota would "require clear legal justification for the data and sufficient information to show that the data will be protected and used properly before it can consider" whether to share the list. App.60; R.Doc.66-1 at 11.



Appellate Case: 26-2679 Page: 25 Date Filed: 09/15/2026 Entry ID: 5683751

On August 13, 2025, DOJ sent a second letter. In it, DOJ did not address or ask any follow-up questions about the information Minnesota had provided in its responsive letter; instead, DOJ insisted that it was entitled to access Minnesota's SVRL under HAVA. *See* App.87; R.Doc.66-2 at 1. DOJ also invoked the CRA for the first time, "making a demand pursuant to 52 U.S.C. § 20703 for a complete copy of the state of Minnesota's [SVRL]." App.88; R.Doc.66-2 at 2. DOJ stated that the "purpose of this request is to ascertain Minnesota's compliance with the list maintenance requirements of HAVA" and that the SVRL produced by the State must include "all fields." *Id.* On August 21, 2025, the Secretary's Office replied to DOJ again. It explained that Minnesota would not be providing the list, both because DOJ had failed to provide "the clear legal basis necessary" for Minnesota to "turn over private data on several million individuals" and because DOJ had not provided adequate assurances that it would treat the data appropriately. App.90, 92; R.Doc.66-2 at 2, 4. The Secretary's Office also noted that the public version of Minnesota's voter list was available for purchase, and invited further discussion to "determine whether there are ways to address the DOJ's concerns without unnecessarily disclosing private data on millions of Minnesotans." App.94, R.Doc.66-2 at 8.

There were no further discussions. Instead, DOJ filed suit on September 25, 2025, bringing claims under the CRA and HAVA. *See* App.33-49; R.Doc.1. Defendants and Intervenors moved to dismiss, and the court held a hearing on March

3, 2026. On April 17, 2026—seven months after the complaint was filed, and long after the motions to dismiss were argued and fully briefed—DOJ sent a letter to Secretary Simon purporting to provide an "additional basis" for DOJ's CRA demand, which it filed in this action that same day. *See* App.118, R.Doc.180-1 at 1. The letter described public reporting on one alleged noncitizen who had purportedly voted in the 2024 general election in Minnesota and had been criminally charged by state authorities. *Id.*

## IV. The district court dismisses DOJ's complaint.

On August 17, 2026, the district court granted Defendants' and Intervenors' motions to dismiss. The court rejected DOJ's argument that this action is a special proceeding to which Rule 12(b)(6) does not apply, *see* Add.14-16; App.133-35; R.Doc.210 at 14-16, and dismissed DOJ's CRA claim on the grounds that Minnesota's SVRL is not a record that "come[s] into [the] possession" of election officials under the CRA. The court reasoned that the phrase "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source," and that, by using this phrase, Congress "referr[ed] to only those documents that state election officials receive from prospective voters." Add.19; App.138; R.Doc.210 at 19 (second alteration in original) (citations omitted). The court likewise noted that interpreting the CRA, which criminalizes the alteration of any record required to be retained, 52 U.S.C. § 20702, to cover SVRLs would put it

in irreconcilable conflict with the NVRA and HAVA, which require the constant alteration of such lists, Add.20; App.139; R.Doc.210 at 20. And the court dismissed DOJ's HAVA claim because HAVA contains no disclosure requirement. *See* Add.24-26; App.143-45; R.Doc.210 at 24-26. Because the district court found that Minnesota's SVRL was outside the CRA's scope, the court did not address the numerous other independent grounds for dismissal presented by Defendants and Intervenors below. This appeal followed.

## SUMMARY OF THE ARGUMENT

1. The district court correctly dismissed DOJ's CRA claim on the grounds that the CRA does not extend to SVRLs. The statute covers only static records—like voter applications—that "come into" the possession of election officials from voters. 52 U.S.C. § 20701. Dictionary definitions, common usage, and statutory context confirm that "come into" possession refers to receiving something from an outside source. The SVRL did not "come into" the possession of election officials, nor is it static; it is a dynamic database that is created, maintained, and continuously revised by election officials. Further, the CRA requires covered records to be retained, preserved, and not altered. That makes sense when applied to discrete documents submitted to election officials by voters, but if extended to SVRLs, it would place the CRA in irreconcilable conflict with HAVA, which commands election officials to continuously update and alter SVRLs.

2. The district court was likewise correct to reject DOJ's claim that the Federal Rules of Civil Procedure or the CRA insulates its demand from judicial scrutiny. None of the provisions DOJ cites has been interpreted to supplant the Federal Rules, and the Supreme Court has made clear that judicial review of government document demands is necessary to ensure that any investigation will be conducted pursuant to a legitimate purpose, that the underlying statute has been satisfied, and that the court's process is not being abused. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964).

3. This Court should also affirm on other grounds that the district court did not reach but nonetheless warrant dismissal. DOJ did not comply with the CRA's requirement that it issue a pre-suit demand stating "the basis and the purpose" for its inspection, 52 U.S.C. § 20703, including by failing to provide any factual "basis" for its demand, as the CRA requires. Its alleged purpose—assessing list-maintenance compliance—is also beyond the scope of the CRA; the NVRA and HAVA govern list maintenance, and the CRA cannot be repurposed to give DOJ the power to audit States' SVRLs when Congress chose *not* to give it any such authority in the NVRA or HAVA. Further, Minnesota law protects the sensitive voter data at issue here from disclosure, and there is no indication in the CRA that Congress intended to preempt state privacy laws. Finally, DOJ failed to comply with the notice requirements of the federal Privacy Act, and thus is not entitled to unredacted copies of the SVRL.



Appellate Case: 26-2679 Page: 29 Date Filed: 09/15/2026 Entry ID: 5683751

4. DOJ has thus failed to state a claim for myriad reasons, but even if the Court were to accept DOJ's arguments and reverse the ruling below, DOJ certainly would not be entitled to the relief it seeks—immediate production of the unredacted SVRL. The proper course is to remand and allow discovery on, among other things, whether DOJ's stated purpose is pretextual.

