No. 26-2679

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STEVE SIMON, in his official capacity as Secretary of State for the State of Minnesota; STATE OF MINNESOTA,

*Defendants-Appellees*,

MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATION FUND; MISAEL HERNANDEZ; COMMON CAUSE; LEAGUE OF WOMEN VOTERS OF MINNESOTA; VALERIE MANGSKAU; JENNIFER COMPEAU; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CYNTHIA WILSON,

*Intervenor Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Minnesota

## BRIEF OF INTERVENOR-APPELLEES NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND CYNTHIA WILSON

(*See inside cover for continuation of Counsel*)

Appellate Case: 26-2679 Page: 1 Date Filed: 09/17/2026 Entry ID: 5685100

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
EDWARD G. CASPAR
ROBERT WEINER
LEAH FRAZIER
GILLIAN CASSELL-STIGA
CATHERINE MEZA
SAMANTHA HEYWARD
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

*Counsel for Appellees-Intervenors National Association for the Advancement of Colored People and Cynthia Wilson*

O'MELVENY & MYERS LLP
ANTON METLITSKY
ANDREW FRACKMAN
REEMA SHAH
1301 Ave. of the Americas, Ste. 1700
New York, NY 10018
Tel: (212) 326-2000

NOAH BOKAT-LINDELL
1625 Eye Street NW, 10th Floor
Washington, DC 20006
Tel: (202) 383-5300

DANIEL METEER
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Tel: (310) 553-6700

## SUMMARY OF THE CASE

The Department of Justice ("DOJ") seeks to commandeer the Civil Rights Act of 1960 ("CRA")—a statute Congress passed to help fight racial discrimination in voting—to federalize state voter roll maintenance and usurp States' power to investigate voter eligibility. It seeks to compel unprecedented disclosure of unredacted, sensitive personal information of every Minnesota voter, all to try and uncover evidence of long-debunked theories of noncitizens committing voter fraud. But Congress enacted the CRA to combat *voting discrimination*, not for DOJ's adulterated purpose. Nor can DOJ use the statute for the stated, but pretextual purpose of trying to uncover purported violations of the Help America Vote Act ("HAVA"). Courts cannot enforce Title III requests untethered to the CRA's purpose. They especially cannot do so here, where DOJ provides no "basis" for suspecting that Minnesota is failing to comply with the statute's anti-discrimination obligations.

The district court correctly dismissed DOJ's unlawful Title III demands and denied its Motion to Compel production of Minnesota's unredacted voter roll, albeit on other grounds. But DOJ's failure to comply with Title III's "purpose" and "basis" requirements remain separate, independent bases to dismiss DOJ claims. In light of the importance and number of issues involved, NAACP requests oral argument of 30 minutes per side.



Appellate Case: 26-2679 Page: 3 Date Filed: 09/17/2026 Entry ID: 5685100

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the National Association for the Advancement of Colored People (NAACP) states that it has no parent corporation and that no publicly held corporation holds 10% or more of its stock.

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE .......... i
STATEMENT OF THE ISSUES .......... 1
STATEMENT OF THE CASE .......... 2
A. Legal Background .......... 2
B. The Government's Targeting of Minnesota and The Present Case .......... 4
SUMMARY OF ARGUMENT .......... 7
ARGUMENT .......... 11
I. DOJ's Demand Is Subject to Traditional Judicial Review. .......... 12
II. DOJ Fails to Satisfy Title III's "Purpose" Requirement. .......... 19
A. The Purpose of a Title III Demand Must Be Consistent with the Purpose of Title III. .......... 20
B. Title III's Purpose Is to Investigate and Remedy Discriminatory Voting Practices. .......... 24
C. DOJ Fails to Articulate an Acceptable Purpose for Its Records Demand. .......... 27
1. DOJ Cannot Use Title III to Compel Sensitive Voter Data for Its Admitted Purposes of Federal List Maintenance and Voter-Fraud Enforcement. .......... 27
2. Title III Does Not Authorize DOJ to Compel Sensitive Voter Data to Ascertain Compliance with HAVA. .......... 32
III. DOJ Does Not Put Forth a Basis for Its Demand. .......... 37
A. Title III Requires that DOJ Provide a Factual Basis for Its Demand. .......... 37
B. DOJ Cannot Remedy Its Failure to Provide Any Basis for Its Title III Demand. .......... 41
C. DOJ Fails to Provide a Basis to Compel Sensitive Voter Information. .......... 42
IV. DOJ's Interpretation of Title III Presents Significant First Amendment Concerns that Must Be Avoided. .......... 44
A. DOJ's Interpretation of Title III Presents Significant First Amendment Concerns. .......... 44
B. Constitutional Avoidance Principles Demand that the Court Avoid DOJ's Interpretation. .......... 53
CONCLUSION .......... 53



Appellate Case: 26-2679 Page: 5 Date Filed: 09/17/2026 Entry ID: 5685100

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026) ....................17

*Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022)....................14

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)....................2

*BFP v. Resol. Tr. Corp.*, 511 U.S. 531 (1994)....................34

*Bond v. United States*, 572 U.S. 844 (2014)....................21

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999).................... passim

*Carlsen v. GameStop, Inc.*, 833 F.3d 903 (8th Cir. 2016)....................8

*Chatrie v. United States*, 146 S. Ct. 2193 (2026)....................17

*Cody v. Hillard*, 304 F.3d 767 (8th Cir. 2002)....................22

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)....................39

*Dep't of Comm. v. New York*, 588 U.S. 752 (2019)....................28

*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)....................42

*Doe v. Boland*, 698 F.3d 877 (6th Cir. 2012)....................39

*Donovan v. Shaw*, 668 F.2d 985 (8th Cir. 1982).................... 18, 19, 41

*Donovan v. Union Packing Co. of Omaha*, 714 F.2d 838 (8th Cir. 1983)....................16

*EEOC v. Elrod*, 674 F.2d 601 (7th Cir. 1982)....................16

*EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920 (11th Cir. 1991) ....................13



Appellate Case: 26-2679 Page: 6 Date Filed: 09/17/2026 Entry ID: 5685100

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*EEOC v. Univ. of Notre Dame Du Lac*,
715 F.2d 331 (7th Cir. 1983)....................44

*EEOC v. Univ. of Pa.*,
850 F.2d 969 (3d Cir. 1988)....................44

*Endicott Johnson Corp. v. Perkins*,
317 U.S. 501 (1943).................... 18, 19

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................33

*Foster v. Love*,
522 U.S. 67 (1997)....................2

*Fresenius Med. Care v. United States*,
526 F.3d 372 (8th Cir. 2008).................... passim

*FTC v. Turner*,
609 F.2d 743 (5th Cir. 1980)....................13

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .................... 45, 51

*Hewitt v. United States*,
606 U.S. 419 (2025)....................21

*In re Children's Nat'l Hosp.*,
2026 WL 160792 (D. Md. Jan. 21, 2026)....................32

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962), *aff'd*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)....................39

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
2026 WL 33398 (D. Colo. Jan. 5, 2026)....................32

*In re Grand Jury Proceedings: Subpoenas Duces Tecum*,
827 F.2d 301 (8th Cir. 1987)....................35

*In re Grand Jury Subpoenas*,
2026 WL 1783899 (D. Minn. June 22, 2026)....................36

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010)....................45

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962).................... passim

*King v. Burwell*,
576 U.S. 473 (2015)....................39

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025), *aff'd sub nom.*, 2026 WL 1991571 (D.C. Cir. July 2, 2026)....2

*Mach Mining, LLC v. E.E.O.C.*,
575 U.S. 480 (2015)....15

*Major League Baseball v. Crist*,
331 F.3d 1177 (11th Cir. 2003)....48

*Maracich v. Spears*,
570 U.S. 48 (2013)....17

*N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288 (2017)....23

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....6

*NAACP v. Pye*,
101 S.E.2d 609 (Ga. Ct. App. 1957)....6

*Nielsen v. Preap*,
586 U.S. 392 (2019)....20, 39

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946)....16

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024)....26

*Parrish v. United States*,
605 U.S. 376 (2025)....23

*Pharm. Rsch. & Mfrs of Am. v. McClain*,
95 F.4th 1136 (8th Cir. 2024)....43

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024)....31, 35

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021)....35, 50

*Reisman v. Caplin*,
375 U.S. 440 (1964)....1, 12, 14

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990)....35

*Safe Extensions, Inc. v. F.A.A.*,
509 F.3d 593 (D.C. Cir. 2007)....40

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)....25, 26



Appellate Case: 26-2679 Page: 8 Date Filed: 09/17/2026 Entry ID: 5685100

**Page(s)**

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ....................39

*U.S. Int'l Trade Comm'n v. ASAT, Inc.*,
411 F.3d 245 (D.C. Cir. 2005) ....................13

*Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*,
738 F.3d 885 (8th Cir. 2013).................... 22, 53

*United States v. Adams*,
2026 WL 2123871 (E.D. Ky. July 23, 2026).................... 15, 43

*United States v. Alabama*,
362 U.S. 602 (1960) ....................25

*United States v. Amore*,
No. 25-cv-00639 (D.R.I.) ....................28

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026), *reh'g denied*, 2026 WL 2364306 (6th Cir. Aug. 14, 2026).................... 1, 15, 40

*United States v. Clarke*,
573 U.S. 248 (2014) ....................14

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) ....................15

*United States v. Harris Methodist Fort Worth*,
970 F.2d 94 (5th Cir. 1992)....................44

*United States v. Johnson*,
703 F.3d 464 (8th Cir. 2013)....................38

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978) ....................21

*United States v. Lynd*,
301 F.2d 818 (5th Cir. 1962)....................26

*United States v. Mississippi*,
380 U.S. 128 (1965) ....................25

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ....................21

*United States v. Palomar-Santiago*,
593 U.S. 321 (2021) ....................38

*United States v. Powell*,
379 U.S. 48 (1964) .................... passim

*United States v. Rumely*,
345 U.S. 41 (1953) .................... passim

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Scanlan*,
2026 WL 1864054 (D.N.H. June 29, 2026), *appeal filed*, No. 26-1783 (1st Cir. July 7, 2026) ....43

*United States v. Warner*,
2026 WL 2018877 (S.D. W. Va. July 13, 2026) .... 15, 43

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ....47

*United States v. Whispering Oaks Residential Care Facility, LLC*,
673 F.3d 813 (8th Cir. 2012).... 14, 17, 21, 40

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .... 35, 43

*Wis. Voter All. v. Millis*,
166 F.4th 627 (7th Cir. Feb. 10, 2026), *cert. docketed*, No. 25-1288 (U.S. May 18, 2026) ....33