## STANDARD OF REVIEW

This Court "review[s] the dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) de novo." *Plymouth County v. Merscorp, Inc.*, 774 F.3d 1155, 1158 (8th Cir. 2014). This Court "may affirm the district court's dismissal on any basis supported by the record." *Phipps v. FDIC*, 417 F.3d 1006, 1010 (8th Cir. 2005).

## ARGUMENT

### I. The CRA does not cover state-created, dynamic records like Minnesota's SVRL.

The district court correctly held that state-created, dynamic voter registration lists do not fall within the scope of Title III. Add.20-21; App.139-40; R.Doc.210 at 20-21. SVRLs are records that election officials create, not ones that "come[] into [their] possession." 52 U.S.C. § 20701. And HAVA directs state officials to make constant changes to the lists, which would conflict with the CRA's requirement that documents be preserved unaltered. DOJ's counterarguments have been rejected by every court to consider them to date. *See, e.g.*, *United States v. Evans*, No. 1:25-cv-

4403, 2026 WL 2267774, at *5 (D.D.C. Aug. 6, 2026) (collecting decisions of the then-15 courts that had held Title III does not cover SVRLs).

### A. Minnesota's SVRL was created by Minnesota election officials and did not "come into" their possession.

"[I]n any statutory construction case," courts start "with the statutory text, and proceed from the understanding that, unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Liscomb v. Boyce*, 954 F.3d 1151, 1154 (8th Cir. 2020) (alteration in original) (quoting *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)). The CRA requires election officers to "retain and preserve … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. But only "records" or "papers" that "come into" election officials' possession within the meaning of § 20701 are subject to production upon a proper demand by the Attorney General. 52 U.S.C. § 20703.

The CRA does not define what it means for a record to "come into" the possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession of something with acquiring, obtaining, or receiving it from an outside source. *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*,

7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire"). This same understanding endures 66 years later. *See, e.g.*, *Receive, Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"). Federal courts have also adopted these definitions. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed., 1966, unabridged)).

Common usage confirms this point. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "come into" possession of a cake she baked with those ingredients. *Id.* Such a phrase would be unnatural because it would falsely imply that the baker merely acquired a finished cake from someone else instead of expending time and labor to produce it. Similarly, "an ordinary English speaker would not say" that Minnesota came into possession of the SVRL that it "created." *Id.*

Accordingly, the district court's definition of "come into possession" is the "natural" and "ordinary" meaning of the phrase. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Because Minnesota election officials internally generate and continuously update the SVRL, it does not "come into" their possession and thus is not a record subject to inspection under the CRA.

If Congress had intended for the CRA to cover dynamic documents created by election officials, it had "obvious alternative" language at its disposal. *Hulce v. Zipongo Inc.*, 132 F.4th 493, 499 (7th Cir. 2025) (quoting *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017)). It could have written the CRA to encompass "all records" that met the statutory criteria, without any qualifier regarding possession, as it did in the NVRA. *United States v. Koski*, No. 3:26-cv-42, 2026 WL 2032532, at *5 (E.D. Va. July 14, 2026) (quoting 52 U.S.C. § 20507(i)(1)), *appeal docketed*, No. 26-2002 (4th Cir. July 29, 2026). Or "Congress could have required the retention and production of all election-related records and papers '*in* the possession of' the state election official." *United States v. Bellows*, 834 F. Supp. 3d 113, 123 n.10 (D. Me. 2026) (emphasis added), *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026). Indeed, Congress *frequently* employs the phrase "in the possession of" to convey its desire that a statute sweep broadly. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a); 18 U.S.C. §§ 3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. § 12(e); 49 U.S.C. § 47124a(b)(1). But in the CRA, Congress "chose not to use this

broader formulation in Section 20701 and, having done so, the court must give meaning to the words 'come into.'" *United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054, at *6 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); Add.19; App.138; R.Doc.210 at 19 (similar). After all, "[c]ourts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018).

Additional textual indicators confirm that Congress used the ordinary meaning of "come into possession." The surrounding text of Section 20701 explains that the relevant "records" are those "relating to any application, registration, payment of poll tax, or other act requisite, to voting in such election." *Yates v. United States*, 574 U.S. 528, 543 (2015) (noting that "accompanying words" provide key context for interpreting statutory phrases because "a word is known by the company it keeps"). "Each of these terms refers to something that the *voter* submits or does as part of the registration process," rather than something state officials create themselves. Add.20; App.139; R.Doc.210 at 20 (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 768-69 (W.D. Mich. 2026)) (emphasis added). And, as the Sixth Circuit recounted, even the reference to records related to a "payment of poll tax" reveals the narrow category of documents captured in this language. *Benson*, 179 F.4th at 479. When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.*

The CRA thus required that officers "would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

**B. Applying the CRA to Minnesota's SVRL would require it to be preserved without alteration, but federal law requires constant updates.**

The CRA's preservation requirements confirm that it does not apply to Minnesota's SVRL. Any record covered by the CRA must be "retain[ed] and preserv[ed]," and may not be "alter[ed]." 52 U.S.C. §§ 20701-20702. If Section 20701 is read to cover Minnesota's SVRL, it would "effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit." *Scanlan*, 2026 WL 1864054, at *5. It is implausible that "Congress was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The command to preserve and retain covered records is paired with Section 20702's criminal penalties for those who willfully "alter" them. 52 U.S.C. § 20702. HAVA, however, *requires* States to establish a dynamic SVRL that "is constantly being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." *United States v. Thomas*, No. 3:26-cv-21, 2026 WL 2070437, at *6 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July

24, 2026); 52 U.S.C. § 21083(a)(1). Adopting DOJ's interpretation of the CRA would create an unavoidable clash with HAVA, and by extension, place election officials in the impossible bind of choosing which statute to honor—at risk of criminal penalty. *See, e.g.*, *United States v. DeMarinis*, No. 25-cv-3934, 2026 WL 1780586, at *4-6 (D. Md. June 18, 2026) ("This Court will not read § 20701 to produce such an absurd result."), *appeal docketed*, No. 26-1878 (4th Cir. July 13, 2026). Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Earlier-adopted statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2177 n.8 (2026) (emphasis added) (citation omitted). This Court should join the Sixth Circuit and numerous district courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

**C. DOJ's interpretation of the CRA should be rejected.**

Nothing in DOJ's brief should convince this Court to depart from the overwhelming consensus among courts that the CRA's plain text does not extend to internally generated, dynamic SVRLs.