*Wisconsin Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ....38

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ....2

U.S. Const. amend. XIV, § 5 ....2

U.S. Const. amend. XV....2

U.S. Const. amend. XV, § 2....2

U.S. Const. art. I, § 4, cl. 1.... 2, 36

**Statutes**

5 U.S.C. § 552a(e)(7)....35

29 U.S.C. § 1134....41

52 U.S.C. § 10101 ....3

52 U.S.C. § 10101(e) ....23

52 U.S.C. § 10301 ....3

52 U.S.C. § 20501(b) ....3

52 U.S.C. § 20507(i) ....34

52 U.S.C. § 20510(a) ....36

52 U.S.C. § 20701 .... 3, 11, 43

52 U.S.C. § 20703 .... passim

52 U.S.C. § 20705 .... 12, 14

**Page(s)**

52 U.S.C. § 21081 ....................................................................................33
52 U.S.C. § 21082 ....................................................................................33
52 U.S.C. § 21083 .................................................................................. 5, 33
52 U.S.C. § 21083(a)(1)(A) .......................................................................36
52 U.S.C. § 21083(a)(2)(A) .......................................................................34
52 U.S.C. § 21083(a)(2)(B) .......................................................................31
52 U.S.C. § 21083(a)(4)..............................................................................34
52 U.S.C. § 21083(a)(5)(B)(i).......................................................................52
52 U.S.C. § 21111 ........................................................................... 32, 33, 36
52 U.S.C. § 21142(a) ..................................................................................34
52 U.S.C. § 21142(b) ..................................................................................34
Minn. Stat. Ann. § 201.091, subdiv. 9 .........................................................17

**Regulations**

Exec. Order 14,248, § 5(a), 90 Fed. Reg. 14,005 (Mar. 25, 2025)..........................29
Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ........................ 29, 30

**Other Authorities**

*Addressing Risks from Chris Krebs and Government Censorship*, The White House (April 9, 2025) ..........................................................................47
Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024), https://www.npr.org/2024/10/11/nx-s1-5147732/voter-fraud-explainer ..........................................................48
Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026)........................................................................... passim
*Basis*, *Black's Law Dictionary* (4th rev. ed. 1968).......................................... 38, 39
Br. of Amicus Curiae the United Black Agenda, *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026) ..............................................51
H.R. Rep. No. 107-329 (2001).........................................................................3
H.R. Rep. No. 86-956 (1959)..........................................................................26
*Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 9 (1960) ........................................................................................ 25, 26
Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025)..................49



Appellate Case: 26-2679 Page: 11 Date Filed: 09/17/2026 Entry ID: 5685100

**Page(s)**

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026) ....49

Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026), https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html ....48

Miles Parks, *Republicans' Sweeping Election Overhaul Fails in the Senate*, NPR (June 4, 2026), https://www.npr.org/2026/06/04/nx-s1-5751145/save-act-senate-vote-trump ....30

Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, U.S. Dep't of Just. (Apr. 21, 2026) ....52

*Purpose*, *Black's Law Dictionary* (4th rev. ed. 1968) .... 38, 39

Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026)....47

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Feb. 25, 2026)....3

U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* (2018)....50

U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* (1959)....25

Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 *W. Pol. Q.* 371 (1959)....6



Appellate Case: 26-2679 Page: 12 Date Filed: 09/17/2026 Entry ID: 5685100

## STATEMENT OF THE ISSUES

1. Whether the district court rightly applied the Federal Rules of Civil Procedure to DOJ's complaint.

- *United States v. Powell*, 379 U.S. 48 (1964)
- *Reisman v. Caplin*, 375 U.S. 440 (1964)
- *Fresenius Med. Care v. United States*, 526 F.3d 372 (8th Cir. 2008)

2. Whether DOJ failed to provide a factual "basis" for requesting Minnesota's full, unredacted voter rolls.

- 52 U.S.C. § 20703
- *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *reh'g denied*, 2026 WL 2364306 (6th Cir. Aug. 14, 2026)

3. Whether DOJ's information request provided the Secretary with, and was made pursuant to, a proper legal "purpose" consistent with Title III.

- 52 U.S.C. § 20703
- *United States v. Powell*, 379 U.S. 48 (1964)

4. Whether constitutional avoidance principles require the Court to reject DOJ's interpretation of Title III because allowing DOJ to issue Title III demands for any purpose and without any factual basis would chill the right to vote.

- *United States v. Rumely*, 345 U.S. 41 (1953)
- *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999)

## STATEMENT OF THE CASE

### A. Legal Background

The Constitution does not prescribe a role for the Executive Branch in administering federal elections. Instead, it "invests the States with responsibility for the mechanics" of federal elections so long as "Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); U.S. Const. art. I, § 4, cl. 1.[1] States bear primary responsibility for maintaining registration lists, stemming from their sole power to prescribe voter qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (discussing Congress's lack of power to "regulate" qualifications). Where the Constitution contemplates federal involvement, it lies with Congress, not the Executive Branch. *See League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 72-74 (D.D.C. 2025), *aff'd sub nom.*, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

The Fourteenth and Fifteenth Amendments increased federal power to police voter qualifications as needed to eliminate discrimination in voting, while underlining Congress's primary role in exercising that power. *See* U.S. Const. amend. XIV §§ 1, 5; *id.* amend. XV. Congress has passed "appropriate legislation" to fulfill this mandate, *id.* amend. XIV, § 5; *id.* amend. XV, § 2—including the Civil

[1] Unless otherwise stated, all emphasis is added and citations, quotations, and alterations are omitted.



Appellate Case: 26-2679 Page: 14 Date Filed: 09/17/2026 Entry ID: 5685100

Rights Act of 1957, 52 U.S.C. § 10101, the Civil Rights Act of 1960, 52 U.S.C. §§ 20701-20706, and the Voting Rights Act of 1965 (VRA), 52 U.S.C. §§ 10301-10314. It is in this constitutional context that Congress enacted information-retention and information-request provisions in Title III of the Civil Rights Act of 1960, "to enable the Attorney General to determine whether [Civil Rights Act] suits or similar actions should be instituted" and to gather evidence to bring such cases. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

Neither the CRA nor HAVA authorizes the federal government to usurp States' responsibilities for maintaining voter lists or to pool sensitive voter data. H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001) (calling for the preservation of state-administered elections under HAVA). Indeed, Congress enacted those laws to facilitate ballot access. *See* 52 U.S.C. § 20501(b).

Yet with this and other actions it has brought throughout the country, DOJ seeks to usurp state administration of elections by creating a federal system for voter verification. To that end, DOJ requested voter-roll data from at least 48 States and has sued 30 of them along with the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Aug. 24, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information. With these suits, DOJ seeks not just to build a federal list maintenance database, but also to "share" voters' sensitive

information "with DHS for the purpose of identifying illegal aliens who are ineligible to vote." Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. __, at 1 (May 12, 2026) ("OLC Memo").

**B. The Government's Targeting of Minnesota and The Present Case**

1. On June 25, 2025, DOJ sent a letter to Minnesota Secretary of State Steve Simon requesting information regarding Minnesota's compliance with the statewide voter registration list maintenance provisions of HAVA ("June 25 Letter"). App. 50-52; R. Doc. 66-1, at 1-3. The June 25 Letter requested a copy of "Minnesota's current statewide voter registration list," including "both active and inactive voters." App. 50-53; R. Doc. 66-1, at 1-3. The Secretary's General Counsel declined DOJ's request on July 25, 2025, explaining that Minnesota's statewide voter registration list "contains sensitive personal identifying information on several million individuals," and that DOJ had not "identif[ied] any legal basis" for obtaining the list, App. 59-60, R. Doc. 66-1, at 10-11.

DOJ followed up on August 13, 2025 with a second letter, this one invoking Section 401 of HAVA and Section 303 of the Civil Rights Act of 1960 ("CRA") as authority for DOJ's demand. App. 87; R. Doc. 66-2, at 1 ("August 13 Letter"). It demanded that the Secretary provide DOJ with "all fields" in its voter registration list, including "the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's Social Security number and the full state

driver's license number." App. 88; R. Doc. 66-2, at 2. DOJ stated that "the purpose of the request is to ascertain Minnesota's compliance with the list maintenance requirements of HAVA" but did not (and apparently could not) identify any possible violation. *Id.* On August 21, 2025, the Secretary declined to produce the unredacted voter registration list, explaining that Minnesota law prohibits disclosure of a "voter's date of birth or any portion of their Social Security Number, driver's license number, state identification card number, military identification number, or passport number," and that DOJ had not "provided adequate justification for amassing highly sensitive information on millions of Minnesotans." App. 89-90, 94; R. Doc. 66-2, at 3-4, 8.

On September 25, 2025, DOJ filed this action alleging two claims—under Title III of the CRA, 52 U.S.C. § 20703 (Count I), and HAVA, 52 U.S.C. § 21083 (Count II)—demanding that the district court order production of Minnesota's full, unredacted voter registration list and declare any state law prohibiting such disclosure preempted by federal law. App. 47-48; R. Doc. 1, at 15-16. DOJ later filed a Motion for Order to Compel Production of Federal Election Records ("Motion to Compel"), seeking to bypass the ordinary course of litigation and compel production of the full, unredacted voter registration list "within five days." App. 97-98; R. Doc. 70, at 3-4.



Appellate Case: 26-2679 Page: 17 Date Filed: 09/17/2026 Entry ID: 5685100

2. NAACP is the oldest and largest civil rights organization in the United States. App. 25; R. Doc. 134-3, at 1. It has approximately 200,000 members, including approximately 1,100 in Minnesota. *Id.* at 1-2. NAACP played a key role in the gestation and birth of the Civil Rights Acts. Today, NAACP engages in voter registration, education, and turnout efforts. App. 25; R. Doc. 134-3, at 2; App. 25; R. Doc. 134-4, at 1. NAACP also has a long history of safeguarding its members' personal information from compelled disclosure. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458 (1958) (prohibiting compelled disclosure of NAACP membership lists);[2] App. 25; R. Doc. 134-3, at 2. Many NAACP members are registered, Black Minnesota voters who have participated in prior federal elections and plan to participate in future elections. App. 25; R. Doc. 134-3, at 1-2. These members' sensitive voter data are at risk of misuse and abuse, implicating their broader right to vote free from intimidation. App. 25; R. Doc. 134-3, at 3.