*First*, DOJ misses the point in arguing that Minnesota's SVRL must be covered by the CRA because it "relat[es] to voter registration" and the phrase "relating to" should be defined "expansively." Br.13. (citation omitted). Under the CRA, a record must not merely "relate to" voter registration—it must *also* "come into" election officials' possession. Whether the SVRL *relates* to voter registration is irrelevant to whether that dynamic, state-created list *came into the possession* of election officials. The two phrases impose distinct requirements.

*Second*, DOJ claims that the phrase "come into … possession" is broadly defined to "focus[] the inquiry on the *moment* at which possession was obtained and denotes 'possession by any means.'" *Id.* at 15 (quoting *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring)). DOJ speculates that Congress "used the phrase '*come* into his possession' rather than '*are* in his possession' . . . to focus on *how* and *when* the officer gains possession of the records or documents in the first instance." *Id.* at 16. But DOJ fails to offer any explanation of *why* focusing on how and when the officer gains possession of the records would be relevant to Title III. "If that is the meaning Congress intended," the phrase "come into … possession" is "an odd selection of words to convey it," particularly in light of "obvious alternative" language. *Bellows*, 834 F. Supp. 3d at 123 n.10. "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," which is the language

used in the NVRA. Add.19; App.138; R.Doc.210 at 19 (quoting *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515, at *7 (D.N.J. July 29, 2026), *appeal docketed*, No. 26-3085 (3d Cir. Aug. 20, 2026)).

DOJ claims the Supreme Court has "demonstrated a similar understanding of" the phrase "come into possession," citing *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989). Br.17-18. But DOJ overreads *Tax Analysts*, which used the term "come into … possession" only a single time and never construed it as a statutory term. In that Freedom of Information Act dispute, the Court construed the meaning of "agency records," which was defined in the statute to cover records "made *or received*" by the agency. 492 U.S. at 145-46 (emphasis added) (quoting 44 U.S.C. § 3301(a)(1)(A)). The Court explained that this definition contains two requirements—that the agency "either create or obtain" the records, and that "the agency must be in control of the requested materials." *Id.* at 145. The Court used the phrase "come into … possession" to make a point not at issue here, writing that "by control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties" and going on to note that this definition excludes "personal materials in an employee's possession, even though the materials may be physically located at the agency." *Id.* In other words, the Court used the phrase "come into the agency's possession" to illustrate *how* an agency must acquire

records for them to be within the agency's control—through the legitimate conduct of its official duties—an issue that is not relevant to the present dispute.

DOJ also points to other statutes that use the phrase "come into possession," Br.17-18, but they reinforce the district court's construction: Each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. *See, e.g.*, 44 U.S.C. § 3572 (using phrase "comes into possession" in reference to "information supplied by individuals or organizations to an agency"); 13 U.S.C. § 214 (referencing 13 U.S.C. § 9, which prohibits disclosure of information "furnished" to the Department of Commerce for the Census); 30 U.S.C. § 1732(b) (explaining States and Indian tribes are entitled to have access to royalty information "as soon as practicable after it comes into the possession of the Secretary"); 10 U.S.C. § 130c(d) (using phrase "came into possession or under the control of the United States" in reference to information "received by an agency" from a foreign government). The district court's construction of the CRA sits comfortably among these laws.

*Third*, DOJ stitches together fragments of the legislative history and "[c]ontext" in which the CRA was enacted to argue that they support DOJ's view. Br.18-21. But they cannot override the CRA's plain text; "[o]nly if the statute is ambiguous do [courts] look to the legislative history to determine Congress's intent." *United States v. Maswai*, 419 F.3d 822, 824 (8th Cir. 2005) (first alteration in

original). In any event, DOJ's retelling of the CRA's history and context is wrong. The Commission Report that prompted enactment of the CRA explains why Congress was preoccupied with application materials. The Commission found its investigations thwarted by Jim Crow officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep.* 93, and it determined that comparing such applications to accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137. As the Attorney General explained, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. 6 (1960) (statement of Att'y Gen. Rogers).[12] DOJ needed those *applications* specifically because, "[w]ithout access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race." *Evans*, 2026 WL 2267774, at *9.

Unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Id.* at *10 (emphasis added). Regardless, voter lists (although not SVRLs,

---

[12] Available at https://perma.cc/46G6-GQZB.

with their detailed personal identifying information) were *already* available to DOJ in most States already, because "voter rolls have long been treated as public records, which are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why, "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* It is no surprise that Congress drafted the CRA to cover records that were *not* traditionally available, rather than records already treated as public.

DOJ incorrectly asserts that a passing reference to "vouchers" in the Civil Rights Commission Report controls whether Minnesota's SVRL falls under the CRA. Br.20. In Jim Crow-era systems, it was not uncommon for States to require prospective voters to be vouched for by registered voters, and for States to keep indices tracking who vouched for who. DOJ claims that voucher indices "were among the records that the Commission recommended that Congress make available for federal inspection," Br.21, but that is not what the report actually says, *see Comm'n Rep*. 137-38. Rather, the report briefly mentions that the Commission reviewed an index showing which voters vouched for which other voters in Bullock County, Alabama; it does not say (or even suggest) that the CRA was meant to ensure DOJ access to voucher indices, which the federal government could *already*



Appellate Case: 26-2679 Page: 41 Date Filed: 09/15/2026 Entry ID: 5683751

*obtain* without the need for further statutory authority. *Id.* at 93. The purpose of the CRA was to ensure the preservation of records that were *not* available to the Commission. And regardless, the Commission's report cannot alter the scope of the CRA's plain text.