Cynthia Wilson is the President of the Minneapolis Branch of NAACP and has been a registered Minnesota voter for over forty years. App. 25; R. Doc. 134-4, at 1. She has participated in federal elections since 1983 and intends to vote in upcoming elections. *Id.* President Wilson fears that the federal government will

---

[2] *See also* Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 *W. Pol. Q.* 371, 378 (1959) (discussing the context and history of *NAACP v. Pye*, 101 S.E.2d 609 (Ga. Ct. App. 1957)).

share her personal information, invading her privacy and exposing her to potential misuse of her personal information. App. 25; R. Doc. 134-4, at 2.

Recognizing the threat to NAACP members' privacy and voting rights if the federal government obtains access to their sensitive information, NAACP and Cynthia Wilson successfully moved to intervene in this case. App. 24; R. Doc. 132.

3. The district court granted Defendants' motions to dismiss and denied DOJ's motion to compel. Add. 3-4; App. 122-23; R. Doc. 210, at 3-4. It first agreed with other courts that nothing in Title III's text exempts it from the Federal Rules of Civil Procedure or sets a different standard for reviewing information requests under the statute. Add. 14-16; App. 133-35; R. Doc. 210, at 14-16. It then held that States' voter rolls are not records within Title III's scope. Add. 17-23; App. 136-42; R. Doc. 210, at 17-23. The court dismissed the HAVA claim because HAVA lacks a disclosure provision and DOJ did not allege a potential HAVA violation. Add. 23-24; App. 142-43; R. Doc. 210, at 23-24.

DOJ appealed. App. 31; R. Doc. 212.

## SUMMARY OF ARGUMENT

DOJ's demand for Minnesota's unredacted voter roll fails to satisfy Title III's "purpose" and "basis" requirements—the Court should affirm.[3]

---

[3] Other appellees' briefs will address the district court's holding that Minnesota's statewide voter list falls outside Title III's ambit, with which NAACP Intervenors

As a threshold matter, DOJ is simply wrong that courts cannot review its Title III requests. DOJ certainly cannot claim unreviewable investigative power while simultaneously arguing that Title III authorizes it to investigate *any* possible violation of *any* statute—a dangerous combination of asserted authorities. By default, all Government requests for production or disclosure of documents are subject to judicial review. *See United States v. Powell*, 379 U.S. 48, 58 (1964); *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008). Title III is no exception.

On the merits, DOJ fails entirely to satisfy the statutory requirements that its Title III demand identify a "purpose" for its investigation consistent with that of the statute and state the *factual* "basis" to suspect Minnesota is violating federal law. 52 U.S.C. § 20703.

***First***, purpose. The text of Title III makes plain that DOJ may only issue demands for purposes consistent with the statute—i.e., investigating and remedying voter discrimination. That is, after all, the reason why Congress enacted the statute in the first place: to equip DOJ with the tools necessary to enforce recently passed

---

do not disagree. This brief will focus on DOJ's failure to satisfy Title III's "purpose" and "basis" requirements. While the district court did not reach these requirements, the Court "may affirm a judgment on any ground supported by the record, whether or not that ground was urged below or passed on by the District Court." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 910 (8th Cir. 2016).

civil rights laws aimed at eliminating discriminatory voting practices. And to hold otherwise—to allow ***any*** purpose to satisfy Title III—would reduce the purpose requirement to nothing more than an empty formality.

Here, by its own admission, DOJ seeks Minnesota's unredacted voter roll to identify, prosecute, and remove from state-voter lists purportedly undocumented and "ineligible" voters. OLC Memo 5 (admitting DOJ's true aims are "to identify illegal aliens who are ineligible to vote" and otherwise "remove those who are ineligible to vote from their rolls—whether due to illegal presence in this country or otherwise.");[4] *see also* App. 30; R. Doc. 189, at 1 n.1 (citing OLC Memo). Neither this purpose nor DOJ's asserted, but pretextual purpose of ascertaining HAVA compliance has anything to do with investigating or remedying voter discrimination. That is reason alone to deny DOJ's demands. And even if purposes unrelated to voter discrimination *could* satisfy Title III (they can't), DOJ cannot invoke HAVA compliance to compel sensitive voter information. HAVA contains no provision authorizing DOJ to compel States to disclose voting records of any kind, let alone sensitive voter information. DOJ cannot use Title III to give itself authority under HAVA that Congress did not grant.

---

[4] https://www.justice.gov/olc/media/1440346/dl.

***Second***, basis. "Basis" means *factual* basis—*i.e.*, the reason DOJ believes there is a potential legal violation to which Minnesota's unredacted voter roll is relevant. DOJ provides none. Nor could it. DOJ's admitted purpose has nothing to do with investigating possible violation of list maintenance statutes; it seeks to create a federal voter registration database and unilaterally force States to purge certain individuals from their rolls. OLC Memo 1, 5. To overcome this deficiency in its demand, DOJ asserts it does not need a factual basis at all and must only identify the CRA as the source of the legal authority for the demands. Not so. If stating the *legal* authority were enough, the "basis" and "purpose" requirements would collapse into one. And regardless, even if DOJ had supplied a basis to suspect Minnesota violated federal election laws, it provides no basis for why the unredacted driver's license and Social Security numbers of every voter in Minnesota would be relevant to its investigation.

***Third***, allowing the Government to wield Title III to compel sensitive voter data for *any* purpose without *any* factual basis to suspect a legal violation—DOJ's desired interpretation—would undoubtedly have a chilling effect on voter participation. DOJ's interpretation of Title III would thus raise significant First Amendment concerns. The Supreme Court has held many times that courts should avoid interpreting statutes in a manner that raises such constitutional questions. *See United States v. Rumely*, 345 U.S. 41, 47 (1953).

## ARGUMENT

Title III of the Civil Rights Act of 1960 does not authorize DOJ to compel sensitive voter data to federalize list maintenance, purge purportedly ineligible voters, or even ascertain compliance with list maintenance statutes. Rather, the CRA only gives DOJ investigative authority to seek voting records to investigate the discriminatory denial of voting rights.

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ may then seek "inspection, reproduction, and copying" of "[a]ny record or paper required by section 20701 of this title to be retained and preserved." *Id.* § 20703. But the government must specify a legal "purpose" for its investigation and a factual "basis" for the requested records that is tied to a possible legal violation. *Id.*

DOJ has failed to do so. It has not identified an acceptable "purpose" under Title III, nor has it provided any factual "basis" to suspect that Minnesota is shirking its anti-discrimination obligations under federal law, let alone that DOJ needs full, unredacted records containing sensitive information to investigate the issue.



Appellate Case: 26-2679 Page: 23 Date Filed: 09/17/2026 Entry ID: 5685100

## I. DOJ'S DEMAND IS SUBJECT TO TRADITIONAL JUDICIAL REVIEW.

DOJ seeks to entirely immunize its information requests from judicial review. But "a court may not permit its process to be abused." *Powell*, 379 U.S. at 58. Otherwise, it could be used to coerce without bounds, authorization, or regard for constitutional delegation of authority, such as DOJ attempts to do here. Therefore, when the Government seeks to "invoke[]" the "court's process" to "enforce" its requests for production or disclosure of documents, its demands are subject to judicial review. *Id.* (holding that courts may "inquire into the underlying reasons" behind an IRS records demand). Title III is no exception. Indeed, Title III's text permits courts to compel the production of documents only through "*appropriate* process." 52 U.S.C. § 20705 (emphasis added). That language requires a meaningful opportunity to question the authority being invoked. As the Supreme Court noted of a statutory summons provision using the same phrase soon after Title III's passage, "[a]ny enforcement action under this section would be an *adversary* proceeding affording *a judicial determination of the challenges* to the summons and giving complete protection to the witness." *Reisman v. Caplin*, 375 U.S. 440, 446 (1964) (emphases added).

DOJ's boundless theory that it is entitled to conduct a digital roundup of voter information free from any limitation or judicial review conflicts with the regular judicial practice of reviewing investigative actions. Even under the more lenient

standards applicable to review of administrative subpoenas, courts may review requests to determine whether they are (1) "issued pursuant to lawful authority" and (2) "for a lawful purpose," and whether they seek evidence that is (3) "not unreasonable" and (4) "relevant to [that] lawful purpose." *Fresenius*, 526 F.3d at 375; *accord FTC v. Turner*, 609 F.2d 743, 745 (5th Cir. 1980); *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 922-23 (11th Cir. 1991); *see U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005) ("[A]lthough the investigative powers of regulatory agencies are broad, they are not unlimited, and are subject to judicial review 'to protect against mistaken or arbitrary orders.'").

DOJ's argument to the contrary relies on a single case from 1962, which sought to surmount the Jim Crow South's wall of resistance to DOJ's investigation into racial discrimination in voter registration. There, the Fifth Circuit opined that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, § [20703], is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. But *Lynd* is readily distinguishable and in any event has been superseded by later precedent.

Unlike *Lynd*, this case concerns the purely legal question of whether Title III authorizes the Government to demand production of *full* voter rolls—including sensitive voter information—for purposes unrelated to the CRA. That sort of pure legal question is subject to judicial review, at least absent a clear congressional



Appellate Case: 26-2679 Page: 25 Date Filed: 09/17/2026 Entry ID: 5685100

statement to the contrary. *See United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 818 (8th Cir. 2012) (a subpoena must not be "plainly incompetent or *irrelevant to any lawful purpose of the agency* in the discharge of its duties" (emphasis added)).

In any event, the Supreme Court undermined *Lynd* two years later by holding in *Powell* that records requests similar to those authorized by Title III *are* subject to judicial review. *See Powell*, 379 U.S. at 52-53, 58 (courts may "inquire into the underlying reasons for the examination" when the Treasury Secretary performs an "inspection of [the] taxpayer's books"); *Reisman*, 375 U.S. at 446 (Section 7402 of the Internal Revenue Code, which grants courts jurisdiction "by appropriate process to compel . . . attendance, testimony, or production," guarantees "a judicial determination of the challenges to the summons"); 52 U.S.C. § 20705 (likewise granting jurisdiction "by appropriate process" to compel records production). Indeed, the Supreme Court since *Lynd* has reiterated on numerous occasions the strong presumption in favor of judicial review of government action, *see, e.g.*, *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 733 (2022)—including review of investigative demands for information, *see, e.g.*, *United States v. Clarke*, 573 U.S. 248, 253-54 (2014) (applying *Powell*, stating summons proceeding must be "adversarial" and that "summoned party must receive notice, and may present argument and evidence on all matters bearing on a summons's validity").