*Fourth*, DOJ argues the district court's construction of the statute would still cover self-generated records because, even if one employee "created the SVRL," other employees who subsequently acquire the record would "come into [the] possession" of it, making it subject to the CRA. Br.22. But the district court—consistent with other courts around the country—did not hold that the CRA's coverage turns on an employee-by-employee assessment, such that whether records are covered would depend "on the staffing practices of state election bodies." *Evans*, 2026 WL 2267774, at *10 n.8 (characterizing DOJ's argument as "pedantry"). It held that the relevant provisions as a whole draw a line between voter-created documents on one hand and internally generated documents on the other, requiring preservation only of the former and not of the latter. *See* Add.17-19; App.136-38; R.Doc.210 at 17-19. Such an approach makes far more sense than DOJ's employee-by-employee scheme, as it is a "doubtful proposition that Congress sought to accomplish" coverage of internal records in such a "surpassingly strange manner" when it could have done so "in a much more straightforward way." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (citation omitted). And DOJ's reading

would *still* fail to capture Minnesota's SVRL, which does not transfer from one election officer to another as a static, discrete record would but is a "continuously maintained, state-generated compilation of data" that Minnesota "has built, updated, and controlled since its creation." *Scanlan*, 2026 WL 1864054, at *6 (describing New Hampshire's list).

*Fifth*, DOJ continues to advance an interpretation that would put the CRA's "prohibition on altering records" on a collision course with the NVRA's and HAVA's requirements that the SVRL be updated regularly. *See* Br.23-26. DOJ relies on *Voter Reference Foundation, LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025), to suggest that its reading of the CRA can be harmonized with these statutes, but that is mistaken. In holding that a dynamic SVRL is a record under the NVRA, the Tenth Circuit interpreted the NVRA's directive to "*maintain*[]" records subject to disclosure. *Id.* at 1085 (quoting 52 U.S.C. § 20501(b) (emphasis added)). Its holding hinged on the dictionary definition of "maintain": "to 'carry on' or 'keep up.'" *Id.* (quoting *Maintain*, *Oxford English Dictionary* (2d ed. 1989)). To "carry on" or "keep up" something is quite unlike the CRA's command to "preserve," "retain," and not "alter" records. 52 U.S.C. §§ 20701-20702.

DOJ next attempts to paper over this conflict by asking the Court to ignore the plain meaning of the term "alter" in the CRA. Br.24. According to DOJ, a CRA-covered record is not altered unless it is destroyed or manipulated with ill intent. But

"alter" simply means "to cause to become different in some particular characteristic." *Alter*, *Webster's Third New International Dictionary* 63 (1966). The very point of list maintenance is that the list will "become different" every time a voter registers, updates their registration, or is removed from the list. DOJ also cites *Fischer v. United States* to suggest that the term "alter" applies only to actions that impair the document's evidentiary value, *see* Br.24-25—but *Fischer* reached that conclusion because the obstruction-of-justice statute it construed in 18 U.S.C. § 1512, contains an additional mens rea requirement that the CRA does not: it criminalizes altering documents "*with the intent to impair the object's integrity or availability for use in an official proceeding*." *See* 603 U.S. 480, 487 (2024) (applying 18 U.S.C. § 1512). Regardless, depending on the issue being investigated, updating the SVRL might well impair its evidentiary value—such as if an ineligible voter previously listed were removed. "Alter" "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *City and Cnty. of S.F. v. EPA*, 604 U.S. 334, 350 (2025) (citation omitted). Read together, the CRA's requirements that covered records be retained and preserved, *and* not altered, are all consistent with an obligation to keep records in a static, identical form; it simply does not make sense to extend that obligation to a dynamic, constantly evolving SVRL.

As a backup, DOJ urges the Court to ignore this statutory collision because an election official is not liable for altering a record covered by the CRA absent a



Appellate Case: 26-2679 Page: 44 Date Filed: 09/15/2026 Entry ID: 5683751

showing of willfulness, Br.25, which "simply means a voluntary, intentional violation of a known legal duty," *United States v. Mathews*, 761 F.3d 891, 893 (8th Cir. 2014) (citation omitted)). DOJ fails to explain how this knowledge requirement can change what it means to "alter" a record, and regardless, if this Court held that Minnesota's SVRL *is* a record covered by the CRA, election officials would thereafter be unable to engage in the list maintenance that HAVA demands.

*Finally*, DOJ turns to hyperbolic policy arguments, claiming that it would "paralyze" DOJ's ability to enforce voting laws if the CRA did not reach SVRLs. Br.25-26. But "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). In any event, nothing would be "paralyzed." DOJ's present campaign for States' SVRLs is unprecedented.[13] If Congress thought it necessary for DOJ to audit unredacted SVRLs to assess compliance with HAVA, it would have given DOJ the authority to do so *in HAVA*. *Bellows*, 834 F. Supp. 3d at 125. Rather than grant DOJ such authority, however, HAVA affirms that SVRLs are to be "maintained" and "administered" at "the State level." 52 U.S.C. § 21083(a)(1)(A).

---

[13] DOJ cites instances in which Georgia in 2006 and Texas in 2008 voluntarily provided DOJ with their SVRLs, Br.26, but neither were part of a national campaign to audit States' SVRLs, as DOJ seeks to do here. Both were also resolved without a court adjudicating the merits. *See* Consent Decree, *United States v. Georgia*, No. 1:06-CV-2442 (N.D. Ga. Oct. 27, 2006), ECF No. 4; U.S. Dep't of Just., *Memorandum of Understanding Between the United States and Texas* (May 13, 2008), https://perma.cc/3ZHL-TNCG.

## II. The Court should also affirm because of other flaws in DOJ's claim.

DOJ's demand also fails for a host of independent reasons addressed by the parties below, each of which provides an independent basis to affirm.

### A. DOJ's CRA demand is subject to meaningful judicial review.

DOJ argues that a 60-year-old Fifth Circuit decision, *Lynd*, largely exempts CRA claims from judicial review and, indeed, the Federal Rules of Civil Procedure. *See* Br.27-28. According to DOJ, the CRA instead requires some unspecified "special statutory proceeding[s]," free of any pesky "procedural device[s] or maneuver[s]" questioning DOJ's compliance with the statute it invokes. *Id.* (citing *Lynd*, 306 F.2d at 225). This is baseless.