That is why every other court to have considered DOJ's argument that *Lynd* shields its Title III requests from judicial review has unequivocally rejected it. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 n.2 (6th Cir. 2026), *reh'g denied*, 2026 WL 2364306 (6th Cir. Aug. 14, 2026); *United States v. Adams*, 2026 WL 2123871, at *3 (E.D. Ky. July 23, 2026); *United States v. Fontes*, 832 F. Supp. 3d 944, 947 (D. Ariz. 2026); *United States v. Warner*, 2026 WL 2018877, at *2 (S.D. W. Va. July 13, 2026); *see also Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (applying "a 'strong presumption' favoring judicial review of administrative action").

***

DOJ's other arguments for why its demand should escape any and all judicial review are unconvincing.

***First***, that Title III "limits any request to a specific set of documents," DOJ Br. 32, does not immunize DOJ's demand from judicial review. Courts routinely review government records requests under statutes that, like Title III, only permit requests for certain documents. *See Powell*, 379 U.S. at 58 (permitting judicial review of a records request under 26 U.S.C. § 7602 even though the statute only compels production of certain documents).

***Second***, the black-letter rule that courts may review the Government's document requests to determine if they seek "information relevant to [the demand's]

lawful purpose," *Fresenius*, 526 F.3d at 375, is not "tethered," DOJ Br. 30, to any particular statutory language. Rather, this default rule stems from two extra-statutory principles: (i) the Fourth Amendment, *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208 (1946), and (ii) the longstanding principle that it would be an "abuse" of the "court's process" to enforce a records demand entirely unrelated to the statute authorizing the request, *Powell*, 379 U.S. at 57-58. Both principles apply even when, like here, a statute does not expressly limit investigatory demands to "relevant" materials. *See, e.g.*, *Donovan v. Union Packing Co. of Omaha*, 714 F.2d 838, 840 (8th Cir. 1983) (applying default requirement that demands be "reasonably relevant to the authorized inquiry" to records request under 29 U.S.C. § 657(b), even though the statute did not expressly limit demands to "relevant" materials).

***Third***, DOJ's Title III demand does not evade judicial review just because DOJ issued the request to Minnesota rather than individual voters. "No different standard exists where state or local governmental bodies are the object of the subpoena." *EEOC v. Elrod*, 674 F.2d 601, 613 (7th Cir. 1982) (applying *Powell* and other principles of judicial review to federal agency's records request to Cook County Department of Corrections). That DOJ seeks voters' private information[5]

[5] That voters disclose their driver's license numbers and Social Security numbers to *States* when submitting routine voter registration forms does not mean that voters have no privacy interest in their sensitive information. Information is "private" as long as "it is 'intended for or restricted to the use of a particular . . . group." *Am.*



Appellate Case: 26-2679 Page: 28 Date Filed: 09/17/2026 Entry ID: 5685100

through a state intermediary does nothing to lessen the "Fourth Amendment concerns," DOJ Br. 32, underlying limitations on the scope of Title III demands, *cf. Chatrie v. United States*, 146 S. Ct. 2193, 2213 (2026) (stating that Fourth Amendment concerns still attach to "information that a user reasonably understands as his own, even though stored on [a third party's] servers"). The unredacted Social Security numbers DOJ demands are among "the most sensitive kind of information" regardless of whether DOJ obtains them from Minnesota state election officials or the voters themselves. *Maracich v. Spears*, 570 U.S. 48, 64 (2013). Not only that, but these identifiers are linked to voter histories containing associational and protected expressive activity. The identifiers in Minnesota's rolls thus implicate the Fourth Amendment and, consequently, the long line of cases holding that Government records demands must be "for a lawful purpose" and "request[] information relevant to the lawful purpose." *Whispering Oaks*, 673 F.3d at 817.

***Fourth***, *Powell* did not limit courts' ability to review and deny government records requests to instances where the Government "target[s]" the recipient "for nefarious reasons having no bearing on law enforcement at all." DOJ Br. 33-34. The

---

*Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 370 (4th Cir. 2026) Voters' sensitive information was "intended for . . . use" by Minnesota election officials to verify voter identity. *Id.* And registrants would have expected their most sensitive information to be protected from further disclosure under state law. *See* Minn. Stat. Ann. § 201.091, subdiv. 9.



Appellate Case: 26-2679 Page: 29 Date Filed: 09/17/2026 Entry ID: 5685100

Court made clear that "***any other purpose*** reflecting on the good faith of the particular investigation" can constitute an "improper purpose." *Powell*, 379 U.S. at 58 (emphasis added). In any event, no matter whether DOJ's demand was improper, *Powell* was clear that the Court can "inquire into the underlying reasons" for the request. *Id.*

***Fifth***, DOJ's assertion that courts cannot review the "scope" of Title III requests, DOJ Br. 34-35, is wrong. The Supreme Court has held that courts can review whether a Title III demand was made for an "improper purpose," *Powell*, 379 U.S. at 58, in other words, whether the Government's stated purpose falls within the "scope" of acceptable objectives. Likewise, inquiries into whether a demand was "issued pursuant to a lawful authority" or whether the information sought is "relevant to [that] purpose" or "unreasonable," *Fresenius*, 526 F.3d at 375, all require courts to consider whether a Title III demand fits the "scope" of a legal request.

Neither *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943), nor *Donovan v. Shaw*, 668 F.2d 985, 987 (8th Cir. 1982), support DOJ's argument. *Contra* DOJ Br. 34-35. Both cases held that district courts could not evaluate whether the statute at issue applied to the subpoena recipient at all—i.e., whether they fell within the statutes' "coverage." *Endicott*, 317 U.S. at 508-09; *Donovan*, 668 F.2d at 989. Coverage was a factual issue that was itself to be determined by the

agency's inquiry; it was therefore inappropriate for a court to pretermit that inquiry. *Endicott*, 317 U.S. at 508-09; *Donovan*, 668 F.2d at 989. Here, by contrast, Defendants do not challenge whether Title III applies to States, or otherwise ask the Court to predetermine an issue that is part of DOJ's own inquiry. Rather, Defendants challenge whether DOJ's demand for sensitive voter information was made for a proper "purpose" under Title III, and whether the unredacted data "sought [is] relevant to [DOJ's] inquiry"—issues that plainly are reviewable. *Donovan*, 668 F.2d at 989; *Endicott*, 317 U.S. at 509 (considering whether records request was "irrelevant to any lawful purposes of the [DOL]").

## II. DOJ FAILS TO SATISFY TITLE III'S "PURPOSE" REQUIREMENT

DOJ has not shown that it made its request to Minnesota for a statutorily permissible legal purpose. The plain language of Title III and principles of administrative law require the purpose of DOJ's Title III demands to align with Title III's own purpose: investigating and remedying voter discrimination. DOJ's request here does not. DOJ's own statements confirm that it demands voters' sensitive information to federalize list maintenance and exert additional control over state elections, including by unilaterally preventing flagged individuals from casting votes and prosecuting purportedly undocumented or ineligible voters. DOJ's stated purpose of ascertaining compliance with HAVA also fails to align with Title III's voter discrimination-related aims. And even if Title III *could* apply outside of the

voter-discrimination context, it would not apply here, as DOJ fails to articulate a proper purpose for its expansive demands.

### A. The Purpose of a Title III Demand Must Be Consistent with the Purpose of Title III.

The text of Section 20703 makes plain that the purpose of a Title III demand for records must match that of the statute. Section 20703 does not require that the Government provide *a* purpose in the abstract, but "*the* purpose *therefor*." 52 U.S.C. 20703 (emphasis added). By requiring Section 20703 demands to contain a statement of "the purpose therefor," Congress specified both that DOJ cannot simply give *any* reason for seeking information, and that the reason given must actually be the purpose "therefor"—the real reason for the request. *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is 'a function word indicating that a following noun or noun equivalent is *definite* or has been previously *specified by context*.'" (emphasis added)).

That Title III "does not contain a list of acceptable purposes," DOJ Br. 44, does not give DOJ carte blanche to wield the statute for any purpose it pleases. Demands under Section 20703 are "investigative in nature," *Lynd*, 306 F.2d at 228, and must be interpreted in light of the presumptions that traditionally govern information requests made during government investigations. "Part of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond v. United States*, 572 U.S. 844, 857



Appellate Case: 26-2679 Page: 32 Date Filed: 09/17/2026 Entry ID: 5685100

(2014); *see, e.g.*, *Hewitt v. United States*, 606 U.S. 419, 424, 431 (2025) (interpreting statute "against the backdrop of certain unexpressed presumptions," including that vacated orders are "void *ab initio*"). One such "unexpressed presumption" is the bedrock principle that when the government initiates an investigative request for information, it must do so "pursuant to a legitimate purpose" through an inquiry "relevant to [that] purpose." *Powell*, 379 U.S. at 57-58. Accordingly, the "purpose" of a Section 20703 demand should mean what it does in other investigatory settings: a purpose tied to the statute authorizing the demand. *See United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 318 (1978) (government demands for production must be made "in good-faith pursuit of the congressionally authorized purposes of" the statute authorizing the demand).

Standard principles of administrative law dictate the same result. Indeed, it is well settled that any administrative demand for production must have a "legitimate purpose" and be part of an inquiry "relevant to [that] purpose." *Powell*, 379 U.S. at 57-58 (explaining that it would be an "abuse" of the court's "process" "if [a] summons [was] issued for an improper purpose"); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("[A] governmental investigation . . . may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."); *see also Whispering Oaks*, 673 F.3d at 817-18 (administrative subpoenas must be made "pursuant to lawful authority" and be



Appellate Case: 26-2679 Page: 33 Date Filed: 09/17/2026 Entry ID: 5685100

"reasonably relevant to the agency's investigation"). Title III demands are no different.

DOJ claims that it can seek records to enforce *any* federal law whatsoever—however unrelated that law is to Title III, its purpose, or indeed to voting at all—and that States have no right to challenge DOJ's purpose. DOJ Br. 34-35. Such an interpretation would give DOJ near-limitless power to investigate anyone for any reason. It also would deprive Section 20703's "purpose" requirement of all practical significance; DOJ could simply write down *any* legal purpose it likes. But Congress did not include a purpose requirement to mandate a performative exercise. Courts "should not interpret one provision in a manner that renders other sections of the same statute inconsistent, meaningless, or superfluous." *Cody v. Hillard*, 304 F.3d 767, 776 (8th Cir. 2002). That concern is only heightened by the breadth and sensitivity of the data DOJ seeks here.[6] The Court should not interpret Title III as granting DOJ such unconstrained authority to intrude on the privacy and voting rights of private citizens absent a "clearly expressed" "affirmative intention" from Congress. *Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 895 (8th Cir. 2013); *see also Rumely*, 345 U.S. at 47 (construing statute authorizing

[6] That Title III only permits demands for election materials for "22-month[s]" after the election, DOJ Br. 45, does not make DOJ's position that it can compel production of voters' sensitive information for any purpose without limitation any less extreme.

investigation of "all lobbying activities" to reach only "representations made directly to Congress," not all efforts to "influence, encourage, promote or retard legislation," because Congress would have used more "explicit" language to authorize "so extensive an investigation").