DOJ points to nothing in the Federal Rules or the CRA that exempts its claim from run-of-the-mill Rule 12(b)(6) analysis. The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is just such an action. Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—but none involve the CRA. *See* Fed. R. Civ. P. 81(a).

Nor does anything in the CRA support the exemption DOJ seeks. The barrier DOJ faces here is high: the Federal Rules "are the default rules in civil litigation," and while Congress may override that command, courts "do not lightly infer that

Congress has done so; and silence on the subject is seldom enough." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023). And the CRA merely provides that federal district courts "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. That unremarkable jurisdictional language cannot be read to insulate CRA claims from routine judicial review or displace the Federal Rules. Just two years after *Lynd*, the Supreme Court construed a statute with materially identical language ("appropriate process") and held that, since it "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. DOJ appears to recognize this: Despite suggesting the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. *See* Br.11.

*Powell* also held that judicial review of government document demands has teeth. *Powell* explains that a reviewing court must ensure, among other things, that the demand is made pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, and that the underlying statute authorizing the demand has been satisfied. *See* 379 U.S. at 58. It underscores that "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Id.* That charge more than authorizes all the judicial review Appellees seek here. Courts evaluating DOJ's recent CRA demands have

consistently held that "[t]he Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1102 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *see, e.g.*, *Benson*, 179 F.4th at 483 n.2; Add.16; App.135; R.Doc.210 at 16 (citing cases).

DOJ's attempt to limit *Powell* to the IRS context is unpersuasive. DOJ suggests that *Powell*'s "judicial inquiry into the IRS's demand for records was appropriate" because it was "authorized by Section 7605(b) of the Internal Revenue Code. Br.33. But there is nothing in *Powell* that suggests any such limitation, and since *Powell*, courts—including the court that issued *Lynd*—have regularly engaged in meaningful judicial review of government document requests of all stripes under the Rules. *See, e.g.*, *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347-50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case); *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458-60 (5th Cir. 2018) (reversing order to enforce civil investigative demand after inquiry into the sufficiency of the purpose and basis of demand); *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689-90 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in civil investigative demand,

reasoning agencies are "not afforded unfettered authority to cast about for potential wrongdoing" (quotations omitted)).[14]

DOJ also claims that, unlike Section 7605, "[t]he CRA contains no similar statutory prohibition limiting the authority of the Attorney General to demand election records." Br.33. But Title III *does* impose such a limit: the Attorney General *must* state a basis and a purpose for DOJ's request. And even *Lynd* recognized that courts must be "open for … determination" if there were a "genuine dispute" about whether a "particular paper or record" fell under the CRA. *Lynd*, 306 F.2d at 226. That is certainly in dispute here. *See supra* Argument § I.

Unlike here, the *Lynd* court had no reason to doubt that DOJ invoked the CRA for a valid purpose and complied with the statute's demand requirements. As it explained, the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights"; there, "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration

---

[14] DOJ also cites *Donaldson v. United States*, 400 U.S. 517, 529 (1971), *superseded by statute*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976), for the proposition that *Powell* does not limit the availability of summary enforcement proceedings. *See* Br.35. But *Donaldson* simply denied a taxpayer's attempt to intervene in enforcement proceedings directed toward a different target; it did not say, much less hold, anything about the scope of such proceedings. 400 U.S. at 527-31. Moreover, the Court confirmed that Federal Rule 24(a)(2)—regarding intervention—continues to apply in a civil action to enforce a tax summons, reinforcing the general applicability of the Federal Rules in such actions. *See id.*

and voting," *Lynd*, 306 F.2d at 228-29, 229 n.6. *Lynd* therefore never considered any of the issues currently before this Court and does not purport to foreclose judicial review of those issues.

Finally, DOJ's assertion that Appellees' arguments constitute a "challenge" to the "scope of the Attorney General's authority to enforce HAVA" is off base. Br.34. DOJ has effectively conceded that it cannot demand Minnesota's SVRL under HAVA: its HAVA claim was dismissed, and it has not appealed that dismissal. Rather, the issues before this Court deal with the scope of what records DOJ may demand *under the CRA*—issues that are plainly fit for judicial review.[15]

### B. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis.

The CRA requires the Attorney General to make a "demand in writing," which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

---

[15] DOJ focuses much of its opening brief on the issue of whether a CRA demand is an administrative subpoena. *See* Br.29-35. Alliance Intervenors have never argued that it is. What matters for this Court's purposes is that a CRA demand is a government document demand, which is subject to meaningful judicial review under *Powell* and must satisfy the requirements of the CRA itself—including, most notably, the requirement to provide an adequate "statement of the basis and the purpose therefor." 52 U.S.C. § 20703. Whether or not a CRA demand is an administrative subpoena, DOJ's failure to satisfy these requirements required the dismissal of its action here. *See* Argument § II.B-C. That is also why DOJ's statement that the CRA "provides no meaningful standards that would permit … judicial review," Br.39, is incorrect: the CRA itself provides the standards by defining the records that fall within its scope and requiring that DOJ state "the basis and the purpose" for the demand.



Appellate Case: 26-2679 Page: 50 Date Filed: 09/15/2026 Entry ID: 5683751

Because DOJ's demand failed to state any "basis," DOJ has not satisfied that requirement, which is alone a sufficient reason to affirm.

As other courts have determined, a "basis" under the CRA means "a factual basis for investigating a violation of a federal statute." *Oregon*, 828 F. Supp. 3d at 1102; *see also United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026) (collecting cases that hold "basis" refers to the facts underlying the demand), *appeal docketed*, No. 26-2126 (10th Cir. July 27, 2026). That is consistent with dictionary definitions. *See, e.g.*, *Basis*, *Black's Law Dictionary* (4th ed. 1968) (including definitions for "basis" such as the "groundwork," "support," or "foundation" of something). DOJ's attempts to reframe the inquiry as whether it provided Minnesota with "notice" ignores the statutory text. Br. 40-42. The CRA does not tell DOJ to provide "notice"; it orders that DOJ "*shall"* include a "*basis*" for its demand. 52 U.S.C. § 20703. "The use of the word 'shall' in a statute 'creates an obligation impervious to judicial discretion.'" *Benson*, 179 F.4th at 483 (quoting *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024)).