That a section in Title VI of the CRA, but not Title III, expressly references racial discrimination does not change the analysis, *contra* DOJ Br. 43-44, especially where there is no dispute about the CRA's purpose. *Infra* Part II(B). Indeed, "[t]he expressio unius canon applies only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded.'" *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). The section in Title VI of the CRA on which DOJ relies provides substantive remedies to the victims of voter discrimination. 52 U.S.C. § 10101(e) (providing remedies to "any person [that] has been deprived on account of race or color of any [voting] right[s]"). It lies in an entirely different section of the statute and does not "have anything to do with" government records requests. *Parrish v. United States*, 605 U.S. 376, 389 (2025). It therefore provides no support for DOJ's argument that by requiring a written purpose Congress intended to give DOJ free rein to compel sensitive voter data for any purpose it wants. *E.g.*, *id.* (holding that inclusion of authority to relate premature notices of appeal forward in two subsections of rule does not impliedly prohibit

relation forward in neighboring subsection dealing with different context, especially in light of background rule allowing relation forward).

Last, and contrary to DOJ's arguments, limiting the permissible purpose of Title III requests to the statute's own purpose would not make stating the demand's purpose "a useless exercise." DOJ Br. 45. As DOJ acknowledges, providing a written statement of its purpose "ensure[s] election officials ha[ve] 'notice as to why such an inspection [is] being made,'" *id.*, thereby allowing them to assess whether DOJ invokes Title III for an authorized purpose, and, if not, to challenge the demand. If States must comply with Title III demands no matter their stated purpose, then giving States "reasonable notice" of that purpose serves no meaningful function.

### B. Title III's Purpose is to Investigate and Remedy Discriminatory Voting Practices.

DOJ cannot use Title III to seek records for a purpose unrelated to investigating discrimination. Title III's "purpose is to enable the Attorney General to determine whether [CRA] suits or similar actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. It is *not* to assess general compliance with HAVA, which was enacted long after the CRA.

Title III's history makes its purpose clear. Confronted with pervasive voter discrimination in the South, Congress enacted the Civil Rights Act of 1957, which "authorized the Attorney General to seek injunctions against public and private

interference with the right to vote." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). But local officials quickly adapted. They heightened registration and ballot access restrictions against Black voters by imposing literacy tests and other discriminatory election devices, vacated public offices to evade injunctions against proper party defendants, and enacted laws requiring the destruction of election records. *See United States v. Mississippi*, 380 U.S. 128, 132-33 (1965) (passage of Mississippi literacy tests in 1954); *United States v. Alabama*, 362 U.S. 602, 603-04 (1960) (per curiam); *Hearing on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong. 9 (1960) ("CRA Hrg.") (statement of Lawrence Walsh, Deputy Att'y Gen. of the U.S.) (referring to Alabama's destruction of records 30 days after denying applicant's registration).

At the same time, federal efforts to enforce civil rights laws and halt these discriminatory practices were often hampered by an evidentiary constraint: the 1957 Act provided no pre-litigation mechanism to compel production of voting records necessary to prove discrimination. U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* 131 (1959). Recognizing this problem, the U.S. Commission on Civil Rights called on Congress to amend the 1957 Act to provide federal "access to registration records and [to] requir[e] their retention," citing the lack of such authority as the reason DOJ failed to secure an indictment against Louisiana's illegal purging of 6,100 Black voters. *Id.* DOJ echoed the Commission's



Appellate Case: 26-2679 Page: 37 Date Filed: 09/17/2026 Entry ID: 5685100

concern. The Deputy Attorney General testified before Congress that "[i]n many cases, discrimination in registration can be proved only by comparing the records of [Black] applicants with those of white applicants," and that "the Government lack[ed] any procedure by which to compel the production of these records *before suit is filed*." CRA Hrg. 9 (statement of Lawrence Walsh, Deputy Attorney General of the United States) (emphasis added).

Congress enacted the Civil Rights Act of 1960 to solve this problem. The CRA authorized the Government to "inspect voting records" provided it had "reasonable grounds for belief that certain voters [were] being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962). Title III thus acted as a "necessary supplement" to the 1957 Act, helping to "implement federal enforcement" of prohibitions against discrimination in voting. H.R. Rep. No. 86-956 at 26 (1959); *see Katzenbach*, 383 U.S. at 313; *Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024) ("[T]he Civil Rights Act of 1960 . . . sought to protect minorities' access to the polls in States with a 'pattern or practice' of denying the right to vote on racial grounds.").



Appellate Case: 26-2679 Page: 38 Date Filed: 09/17/2026 Entry ID: 5685100

### C. DOJ Fails to Articulate an Acceptable Purpose for Its Records Demand.

#### 1. DOJ Cannot Use Title III to Compel Sensitive Voter Data for Its Admitted Purposes of Federal List Maintenance and Voter-Fraud Enforcement.

In its Title III demands, Complaint, and Opening Brief, DOJ has stuck to the same disingenuous party line: that the purpose of its Title III demand is to "ascertain Minnesota's compliance with the list maintenance requirements of HAVA." App. 87-88; R. Doc. 66-2 at 1-2; App. 33-49; R. Doc. 1; DOJ Br. 43. But DOJ's own statements and legal filings betray a different purpose. A May 12, 2026 Memorandum Opinion from the Attorney General Office of Legal Counsel ("OLC") explains that the true purpose of DOJ's Title III demands is and has been "to remove those who are ineligible to vote from [States'] rolls—whether due to illegal presence in this country or otherwise," and to "refer [those individuals] for prosecution." OLC Memo 5. DOJ put any doubt regarding this purpose to rest in its Motion to Expedite (at 17-18), where it confirmed that it sought to "work with the Social Security Administration (SSA)" to use Minnesota's unredacted voter roll to identify and target "fraudulent or noncitizen registrations." And in a court hearing on a similar Title III demand for Rhode Island's voter roll, DOJ represented that it "intend[s]" to "send [unredacted voter rolls] to Homeland Security . . . to see if any of these people are not citizens," and that DOJ "cannot promise what [] other agenc[ies] will or will

not do" with voter data. Mar. 26, 2026 Hr'g Tr. 65:1-6, 66:2-14, *United States v. Amore*, No. 25-cv-00639 (D.R.I.).[7]

This purpose cannot justify DOJ's demand. Federalizing list maintenance and voter-fraud enforcement are irrelevant to Title III's purpose of investigating and remedying voter discrimination. *See Powell*, 379 U.S. at 58 (courts must not enforce production demands "issued for an improper purpose"). DOJ cannot weaponize a statute Congress enacted to expand the right to vote to disenfranchise voters it deems "ineligible."

In an attempt to paper over these public admissions, DOJ claims federal list maintenance and voter-fraud enforcement are just some of the "multiple purposes" DOJ holds for its Title III demands, in addition to ascertaining compliance with HAVA. DOJ Br. 49. But courts are not required to accept the Government's pretextual justifications, and the Court should not do so here. *See Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019). From the start, the Government's own statements have made plain that DOJ's true purpose has always been to create a federal system for voter eligibility verification and to use that voting data to advance its agenda of exerting federal control over elections.

---

[7] https://www.brennancenter.org/media/15517/download/ri-hearing-transcript-2026-03-26.pdf.

Just two months into his current term, the President issued an Executive Order doing exactly that. The order directed the Attorney General to "enter into information-sharing agreements" with state election officials "to provide the Department of Justice with detailed information on all suspected violations of State and Federal election laws discovered by State officials." Exec. Order No. 14,248, § 5(a), 90 Fed. Reg. 14,005, 14,008 (Mar. 25, 2025). "In response to the President's order to identify those who may be voting illegally," OLC Memo 1, DOJ began issuing Title III demands across the country "to compel states to turn over statewide voter lists" and "share those records" with the Department of Homeland Security "for the purposes of investigating voter fraud" and "strik[ing]" purportedly ineligible voters "from [states'] voter registration list[s]," OLC Memo 5-6.

Another executive order issued this year reinforced the federal government's desire to usurp States' authority to determine their voters' qualifications. The order required DHS to create federal lists of citizens who the federal government deems eligible to vote; it threatened States with loss of federal funds for failure to cooperate, and prosecution of election officials who send ballots to those the federal government deems ineligible. Exec. Order No. 14,399, §§ 2(a)-(b), 5, 91 Fed. Reg. 17125, 17125-27 (Mar. 31, 2026). It also ordered the U.S. Postal Service to issue a regulation providing, among other things, that "USPS shall not transmit mail-in or



Appellate Case: 26-2679 Page: 41 Date Filed: 09/17/2026 Entry ID: 5685100

absentee ballots from any individual unless those individuals have been enrolled on [DHS's] State-specific list" of citizens. *Id.* § 3(b)(iii).[8]

As directed, the Administration has consistently seized any opportunity to take control of the list maintenance process. Case in point: then-Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz tying reduction in ICE activity with access to Minnesota's full, unredacted voter rolls. Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3. In the former Attorney General's words, "allow[ing] the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law" was one of a few "common sense solutions" to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota." *Id.* at 3.

Against this backdrop, DOJ's claim that the purpose of its demand is "ascertaining Minnesota's compliance with HAVA," DOJ Br. 43, is simply not credible. If DOJ's objectives were limited to ascertaining compliance with HAVA, then why insist that Minnesota produce sensitive voter information? Why introduce

---

[8] Consistent with the Constitution's directive that the Executive play no part in state elections, Congress rejected the Administration's proposed legislation adopting many of the same initiatives appearing in the executive order. Miles Parks, *Republicans' Sweeping Election Overhaul Fails in the Senate*, NPR (June 4, 2026), https://www.npr.org/2026/06/04/nx-s1-5751145/save-act-senate-vote-trump.