Under this standard, DOJ's demand was clearly inadequate. Its June 25, 2025 letter merely contains a series of questions about Minnesota's list-maintenance practices. App.50-51; R.Doc.66-1, at 1-2. And its August 13, 2025 letter did not say anything about DOJ's factual basis for its demand. App.87-88; R.Doc. 66-2 at 1-2.

Nor can DOJ's post-hoc April 17, 2026 letter, regarding public reporting that an alleged noncitizen had voted, rescue its deficient demand. *See* App.118; R.Doc.180-1 at 1. That notice was never properly before the district court, as a party cannot introduce new allegations without moving to amend or supplement the complaint, which DOJ did not do. *See* Fed. R. Civ. P. 15. Further, the alleged noncitizen in question was caught and criminally charged through the ordinary operation of state law. The letter thus provides no basis for suspecting a HAVA violation on Minnesota's part or for doubting the adequacy of its list-maintenance procedures. In any event, the Supreme Court has interpreted statutory instructions similar to those in the CRA to require that the government provide "'a' *single* document containing the required information, not a mishmash of pieces with some assembly required." *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (emphasis added); *id.* at 163 ("Congress's decision to use the indefinite article 'a' … suggests that the government must issue a single statutorily compliant document[.]").

Unable to identify a single demand that advances a sufficient basis, DOJ invites the Court to reject the statutory requirement entirely. It insists that no factual basis is necessary, and that it was sufficient to merely "invoke[] the CRA" and state that DOJ's purpose was "to ascertain Minnesota's compliance with the list-maintenance requirements of HAVA." Br.40-41 (quoting App.88; R.Doc.66-2, at 2). But that renders the term "basis" meaningless, either by ensuring that it is

automatically satisfied in every case or by fully collapsing it with the "purpose" requirement. *See Galvin*, 830 F. Supp. 3d 122, 128 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026) ("the statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct"). This is straightforwardly impermissible as a matter of statutory construction. *See, e.g.*, *United States v. Lamere*, 980 F.2d 506, 513 (8th Cir. 1992) ("[W]ords employed in a statute should not be discarded as being mere surplusage or being meaningless."). And indeed, demands made shortly after the CRA's passage demonstrate that DOJ originally understood Title III to require a factual basis. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6 ("This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (similar). To allow a rote statutory invocation of the CRA to serve as the "basis" for a Title III demand not only contradicts the statutory text, but it also runs counter to DOJ's own historical practice.

### C. DOJ's purported desire to investigate list maintenance is not a proper purpose under the CRA.

A CRA demand must also state "the purpose therefor." 52 U.S.C. § 20703. The statutory term "purpose" must be read in the context of the CRA—a law designed to enhance DOJ's enforcement powers to protect *civil rights*. *See Oregon*,

828 F. Supp. 3d at 1105 (holding that "[t]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights"). Thus, DOJ's only stated purpose of auditing Minnesota's voter list maintenance is not a proper purpose under the CRA, as courts have repeatedly held when rejecting DOJ's parallel demands.[16]

DOJ effectively asks the Court to read the CRA's "purpose" requirement out of the statute. According to DOJ, because the CRA does not "contain a list of acceptable purposes," there is "no limitation on the permissible purpose of the Attorney General's demand." Br.44. But "[i]f *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 828 F. Supp. 3d at 1104. In other words, DOJ again has a surplusage problem, and this Court should not read "Title III so broadly as to render an express statutory obligation void of any authoritative meaning." *Warner*, 2026 WL 2018877, at *6; *see also United States v.*

---

[16] *See United States v. Matthews*, No. 3:25-cv-03398-CRL-DJQ, 2026 WL 2212877, at *5-6 (C.D. Ill. July 31, 2026), *appeal docketed*, No. 26-2695 (7th Cir. Aug. 17, 2026)*; United States v. Warner*, No. 2:26-cv-00156, 2026 WL 2018877, at *6-7 (S.D. W. Va. July 13, 2026); *Bellows*, 834 F. Supp. 3d at 123-28; *United States v. Amore*, 831 F. Supp. 3d 149, 157-58 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 10, 2026); *Oregon*, 828 F. Supp. 3d at 1108-09; *United States v. Weber*, 816 F. Supp. 3d 1168, 1183-84 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *see also United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921, at *8 (N.D.N.Y. July 10, 2026) (DOJ's purported purpose "lacks any relation to the purposes for which Title III was enacted").



Appellate Case: 26-2679 Page: 54 Date Filed: 09/15/2026 Entry ID: 5683751

*Talley*, 16 F.3d 972, 976 (8th Cir. 1994) (rejecting interpretation that would render term surplusage).

DOJ's blinkered read of the CRA's purpose requirement is simply not how statutory interpretation works. "Textualists—like all those who use language to communicate—do not interpret words in a vacuum." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 301 (2026) (Barrett, J., concurring). Just as a parent's instruction to "[m]ake sure the kids have fun" does not mean a babysitter may take the kids on a multi-day jaunt to a rollercoaster park, *Biden v. Nebraska*, 600 U.S. 447, 513 (2023) (Barrett, J., concurring), the CRA's instruction that DOJ state the "purpose" for its demand does not give DOJ carte blanche to invoke the CRA for whatever purpose it desires.