Appellate Case: 26-2679 Page: 42 Date Filed: 09/17/2026 Entry ID: 5685100

a wave of armed, federal agents into Minneapolis and then, after they kill two Minnesota citizens, offer to withdraw the agents in exchange for Minnesota's unredacted voter rolls? Not once has DOJ explained why simply determining the State's compliance with HAVA would require seeking the most personal information of every Minnesota voter in such a ham-fisted manner.[9] After all, a static snapshot of driver's license and Social Security numbers says nothing about whether Minnesota is satisfying HAVA's *procedural* requirements to perform "list maintenance" "in a manner that ensures that" registered voters appear on state voter rolls and unregistered and ineligible voters are "removed" from state voter rolls. 52 U.S.C. § 21083(a)(2)(B). Nor is the voter roll a list of who was or was not permitted to vote in any particular election.

Neither conducting federal voter-list maintenance nor expanding federal control over elections has anything to do with Title III's lawful purpose: investigating and remedying discriminatory voting practices. DOJ knew this, so it used ascertaining compliance with HAVA "as a smokescreen for its true objective[s]." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL

---

[9] In its Motion to Expedite (at 17-18), DOJ suggested that it needs Minnesota voters' sensitive information to compare their Social Security numbers against other States' voter rolls and federal databases to "identify . . . out-of-state voters," "duplicate voter registrations," and "fraudulent or noncitizen registrations." Other actors have proven capable of doing just this without receiving such sensitive personal data. *E.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 43, 56 (1st Cir. 2024).



Appellate Case: 26-2679 Page: 43 Date Filed: 09/17/2026 Entry ID: 5685100

33398, at *6-7 (D. Colo. Jan. 5, 2026). This deception is an "abuse of the Court's process" and yet another reason to deny DOJ's demand. *Id.* (denying DOJ's administrative subpoena because "the government's proffered purpose for the Subpoena—investigating potential violations of the FDCA—is pretext[]" for "its true objective"); *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026) (denying DOJ administrative subpoena issued for pretextual purpose).

**2. Title III Does Not Authorize DOJ to Compel Sensitive Voter Data to Ascertain Compliance with HAVA.**

Even assuming DOJ's stated rationale is genuine, "ascertaining compliance" with HAVA falls outside Title III's authority, because compliance with HAVA's general list maintenance requirements is unrelated to Title III's purpose of investigating and remedying voter discrimination. DOJ cannot bridge this gap by rebranding ascertaining compliance with HAVA as "protecting voting rights." DOJ Br. 45. Even assuming "HAVA's procedures" could "minimize[]" "fraudulent votes," *id.* at 46, that is not Title III's purpose. Congress enacted Title III to help solve the particular problem of voting discrimination, not to hand DOJ roving audit power related to every statute touching elections—and certainly not audit authority related to HAVA, which has its own enforcement provision that does not authorize DOJ to compel sensitive information. *See* 52 U.S.C. § 21111; *Rumely*, 345 U.S. at 47.

Moreover, even if Title III could be used for purposes beyond combating voter discrimination, DOJ's demand for sensitive personal information would still lack a proper purpose.

***First***, DOJ's stated purpose of ascertaining HAVA compliance cannot support its demand where the relief DOJ seeks—disclosure of Minnesota's unredacted voter roll—is not available under HAVA itself. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (courts must interpret statutes in light of "subsequent statutes" that "more specifically address the topic at hand"). Congress enacted HAVA to set minimum requirements for voting systems and voter registration lists. 52 U.S.C. §§ 21081-83. If any States are "noncompliant" with these requirements, the "Attorney General can institute a civil action," *Wis. Voter All. v. Millis*, 166 F.4th 627, 630 (7th Cir. Feb. 10, 2026), *cert. docketed*, No. 25-1288 (U.S. May 18, 2026), for "declaratory and injunctive relief," 52 U.S.C. § 21111. But while DOJ can certainly bring civil actions to *enforce* HAVA, Congress did not include in HAVA the pre-enforcement power to mandate disclosure of Minnesota's unredacted voter roll.

Congress did not silently affirm DOJ's authority to compel unredacted voting records under Title III by enacting HAVA without a disclosure provision, as DOJ suggests. DOJ Br. 47. Congress knows how to authorize the disclosure of certain voting records—and it did so expressly in the NVRA, on whose structure HAVA

builds, *see* 52 U.S.C. § 20507(i), and again in a separate provision of HAVA allowing offices "making a grant" to States to "audit or examine" materials "related or pertinent to the grant or payment." 52 U.S.C. §§ 21142(a), (b). The Court should not permit DOJ to use Title III as an end-run around Congress's deliberate legislative choice not to include comparable language in the CRA authorizing disclosure of state voter rolls. *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another.").

Pressing forward regardless, DOJ argues that the "backdrop" of Title III meant that "Congress saw no need to provide an inspection provision" in HAVA because "the CRA provided a pre-existing investigative tool." DOJ Br. 47. But that reasoning would have made the NVRA's disclosure provision equally unnecessary. Rather, no new disclosure provision was necessary in HAVA because its list maintenance provisions built upon those in the NVRA, *see* 52 U.S.C. § 21083(a)(2)(A) and (4), and Congress had already decided to include a new public-disclosure provision in the NVRA, *see* 52 U.S.C. § 20507(i). The "public"—of which the Attorney General is, of course, a member—could thus seek records related to HAVA's list maintenance requirements under the NVRA's disclosure provision. *Id.* The problem for DOJ is that courts have consistently construed the NVRA's disclosure provision to allow States to redact sensitive information. *See, e.g.*, *Voter Reference Found.*,

*LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Bellows*, 92 F.4th at 56; *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267-68 (4th Cir. 2021). And in any event, the Privacy Act bars DOJ from amassing sensitive information regarding voters' registrations. 5 U.S.C. § 552a(e)(7) (the Government shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment"); *see also Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990) (party association is a form of political "belief").

Thus, even if DOJ's stated purpose were genuine, it would still be insufficient. Using Title III as an end-run around HAVA's lack of a disclosure requirement is an "improper purpose" that justifies denial of a government demand for documents. *See Powell*, 379 U.S. at 58.

***Second***, DOJ's stated purpose is improper because the information it seeks—*sensitive voter information* about *every registered voter in Minnesota*—is not "relevant to [that] purpose." *Fresenius*, 526 F.3d at 375 (government records requests that are not "relevant to" their stated "purpose" are not "properly enforced"). Drivers' license and Social Security numbers, especially in a static voter roll, offer no insight into whether Minnesota is complying with HAVA's procedural list maintenance requirements, so it is improper to require Minnesota to hand over that data in violation of state law. *See supra* at 31; *In re Grand Jury Proceedings: Subpoenas Duces Tecum*, 827 F.2d 301, 303 (8th Cir. 1987).

***Third***, DOJ cannot use Title III to intrude on the States' constitutional authority over their own elections. The Constitution grants States primary authority over elections, and grants Congress authority in that realm. U.S. Const., art. I, § 4, cl. 1. In exercising that authority in HAVA, Congress expressly affirmed that *States* are in charge of maintaining voter rolls. 52 U.S.C. § 21083(a)(1)(A) (HAVA provision that "each State" must implement and maintain a centralized voter registration list meeting certain requirements). DOJ can enforce some provisions of HAVA, 52 U.S.C. §§ 20510(a), 21111, but it cannot "inspect Minnesota's SVRL" to conduct list maintenance itself, DOJ Br. 47-48—let alone force States to remove certain voters from their rolls. Nor can DOJ use Title III to hijack States' constitutional authority over elections or voter registration procedures Congress delegated to the States. Especially given the evidence from the public record and the government's own public statements, *see supra* at 27-30, indicating that the request for Minnesota's unredacted voter rolls is "part of a broader campaign to coerce state and local officials in Minnesota to assist the Trump administration in its enforcement of immigration laws." *In re Grand Jury Subpoenas*, 2026 WL 1783899, at *7 (D. Minn. June 22, 2026). "Initiating" such a sweeping "investigation in order to harass political opponents or to coerce them into taking official action—particularly official action that the federal government cannot directly require those political opponents to take—is a blatantly unlawful and unethical use" of government power. *Id.* at *6.

## III. DOJ DOES NOT PUT FORTH A BASIS FOR ITS DEMAND.

DOJ fails to satisfy Title III's "basis" requirement. Nothing DOJ has generated—not its Complaint (App. 33-49; R. Doc. 1), underlying letter demands (App. 50-52, 87-88, R. Docs. 66-1 at 1-3, 66-2 at 1-2), Motion to Compel (App. 95-100; R. Doc. 70), or supplemental authority (App. 118-119; R. Doc. 180-1)—provides any *basis* for an investigation into voter discrimination in Minnesota, or even an investigation into potential violations of HAVA by Minnesota. And DOJ cannot even begin to pretend to articulate a basis for requiring the sensitive information of every voter in the State. DOJ's failure to do so is, by itself, fatal to its claim. *See* 52 U.S.C. § 20703.

Perhaps unsurprisingly then, DOJ makes no serious effort to establish a factual basis,[10] instead arguing that Title III does not require one in the first place. DOJ Br. 39. None of its arguments are persuasive.

### A. Title III Requires that DOJ Provide a Factual Basis for Its Demand.

**1.** DOJ's primary argument rests on treating its assertion that its "*purpose*" to "ascertain Minnesota's compliance with the list maintenance requirements of HAVA," App. 87-88; R. Doc. 66-2 at 1-2, as also supplying the "*basis*" for its request. DOJ Br. 40. But the two requirements are distinct. Courts "must give effect,

---

[10] DOJ's fleeting attempt to establish a "factual basis" is unpersuasive. DOJ Br. 41-42; *see infra* at 42.



Appellate Case: 26-2679 Page: 49 Date Filed: 09/17/2026 Entry ID: 5685100

if possible, to every clause and word of a statute." *United States v. Johnson*, 703 F.3d 464, 468 (8th Cir. 2013). Especially here, where Congress connected "basis" with "purpose" using "the conjunctive 'and.'" *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021).

The terms "purpose" and "basis" must therefore be read separately, "consistent with their ordinary meaning" at the time of passage. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). The *purpose* of a records request is the legal rationale for or goal of the investigation—*e.g.*, determining whether a State is complying with the CRA or the Voting Rights Act ("VRA"). *See Purpose*, *Black's Law Dictionary* (4th rev. ed. 1968) (defining "purpose" as "[t]hat which one sets before him to accomplish; an end, intention, or aim, plan, project"); *supra* Part II(A)-(B). The *basis* is the reason DOJ has to believe there is a potential legal violation to which the records are relevant. *See Basis*, *Black's Law Dictionary* (4th rev. ed. 1968) (defining "basis" as the "[f]undamental principle; groundwork; support; foundation"). The function of these requirements is to enable the court to examine whether the stated purpose and basis of the request are consistent with the statute.