Rather, the proper purposes for a CRA demand can be discerned by "look[ing] to Title III's text together with the legislative backdrop against which Congress enacted the statute." *Warner*, 2026 WL 2018877, at *6. The CRA was concerned with individuals' ability to register to vote and then cast a vote freely. Its focus on "act[s] requisite to voting," 52 U.S.C. §§ 10101(a)(2)(B), 20701, demonstrates that its inspection provision is also rooted in an *individual's* right to vote. That unmistakable textual cue aligns with the CRA's history, which, as contemporary courts observed, "leaves no doubt but that [the CRA] [wa]s designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*,

187 F. Supp. 848, 853 (M.D. Ala. 1960). The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, *see Benson*, 179 F.4th at 476, and specifically, enforcement of the 1957 Act was stymied by "the refusal of some state and local authorit[ies] to permit" inspection of voter registration forms. H.R. Rep. No. 86-956, at 7. Thus, as DOJ's favored case put it, the 1960 CRA's "purpose is to enable the Attorney General to determine whether [§ 10101 voting rights] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. Said differently, the "purpose of [T]itle III" was to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Hearings* at 700 (statement of Rep. McCullough). This Court should reject DOJ's attempt to convert the CRA, enacted to *protect* individuals' right to vote, into a tool to further its broader efforts to *remove* voters from States' voter rolls. *See supra* Statement of the Case §§ I.A, II.

In a last-ditch pivot, DOJ suggests that its purpose in ensuring Minnesota's HAVA's compliance also "relates to individual voting rights." Br.45. This pivot fails immediately, as such a stated purpose cannot be found in the August 13 letter or even DOJ's briefing in the district court. And even if DOJ had made this assertion earlier, it cannot use the specter of supposedly "fraudulent votes" to transform a HAVA list-maintenance investigation into a CRA-permitted civil rights investigation. Br.46-47. The authority DOJ relies on makes clear that list-



Appellate Case: 26-2679 Page: 56 Date Filed: 09/15/2026 Entry ID: 5683751

maintenance issues such as "failures to purge voters who have moved away or have died" do not "bear any particular importance" to a CRA inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962).

DOJ's attempt to shoehorn the CRA into a voter list inspection tool would also upset the "comprehensive scheme for the creation and upkeep of states' computerized" SVRLs Congress created in HAVA and the NVRA. *Bellows*, 834 F. Supp. 3d at 125. Indeed, HAVA contains no inspection provision, and certainly does "not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list." *Id.* at 126. DOJ has even abandoned its initial HAVA claim seeking Minnesota's unredacted SVRL, effectively conceding that HAVA does not grant this freestanding authority. Instead, HAVA grants the Attorney General power to "bring a civil action against any State" for "declaratory and injunctive relief" under the statute and receive discovery—but only if DOJ can state a viable claim of a HAVA violation. 52 U.S.C. § 21111.

DOJ speculates—without evidence—that Congress saw "no need" to include an inspection provision in HAVA because the CRA already provided such a tool. Br.47. But to *infer* that the federal government could audit a State's SVRL for violations of one federal statute (HAVA) by using authority from a provision in a *separate* federal statute (the CRA)—enacted decades earlier for a distinct purpose—

defies logic. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (holding where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," specific provisions control over general authorizations). If Congress intended HAVA to include an inspection tool on par with the CRA or even the NVRA, it could have easily said so or cross-referenced the CRA itself. In fact, HAVA regularly cross-references other statutes—including the NVRA, 52 U.S.C. § 21083(a)(2)(A); the Privacy Act, *id.* § 21083(a)(5)(D); and the Uniformed and Overseas Citizens Absentee Voting Act, *id.* § 21083(b)(3). But HAVA conspicuously fails to cross-reference Title III of the CRA. In short, "Congress knew how to draft the kind of statutory language that" DOJ wishes "to read into" HAVA but chose not to. *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 580 U.S. 26, 36 (2016). And the "express provision of one method of enforcing" HAVA "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

**D. The CRA does not preempt Minnesota's voter privacy laws.**

Even if the CRA permits DOJ to inspect Minnesota's SVRL, Minnesota law protects sensitive voter information from disclosure. *See* Minn. Stat. § 201.091, subdiv. 9. That includes "any part of a voter's Social Security Number" or "driver's license number," *id.*, the very information DOJ demands, *see* App.88; R.Doc.66-2,



Appellate Case: 26-2679 Page: 58 Date Filed: 09/15/2026 Entry ID: 5683751

at 2. For DOJ to obtain this protected information, it must show the CRA preempts Minnesota's voter privacy laws. It does not.

As DOJ admits, "[t]he purpose of Congress is the ultimate touchstone" in every pre-emption case. Br.55 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). DOJ, as "the party asserting federal preemption of state law ... bears the burden of showing" such preemption. *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1175 (8th Cir. 2023). It has entirely failed to do so.

Nothing in the CRA evinces a purpose to preempt common-sense voter privacy laws like Minnesota's. The statute does not speak to the issue at all. A comparison to the NVRA confirms the point: The courts that have held the NVRA's inspection provision requires disclosure of SVRLs have emphasized that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" on such lists. *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see, e.g.*, *Voter Reference Found.*, 160 F.4th at 1083 n.14. Nor does anything in the CRA's text prohibit such redactions.

DOJ's only attempt to identify any preemptive intent in the CRA is its citation to 52 U.S.C. § 20704, which provides that DOJ may not share records obtained under the CRA except to Congress, other government agencies, or in a judicial proceeding. *See* Br.56. But this too says nothing about state privacy laws, and there is no reason to read it as containing a hidden implication to preempt them. To the contrary, the



Appellate Case: 26-2679 Page: 59 Date Filed: 09/15/2026 Entry ID: 5683751

Congress that enacted the CRA could not have intended to preempt state laws exempting driver's license numbers and social security numbers from inspection because federal law did not even require registrants to provide that information until 2002. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Even *Lynd* recognizes that the CRA was intended only to reach "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231.[17] Because there is no reason to conclude Congress's purpose in enacting the CRA was to preempt state voter privacy laws, the CRA cannot require Minnesota "to disclose specific types of information [it is] prohibited from disclosing under" state law. *Oregon*, 828 F. Supp. 3d at 1108.

**E. DOJ has not complied with the Privacy Act.**

This Court should also affirm because the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F. Supp. 3d at 1192-93 (dismissing DOJ's demand for California's unredacted SVRL on this ground); *see also League of Women Voters*, 2026 WL 1784297, at *21-28 (finding DHS violated the Privacy Act in seeking to run voter lists through SAVE).