The statute's plain language makes this clear. In addition to connecting the two requirements by the conjunctive "and," Title III instructs that written demands contain "***the*** basis and ***the*** purpose therefor." 52 U.S.C. § 20703 (emphasis added). Congress's use of the definite article "establish[es] . . . that [the] following noun or



Appellate Case: 26-2679 Page: 50 Date Filed: 09/17/2026 Entry ID: 5685100

noun equivalent"—here, "the" basis and "the" purpose—are "definite" concepts, not two different ways of saying the same thing. *See Nielsen*, 586 U.S. at 408. As such, Title III's text requires that DOJ assert both. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction" that no "word shall be [interpreted as] superfluous, void, or insignificant").

This is not one of the rare exceptions to the "close to absolute" "rule against treating a term as a redundancy," such as unique phrases like "aid and abet," "cease and desist," or "null and void." *King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting). Those pairs are historically linked in the English language. "Purpose" and "basis" are not. *Compare Purpose*, *Black's*, *supra*, *with Basis*, *Black's*, *supra* (defining the two terms differently); *cf. Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012) (presumption against surplusage "does not apply to doublets—two ways of ***saying the same thing***" (emphasis added)).

DOJ's citation to *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963), DOJ Br. 40, does not support its position. That case enforced a Title III demand where the government's written demand specified that it was "based upon *information in the possession of the Attorney General* tending to show that *discriminations on the basis of race and color* have been made with respect to registration and voting." *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (emphasis added), *aff'd*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). In short, exactly what DOJ was required—



Appellate Case: 26-2679 Page: 51 Date Filed: 09/17/2026 Entry ID: 5685100

and has failed—to show here: a *factual* basis to investigate claims of racial discrimination.

**2.** Next, DOJ argues that because Title III "provides no meaningful standards" to review a demand's factual basis, DOJ's stated basis is not reviewable at all. DOJ Br. 39. The Sixth Circuit rightly rejected this argument, *Benson*, 179 F.4th at 483 n.2, and this Court should as well. First, "far more ambiguous statutory directives" than Title III's instruction to include a factual basis have been "found . . . reviewable"—for example, instructions to excuse failures to file suit within the statute of limitations if it is in "the interest of justice" to do so. *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 601 (D.C. Cir. 2007). Second, even under this Court's administrative-subpoena precedents, courts must determine whether the information request is "issued pursuant to lawful authority" and whether the information sought is "relevant to the lawful purpose." *Fresenius*, 526 F.3d at 375. To determine the subpoena's legality, then, a court must analyze whether "the investigation is authorized by Congress," *Whispering Oaks*, 673 F.3d at 817, an inquiry that necessitates determining whether the request meets statutory prerequisites and follows statutory procedures, *see id.* (noting that defendant "does not argue that the subpoenas fail to comply with" authorizing statute, but nonetheless examining whether government had authority under subpoena-authorizing statute to investigate). Regardless of the standard of review courts apply to a Title III demand's



Appellate Case: 26-2679 Page: 52 Date Filed: 09/17/2026 Entry ID: 5685100

stated basis, DOJ fails to meet it here, as its demand provides *no basis* whatsoever. *See supra* at 37.

**3.** To justify disregarding Title III's basis requirement, DOJ points to a case involving administrative subpoenas and stating that "a regulatory agency need not advance facts in support of its application of a subpoena." DOJ Br. 39. Again, not so. The case DOJ cites, *Donovan v. Shaw*, 668 F.2d 985, 987 (8th Cir. 1982), considered an administrative subpoena issued by the Department of Labor pursuant to 29 U.S.C. § 1134. Unlike Title III, that statute does not require the Government to provide a statement of its factual basis. *See* 29 U.S.C. § 1134. And accordingly, because there was no "solid indication in the legislative history" that Congress intended such a requirement, the Court applied the default rule that administrative subpoenas do not require "competent evidence" of wrongdoing. *Donovan*, 668 F.2d at 991. With Title III, by contrast, Congress provided far more than a "solid indication" that DOJ must provide a factual basis, *id.*—it inserted the "basis" requirement into the statute's text, 52 U.S.C. § 20703.

### B. DOJ Cannot Remedy Its Failure to Provide Any Basis for Its Title III Demand.

DOJ's April 17, 2026, mid-litigation "follow-up letter" does not supply a basis for its Title III demand. *Contra* DOJ Br. 42. Information DOJ learned in Spring 2026 could not possibly serve as "*the* basis" for "*this* demand" that DOJ issued almost a year prior. *Id.* (emphasis added); *see also DHS v. Regents of Univ. of Cal.*, 591 U.S.

1, 21 (2020) (agencies "may elaborate later on th[e] reason (or reasons)" initially given for action "but may not provide new ones").

Regardless, the April 17, 2026 letter does not provide a factual basis for DOJ's demand. The letter points to reporting that a single noncitizen voted in Minnesota's 2024 election. App 118; R. Doc. 180-1 at 1. But the CRA does not allow DOJ to issue Title III demands for the purpose of investigating noncitizen voting, *see supra* Part II(A)-(B), so evidence of such cannot serve as a "basis" for a Title III demand. And even if such a purpose could justify a Title III demand (it cannot), evidence that ***one*** noncitizen—who "***may*** not have been eligible to vote"—voted in 2024, *id.*, does not provide a factual basis to suspect that Minnesota is not complying with statewide procedural list maintenance requirements. *See supra* at 31.

### C. DOJ Fails to Provide a Basis to Compel Sensitive Voter Information.

Even if there were some basis to suspect Minnesota had violated HAVA, DOJ provides no reason why production of sensitive information about every Minnesota voter is reasonably related to investigating that violation or otherwise ensuring compliance with HAVA. No federal court has ever held that determining compliance with list maintenance requirements justifies disclosure of the types of personal information DOJ now seeks. Even in *Kennedy v. Lynd*, the pre-split Fifth Circuit case that most emphatically required disclosure of information in Title III's early years, the court swept away officials' logistical objections by making clear that it

was "not discussing confidential, private papers and effects[, but] rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. And the courts that have since analyzed this question have unequivocally rejected DOJ's position. *See, e.g.*, *Adams*, 2026 WL 2123871, at *5; *Warner*, 2026 WL 2018877, at *6; *United States v. Scanlan*, 2026 WL 1864054, at *7 (D.N.H. June 29, 2026), *appeal filed*, No. 26-1783 (1st Cir. July 7, 2026).

DOJ has given no reason to make this the first time to order such disclosure. Nothing in the text of Title III, especially when measured under the principles of conflict preemption, prohibits States from redacting sensitive voter information in compliance with state law when such data is not actually needed for DOJ's proffered investigative purpose. *See* 52 U.S.C. §§ 20701, 20703; *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir. 2024) (obstacle preemption applies only where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *see also Torrez*, 160 F.4th at 1082-83 & n.14 (holding that, while NVRA's disclosure provision preempts certain state-law disclosure restrictions, "the NVRA does not prohibit" states from "redact[ing] appropriate personal information").

This is unsurprising. Courts routinely order the redaction of private personal information from records produced when disclosure of that information is not

necessary. *See EEOC v. Univ. of Pa.*, 850 F.2d 969, 982 (3d Cir. 1988) (vacating order to release nonredacted records and holding redactions of identifying information in records sought by Title VII investigation may be justified); *EEOC v. Univ. of Notre Dame Du Lac*, 715 F.2d 331, 337 (7th Cir. 1983) (ordering redactions of identifying information); *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 103-04 (5th Cir. 1992) (inviting target of government document request to "seek the assistance of the courts when necessary to protect" confidential information).

## IV. DOJ'S INTERPRETATION OF TITLE III PRESENTS SIGNIFICANT FIRST AMENDMENT CONCERNS THAT MUST BE AVOIDED.

The Court should reject DOJ's interpretation of Title III for yet another reason: allowing DOJ to compel sensitive voter data for *any* purpose and without *any* factual basis to suspect a legal violation will undoubtedly chill voter participation and "raise[] doubts of constitutionality in view of the prohibition on the First Amendment," *Rumely*, 345 U.S. at 46 (courts should interpret statutes to "avoid[] a serious constitutional doubt").

### A. DOJ's Interpretation of Title III Presents Significant First Amendment Concerns.

Laws that compel the disclosure of private information violate the First Amendment when they "discourage[] participation" in the electoral process. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 200 (1999). For example, in *Buckley*, the Supreme Court held a Colorado law that compelled individuals

circulating ballot-initiative petitions to wear name badges violated the First Amendment because it "discourages participation in the petition circulation process." *Id.* Similarly, in *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993), the Fourth Circuit struck down a Virginia statute that compelled individuals registering to vote to publicly disclose their Social Security numbers because "the possibility of a profound invasion of privacy when exercising the fundamental right to vote" would deter voters, *id.* at 1354 (holding that by "condition[ing] the right to vote on . . . the public disclosure of a would-be voter's SSN," *id.* at 1352, Virginia statute "substantially burdened" the right to vote and made it "eminently reasonable" "not to provide [a] SSN" and thus not participate in the voting process, *id.* at 1354).[11] As a general matter, if there is "a reasonable probability that the compelled disclosure of personal information will subject [individuals] to threats, harassment, or reprisals from either Government officials or private parties," then "those resisting disclosure can prevail under the First Amendment." *John Doe No. 1 v. Reed*, 561 U.S. 186,

[11] The court in *Greidinger* noted in dicta that the statute might not burden the right to vote if Social Security numbers were disclosed to the Virginia state government. *See* 988 F.2d at 1354 n.10. But constitutionality depends on whether disclosure will discourage participation in elections, *Buckley*, 525 U.S. at 200, or otherwise significantly burden the right to vote, *Greidinger*, 988 F.2d at 1354. In *Greidinger*, the court had no reason to believe that Virginia would misuse voters' information. *See id.* at 1352-54. Here, by contrast, DOJ openly admits it seeks voters' data to federalize elections and prosecute purported voter fraud. OLC Memo 5; Mot. to Expedite 17-18. This prospect chills the right to vote in the same way the public disclosure of Social Security numbers did in *Greidinger*. *See infra* at 46-53.

200-01 (2010) (denying First Amendment challenge only because plaintiffs provided "scant evidence or argument" that disclosure would subject them to harm).