[17] DOJ incorrectly suggests that this framing mischaracterizes *Lynd*, Br.56 n.11. While *Lynd* did not reach a holding about the scope of the CRA, this language illustrates the Fifth Circuit's understanding that documents encompassed in a CRA demand were by their nature "public records," undercutting any suggestion that anyone would have understood the CRA to preempt state laws rendering certain documents *non*-public.

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 1:25-CV-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). One such requirement is that, before an agency may "establish or revise any 'system of records,' it must 'publish in the Federal Register … a notice of the existence and character of the system of records.'" *Id.* at *2 (quoting 5 U.S.C. § 552a(e)(4)). The System of Records Notice ("SORN") must specify the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. 5 U.S.C. § 552a(e).

DOJ does not contest that Minnesota's SVRL qualifies as a "system of records" under the Act. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ must, therefore, issue a compliant SORN "before" it engages in activity covered by the Act. *LULAC v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 115-16 (D.D.C. 2026).

DOJ points to a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." Br.57-59. But this SORN fails to support DOJ's attempt to collect voter data here several times over. *First*, it does not disclose what DOJ intends to do with the voter data it collects—indeed, it does not even *mention* HAVA or the CRA. DOJ seeks to excuse this omission

because the SORN refers to the Civil Rights Division's website, which in turn mentions the statutes, Br.58 n.12, but the Privacy Act requires information in the SORN to be "published in the Federal Register"—not on an agency's webpage, 5 U.S.C. § 552a(e)(4), (l)(2). And the Division's website merely lists the statutes enforced by the Voting Section—it does not disclose the intended "routine uses" of the mass data collection DOJ seeks here, and so does not satisfy the Privacy Act. *Id.* § 552a(e)(3)(C).

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists that this language covers its demand because every registered voter in Minnesota is simultaneously a "subject" and "victim" in its "investigation into list maintenance and voter fraud." Br.59. Minnesota's voters would likely be shocked to learn that DOJ views each and every one of them as a "subject"—a term that, as DOJ recognizes, means that the individual's "conduct" is "under investigation," *id.* at 31, a designation serious enough that it would normally trigger a well-advised recipient to seek criminal defense counsel. And it is similarly implausible to call every registered voter in Minnesota a "victim" in an investigation purportedly about the sufficiency of Minnesota's processes and programs to maintain its voter roll. Reading these terms as capaciously as DOJ urges would make a mockery of the Privacy Act's notice requirements.



Appellate Case: 26-2679 Page: 62 Date Filed: 09/15/2026 Entry ID: 5683751

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. 47611. Although this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's full, unredacted SVRL.

For all these reasons, this SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F. Supp. 3d at 1193-94. DOJ seeks a remedy inconsistent with federal law; "[b]ecause the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of" Minnesotans. *Id.* at 1194.[18]

## III. If the Court reverses, the next step would be to remand for discovery.

Even if this Court were to reverse the ruling below, it should reject DOJ's improper request to "remand with instructions to order Secretary Simon to immediately produce the requested unredacted SVRL" and to immediately issue its

[18] The "law enforcement" exception DOJ references, Br.59-60, means only that DOJ is not *categorically* barred from collecting First Amendment information, *see* 5 U.S.C. § 552a(e)(7). There is no law enforcement exception to the SORN requirement. *Id.* § 552a(e)(4).

mandate. Br.64-65. The appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking Minnesota's SVRL was pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). The CRA required DOJ to state "the purpose" for its demand, so it matters whether the asserted purpose is the true one.

As multiple federal courts have noted, there is reason to doubt DOJ's true purpose in seeking States' SVRLs. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F. Supp. 3d at 1107 (expressing "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data"). DOJ's true purpose appears to be to run Minnesota's SVRL through DHS's SAVE database and then pressure the State to remove flagged registrants, notwithstanding SAVE's demonstrable unreliability. *See supra* Statement of the Case § II. But that project has nothing to do with DOJ's stated purpose here—and DHS is currently blocked from using SAVE to facilitate voter removals in any event. *Id.*[19]

[19] DOJ's contention that Appellees have not made a sufficient showing to be entitled to discovery is also incorrect. *See* Br.50. The sole case it cites, involving an IRS enforcement proceeding, held the taxpayers "failed to raise any substantial question

## CONCLUSION

This Court should affirm the district court's decision.

Dated: September 11, 2026

Respectfully submitted,


<u>*/s/ Uzoma N. Nkwonta*</u>
Uzoma N. Nkwonta
Robert Golan-Vilella
Julianna D. Astarita
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Ste. 400
Washington, D.C. 20001
Telephone: (202) 948-1135
unkwonta@elias.law
rgolanvilella@elias.law
jastarita@elias.law
kkowalewski@elias.law

Sybil L. Dunlop
Katherine M. Swenson
Kshithij Shrinath
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-0830
sdunlop@greeneespel.com
kswenson@greeneespel.com
kshrinath@greeneespel.com

*Attorneys for Intervenor-Defendants-Appellees Minnesota Alliance for Retired Americans Educational Fund and Misael Hernandez*


---

regarding the validity of the Government's purpose" *after* the taxpayers "had an opportunity directly to examine several IRS employees who participated in the investigation" and "to cross-examine the Government's chief witness." *United States v. Lask*, 703 F.2d 293, 300-01 (8th Cir. 1983). Appellees have had no comparable opportunity here.



Appellate Case: 26-2679 Page: 65 Date Filed: 09/15/2026 Entry ID: 5683751

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7). The brief was prepared using Microsoft Word in Office 365, which reports that the brief contains 12,907 words, excluding items listed in Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Office 365 with 14-point Times New Roman.

Pursuant to Eighth Circuit Rule 28A(h)(2), the undersigned certifies that this brief has been scanned for viruses with Sophos Endpoint Agent version 2026.2.1.3.0 and is virus-free.

Dated: September 11, 2026

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta



Appellate Case: 26-2679 Page: 66 Date Filed: 09/15/2026 Entry ID: 5683751

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 11, 2026

*<u>/s/ Uzoma N. Nkwonta</u>*
Uzoma N. Nkwonta