DOJ's interpretation of Title III presents the same First Amendment concerns as in *Buckley* and *Greidinger*. Functionally, if DOJ can issue a Title III demand without *any* factual basis and for *any* purpose, then it can use the statute to collect and investigate voters' sensitive data whenever, wherever, and for whatever purpose it pleases. The prospect of such unbounded disclosure would discourage participation in the voter registration process just as Colorado's name badge requirement "discourage[d] participation in the petition circulation process." *Buckley*, 525 U.S. at 200. Like Colorado's requirement, an unbounded Title III would put voters at risk of "harassment." *Id.* at 198. An administration could share compelled voter data with state and local partners to facilitate targeted voter roll purges, signature-match challenges, or eligibility investigations. Or it could use the data to initiate an IRS audit of swing-state voters registered with the opposition party. Unscrupulous officials could dox voters or facilitate identity theft. Even if the Government ultimately refrained from abusing its authority, the threat would persist. DOJ's interpretation of Title III thus "stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used." *United States v. Weber*, 816 F. Supp. 3d



Appellate Case: 26-2679 Page: 58 Date Filed: 09/17/2026 Entry ID: 5685100

1168, 1176 (C.D. Cal. 2026) (warning of the electoral chilling effect of DOJ's voter roll demands in California).

This chilling effect is not speculative. Minnesota voters have every reason to fear that DOJ will weaponize their sensitive data against them, particularly those in vulnerable minority communities already being targeted in other ways. DOJ itself telegraphed this intent when it asked OLC whether it could use voters' sensitive information "for the purpose of investigating *voter fraud*," OLC Memo 6 (emphasis added), a familiar refrain the Administration deploys when targeting political adversaries, *see, e.g.*, *Addressing Risks from Chris Krebs and Government Censorship*, The White House (Apr. 9, 2025)[12] (instructing the Attorney General to investigate former head of the Cybersecurity and Infrastructure Security Agency for "inappropriately . . . dismissing" purported reports of "widespread election malfeasance and serious vulnerabilities with voting machines"); Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026)[13] (FBI agents sought interviews with Milwaukee election officials to find evidence of voter fraud). The premise of that justification is demonstrably false: voter fraud in American elections is vanishingly rare. *See, e.g.*,

[12] https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship.

[13] https://www.cnn.com/2026/05/28/politics/inside-justice-department-2020-election-fraud.



Appellate Case: 26-2679 Page: 59 Date Filed: 09/17/2026 Entry ID: 5685100

Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024).[14] Yet the Administration has persistently and falsely claimed otherwise, and threatened to prosecute purported perpetrators. *See, e.g.*, Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026)[15] (describing President Trump's "often repeated—and equally often debunked—claims of widespread election fraud").

Continuing "voter fraud" investigations of non-crimes necessarily target non-criminals—voters who cast *lawful* ballots. This is yet another reason why DOJ's interpretation presents constitutional concerns. *See Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) ("investigations premised solely upon legal activity are the very type of 'fishing' expeditions" the Supreme Court has found unconstitutional). And such investigations chill political and expressive rights. Voters may reasonably fear that DOJ will use Title III to cross-reference their sensitive voter data with other federal databases and race to prosecute, all in furtherance of DOJ's pretextual purpose of "investigating voter fraud." OLC Memo 5-6. That fear is especially potent given that minority communities historically favor the Democratic Party, and voter-registration and primary-voting records would

---

[14] https://www.npr.org/2024/10/11/nx-s1-5147732/voter-fraud-explainer.

[15] https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html.



Appellate Case: 26-2679 Page: 60 Date Filed: 09/17/2026 Entry ID: 5685100

reveal these voters' preferences. Against this backdrop, voters have good reason to fear that granting federal agencies unfettered access to sensitive voter data could enable the Administration to identify them as perceived political opponents and direct investigations against them. That prospect chills the exercise of the franchise.

Just as chilling is DOJ's promise to use voters' sensitive information to "identify illegal aliens" and "refer [them] for prosecution," *id.* at 5, a threat that affects more than just the undocumented. The Administration's supposedly revamped tool for identifying noncitizens—the SAVE database—consistently misidentifies U.S. citizens as noncitizens. *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026);[16] *see also* Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025).[17] These flaws are built into the system itself, which was never intended for widescale immigration enforcement. Indeed, as a 2018 report by the U.S. Commission on Civil Rights noted, "SAVE is not a comprehensive list of U.S. Citizens," "[i]t is not updated to include all naturalized citizens, and it does not include derivative citizens born to U.S. parents outside the

---

[16] https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion.

[17] https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters.

country." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 148 (2018);[18] *see also N.C. State Bd. of Elections*, 996 F.3d at 261 (describing a North Carolina report finding that "SAVE information had a high rate of inaccuracy").

An unbounded Title III would thus force individuals to weigh the risk that registering to vote—and thereby disclosing sensitive information to the federal government, not just to state election authorities—will trigger immigration enforcement, which DOJ has now openly admitted is a purpose for which it is using voter data.[19] OLC Memo 5. It would also force individuals to weigh the risk of investigation for other possible violations of law, or the investigation of their closest relations and associations. Indeed, naturalized citizens and relatives of recent immigrants may not register to vote for fear that DOJ will share their home address and other personal information with DHS for use in immigration raids targeting their relatives and close associates. In other words, voters would face the same poisoned choice the Fourth Circuit condemned in *Greidinger*: register to vote and risk "misuse" of your sensitive information, or abandon the right to vote entirely. 988

[18] https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1.

[19] This is a particularly potent risk for recently naturalized citizens, who will not appear as citizens in the SAVE database that DHS and DOJ use to determine whether to initiate an immigration enforcement action. *See supra* at 49-50.

F.2d at 1352–55. Forcing voters to make that choice would "discourage[] participation" in the electoral process and violate the First Amendment. *Buckley*, 525 U.S. at 200.

DOJ's attempt to use Title III to seize Minnesota voters' sensitive information has already provoked alarm among leaders of local and national civil rights organizations, who warn that the prospect of Government misuse of their members' information alone is enough to chill civic participation. *See, e.g.*, App. 25; R. Doc. 134-3, at 2-5; App. 25; R. Doc. 134-4, at 2-3. That chilling effect is especially potent for NAACP members and voters of color in the State. *See* Br. of Amicus Curiae the United Black Agenda at 18–22, *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026), ECF No. 78. These communities have long been targeted by government officials hostile to their mission and advocacy efforts. *Id.*; App. 25; R. Doc. 134-3, at 3. In light of that history, NAACP's members have concrete and legitimate reason to fear that DOJ would wield an unconstrained Title III as a tool for retaliation—especially toward members who hold political views and engage in civic activities the current Administration disfavors, *see, e.g.*, Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, U.S. Dep't of Just.

(Apr. 21, 2026);[20] *see also supra* at 47-50. Some, no doubt, would vote anyway. But others, understandably, would stay home.

That HAVA already requires voters to disclose sensitive information to States is not reason to disregard the chilling effect described above. DOJ Br. 52. That Congress, in enacting HAVA, authorized *States* to receive sensitive voter data as part of the voter registration process, *see* 52 U.S.C. § 21083(a)(5)(B)(i), says nothing about whether Title III—an entirely different statute—authorizes the *federal government* to compel sensitive information for any purpose it pleases. Nor is there any reason to treat the two disclosures the same. HAVA only requires partial Social Security numbers on state voter registration forms so that state election officials can "verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B)(i). There is no evidence Minnesota shares that information with law enforcement, and thus no threat that providing it will "discourage[] participation" in the electoral process. *Buckley*, 525 U.S. at 200. DOJ, by contrast, has acknowledged openly that it seeks Minnesota voters' sensitive voter data "to remove those who are ineligible to vote from [Minnesota's voter] roll[]" and "refer [those individuals] for prosecution." OLC Memo 5; *accord* Mot. to Expedite

[20] https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and ("'The SPLC is manufacturing racism to justify its existence,' said Acting Attorney General Todd Blanche.").



Appellate Case: 26-2679 Page: 64 Date Filed: 09/17/2026 Entry ID: 5685100

at 17-18. And it has argued continuously in courts around the country that DOJ can compel voters' sensitive data for any purpose it wants, without limitation. *E.g.*, DOJ Br. 43-49. Allowing DOJ to compel sensitive voter information so that it may investigate voters' immigration and voting status poses a far greater burden on First Amendment rights than authorizing state election officials to collect that information as part of routine voter registration processes. *Contra* DOJ Br. 52.

### B. Constitutional Avoidance Principles Demand that the Court Avoid DOJ's Interpretation.

Because DOJ's interpretation of Title III would present serious questions as to its constitutionality in circumstances like this one, the Court must avoid it. *Union Pac. R.R.*, 738 F.3d at 892-93 ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."). Here, that means rejecting DOJ's interpretation of Title III and dismissing DOJ's complaint. *See Rumely*, 345 U.S. at 46 (construing statute authorizing investigation of "all lobbying activities" to reach only "representations made directly to the Congress" to avoid "doubts of constitutionality in view of . . . the First Amendment").

## CONCLUSION

For the foregoing reasons, the Court should affirm.



Appellate Case: 26-2679 Page: 65 Date Filed: 09/17/2026 Entry ID: 5685100

Dated: September 11, 2026

Respectfully submitted,

*/s/ Anton Metlitsky*

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
EDWARD G. CASPAR
ROBERT WEINER
LEAH FRAZIER
GILLIAN CASSELL-STIGA
CATHERINE MEZA
SAMANTHA HEYWARD
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

O'MELVENY & MYERS LLP
ANTON METLITSKY
ANDREW FRACKMAN
REEMA SHAH
1301 Ave. of the Americas, Ste. 1700
New York, NY 10018
Tel: (212) 326-2000

NOAH BOKAT-LINDELL
1625 Eye Street NW, 10th Floor
Washington, DC 20006
Tel: (202) 383-5300

DANIEL METEER
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Tel: (310) 553-6700

*Counsel for Appellees-Intervenors National Association for the Advancement of Colored People and Cynthia Wilson*

## CERTIFICATE OF COMPLIANCE

1. This corrected brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,727 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This corrected brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3. This corrected brief is being electronically filed in PDF format pursuant to Eighth Cir. R. 28A(h), and the brief and addendum have been scanned for viruses and are virus-free.

Dated: September 15, 2026

*/s/ Anton Metlitsky*
Anton Metlitsky



Appellate Case: 26-2679 Page: 67 Date Filed: 09/17/2026 Entry ID: 5685100

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 15th day of September, 2026, the foregoing corrected brief was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system. Paper copies of the foregoing will be filed with the Clerk in accordance with the Local Rules.

Dated: September 15, 2026

*/s/ Anton Metlitsky*
Anton Metlitsky